FILED

2008 May-06 PM 06:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

1          GIRARD H. TURNER

2          INSTRUCTIONS TO THE WITNESS

3

4               Please read your deposition over

5     carefully before you sign it.  You should

6     make all your changes on the attached

7     errata sheet.

8               After making any changes which you

9     have noted on the attached errata sheet,

10    sign your name on the Deponent's

11    Certificate and date it.  You are signing

12    it subject to the changes you have made on

13    the errata sheet, which will be attached to

14    the deposition.

15               Return the attached errata sheet

16    and Deponent's Certificate to American

17    Court Reporting Service, Read & Sign

18    Department, P. O. Box 12765, Birmingham,

19    Alabama 35202.

20               According to the rules of Civil

21    Procedure, you will have thirty (30) days

22    from the date you receive this deposition

23    in which to read it, sign it, and return

EXHIBIT

tabbies

Page 2

1   the errata sheet and Deponent's Certificate
2   to the above office. If you fail to do so,
3   you automatically waive your right to make
4   any corrections to your deposition.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1               DEPONENT'S CERTIFICATE
2
3        I, GIRARD H. TURNER, the witness
4   herein, have read the transcript of my
5   testimony and the same is true and correct,
6   to the best of my knowledge.  Any
7   corrections and or additions, if any, are
8   listed separately.
9
10
11   _____
12               WITNESS
13
14   _____
15               DATE
16
17        Sworn to and subscribed before me,
18   this the ____ day of _____, 2007, to
19   certify my hand and seal of office.
20
21   _____
22               NOTARY PUBLIC
23

Page 3

1               ERRATA SHEET
2
3   PAGE      LINE      EXPLANATION
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____

Page 5

1        IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ALABAMA
3                 EASTERN DIVISION
4
5   CIVIL ACTION NUMBER:
6   CV-06-BE-1486-E
7
8   PATRICIA ANNE COTTON,
9        Plaintiff(s),
10   vs.
11   ALT, INC., WESTOWER COMMUNICATIONS,
12   INC., CINGULAR WIRELESS, LLC, et al.,
13        Defendants(s).
14
15
16            DEPOSITION TESTIMONY OF:
17                GIRARD H. TURNER
18
19   AUGUST 23, 2007
20   9:13 A.M.
21
22   COURT REPORTER:
23   Timothy R. Lovelady, CSR, CLR, CMRS

Page 6

STIPULATIONS

1    IT IS STIPULATED AND AGREED by and
2    between the parties through their
3    respective counsel that the deposition of
4    GIRARD H. TURNER may be taken before
5    Timothy R. Lovelady, CSR, CLR, CMRS, and
6    Notary Public for the State of Alabama at
7    Large, at the offices of Wiggins, Childs,
8    Quinn & Pantazis, The Kress Building, 301
9    19th Street North, Birmingham, Alabama
10   35203 on the 23rd day of August, 2007,
11   commencing at approximately 9:13 a.m.
12       IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the witness is
15   not waived, the deposition to have the same
16   force and effect as if full compliance had
17   been had with all laws and rules of Court
18   relating to the taking of depositions.
19       IT IS FURTHER STIPULATED AND
20   AGREED that it shall not be necessary for
21   any objections to be made by counsel as to
22   any questions except as to form or leading

Page 7

1    questions, and that counsel for the parties
2    may make objections and assign grounds at
3    the time of trial, or at the time said
4    deposition is offered in evidence, or prior
5    thereto.
6        In accordance with Rule 5(d) of
7    The Alabama Rules of Civil Procedure, as
8    amended, effective May 15, 1988, I, Timothy
9    R. Lovelady, am hereby delivering to J.
10   MITCHELL FROST, JR., the original
11   transcript of the oral testimony taken on
12   the 23rd day of August, 2007, along with
13   exhibits.
14       Please be advised that this is the
15   same and not retained by the Court
16   Reporter, nor filed with the Court.

Page 8

APPEARANCES

FOR THE PLAINTIFF(S):
     Joseph L. Dean, Jr., Esq.
     DEAN & BARRETT
     457 South 10th Street
     Opelika, Alabama 36803

     Edward M. Johnson, Esq.
     WIGGINS, CHILDS, QUINN & PANTAZIS
     The Kress Building
     301 19th Street North
     Birmingham, Alabama 35203

     Clay Thomason, Esq.
     THOMASON, MAPLES & ALLSUP
     1710 2nd Avenue North
     Bessemer, Alabama 35021

Page 9

FOR THE DEFENDANT(S):
     J. Mitchell Frost, Jr.
     FERGUSON, FROST & DODSON
     2500 Acton Road
     Suite 200
     Birmingham, Alabama 35243

     M. Keith Gann, Esq.
     HUIE, FERNAMBUCQ & STEWART
     Three Protective Center
     Suite 200
     2801 Highway 280 South
     Birmingham, Alabama 35223

     Patrick R. Norris, Esq.
     McDANIEL, BAINS & NORRIS
     Two Metroplex Drive
     Suite 504
     Birmingham, Alabama 35209

3 (Pages 6 to 9)

Page 10

1   Leslie Hand, Esq.
2   SPAIN & GILLON
3   The Zinszer Building
4   2117 2nd Avenue North
5   Birmingham, Alabama 35203-3753
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 12

1   12 - CD                                      32
2   13 - CD                                      33
3   14 - CD                                      33
4   15 - CD                                      34
5   16 - Safety Manual                           36
6   17 - Composite                               38
7   18 - Composite                               42
8   19 - Photographs                             45
9   20 - Response to Request for
10      Production                               53
11  21 - Tower Climbing Safety & Rescue      57
12  22 - OSHA Public Law 91-596             57
13  23 - Safety Training Video               62
14  24 - College Physics                     69
15  25 - Letters                             71
16  26 - ANSI Safety Requirements for
17      Industrial Head Protection           72
18  27 - ANSI Protective Headwear for
19      Industrial Workers - Requirements   72
20  28 - Expert Witness Report               76
21  29 - Product label                       77
22  30 - Indexes of Depositions              81
23  31 - Case File Activity Diary            82

Page 11

1           I N D E X
2
3   EXAMINATION BY:              PAGE NO.
4   Mr. Frost                   15
5   Mr. Gann                    207
6   Mr. Norris                  264
7   Mr. Gann                    313
8   Mr. Frost                   339
9   Mr. Gann                    340
10
11          INDEX OF EXHIBITS
12  DEFENDANT'S EXHIBITS:
13  1 - Deposition Notice           16
14  2 - Resume packet               18
15  3 - Job description             19
16  4 - Training Conducted          20
17  5 - Civil Action List       20
18  6 - CD                      27
19  7 - CD                      27
20  8 - CD                      28
21  9 - CD                      29
22  10 - CD                     30
23  11 - CD                     31

Page 13

1   32 - Cash Register Receipt           82
2   33 - Invoice and Fed Ex statement      83
3   34 - Excerpt from book               86
4   35 - Handwritten notes               88
5   36 - Sling                       162
6   37 - Product Label               179
7   38 - Safety Banner               191
8   39 - Girard Turner brochure          308
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 14

1    I, Timothy R. Lovelady, CSR, CLR,
2  CMRS, of Birmingham, Alabama, and Notary
3  Public for the State of Alabama at Large,
4  acting as Commissioner, certify that on
5  this date as provided by Rule 30 of the
6  Alabama Rules of Civil Procedure, and the
7  foregoing stipulations of counsel, there
8  came before me at the offices of Wiggins,
9  Childs, Quinn & Pantazis, The Kress
10  Building, 301 19th Street North,
11  Birmingham, Alabama 35203, on the 23rd day
12  of August, 2007, commencing at or about
13  9:13 a.m., GIRARD H. TURNER, witness in the
14  above cause, for oral examination,
15  whereupon, the following proceedings were
16  had:
17
18          GIRARD H. TUNER,
19  having been first duly sworn, was examined
20  and testified as follows:
21
22          COURT REPORTER: Would you like
23  to read and sign your deposition?

Page 15

1          THE WITNESS: Yes, sir.
2          THE COURT REPORTER: Other than
3  that, usual stipulations?
4          MR. JOHNSON: Other than that,
5  that's fine.
6  EXAMINATION BY MR. FROST:
7    Q.  Mr. Turner, my name is Mitch
8  Frost. I was introduced to you just a few
9  minutes ago.
10    A.  Yes, sir.
11    Q.  I understand you're here to
12  offer some expert testimony in this case;
13  is that correct?
14    A.  That's correct.
15    Q.  What is your full name, sir?
16    A.  Girard H. Turner.
17    Q.  And where do you live?
18    A.  1204 West Lynches,
19  L-y-n-c-h-e-s, River Road, Lamar, South
20  Carolina 29069.
21    Q.  How long have you lived at that
22  address?
23    A.  Approximately five years.

Page 16

1    Q.  We're going to do some
2  preliminary matters until two other lawyers
3  get here. I assume you have seen this
4  notice to take your deposition?
5    A.  Yes, sir.
6    Q.  All right. Let me mark it as
7  Exhibit 1 to your deposition.
8          (WHEREUPON, a document was
9  marked as Defendant's Exhibit Number 1 and
10  is attached to the original transcript.)
11    Q.  In the deposition notice, we
12  requested that you bring a variety of
13  documents and things to your deposition.
14  Have you read that list?
15    A.  Yes, sir.
16    Q.  Is that a "yes"?
17    A.  Yes, sir.
18    Q.  All right. And have you brought
19  some documents and things with you?
20    A.  I have.
21    Q.  All right. Why don't we start
22  with number one. It says a copy of your
23  resume and your licenses.

Page 17

1    A.  I will produce to you the entire
2  CV packet, which includes my resume.
3    Q.  You're saying this is what you
4  called a CV packet?
5    A.  Yes, sir.
6    Q.  Okay. And this is your resume;
7  is that right?
8    A.  That is correct.
9    Q.  Okay. And then these are copies
10  of your current licenses; is that right?
11    A.  That is correct. Now, I will
12  explain one thing to you. On a lot of the
13  licenses may be expired dates. I do
14  maintain them all current. But if I were
15  to -- I'd be changing that page every other
16  day or two almost, I'm always getting
17  something in the mail saying I need to
18  renew it, recertify, this, that and the
19  other. The only one that is not current is
20  the one with the Texas worker's comp, and
21  I've let it expire and I do not intend to
22  renew it.
23    Q.  Okay. I was going to ask you

Page 18

1  that at some point in the deposition. When
2  I reviewed the initial information you had
3  sent to us, it appeared to me that all of
4  them had expired. So what you're telling
5  me is you've maintained all of them except
6  your Texas workmen's comp?
7      A. That is correct.
8      Q. Even though these show them to
9  be expired, they're actually current?
10     A. That is correct. And I've
11 probably got a lot of the documentation in
12 my wallet to verify it.
13     Q. All right. And what is this
14 that you've got in your resume packet?
15     A. That was a job description I had
16 when I was a compliance officer with the --
17 a safety engineer with the U.S. Department
18 of Labor, commonly known as OSHA, OSHA.
19     Q. All right. I'm going to mark
20 collectively as Exhibit 2, which you have
21 identified as your resume packet, we'll
22 keep that together.
23         (WHEREUPON, a document was

Page 19

1  marked as Defendant's Exhibit Number 2 and
2  is attached to the original transcript.)
3      Q. And then I'm going to mark as
4  Exhibit 3 within your resume packet this
5  document here. And if you will, explain to
6  me again what Exhibit 3 is.
7         (WHEREUPON, a document was
8  marked as Defendant's Exhibit Number 3 and
9  is attached to the original transcript.)
10     A. It was a job description of my
11 job as a safety engineer when I was
12 employed with the U.S. Department of Labor,
13 commonly known as Occupational Safety and
14 Health Administration, OSHA, or OSHA.
15     Q. All right. And what is this
16 document?
17     A. That is a list of everything
18 that I have done since I have left OSHA,
19 whether it be training that I have
20 conducted, audits that I have conducted or
21 civil cases that I have been involved with
22 in which I have given sworn testimony,
23 whether it be at deposition or at trial.

Page 20

1         (Off-the-record discussion.)
2      Q. Are these additional copies for
3  everybody else?
4      A. Right.
5         MR. JOHNSON: Yeah.
6         (WHEREUPON, a document was
7  marked as Defendant's Exhibit Number 4 and
8  is attached to the original transcript.)
9      Q. All right. You were describing
10 to me what these individual exhibits within
11 your resume packet are, and I have
12 separated one of them. You had a document
13 entitled "Training Conducted" and a
14 document entitled "Civil Action List". You
15 had them combined. I have separated them,
16 okay?
17         (WHEREUPON, a document was
18 marked as Defendant's Exhibit Number 5 and
19 is attached to the original transcript.)
20     A. That's fine with me.
21     Q. And I have tabbed Training
22 Conducted as Exhibit 4 and Civil Action
23 List as Exhibit 5. Can you tell me then

Page 21

1  what Exhibit 4 is?
2      A. That is training that I have
3  conducted in industry or associations since
4  I have left the Department of Labor.
5      Q. All right. And then what is
6  Exhibit 5 then?
7      A. That is a list of civil cases
8  that I have been involved with, whether it
9  be at deposition or at trial, since I have
10 left the Department of Labor.
11     Q. Do you have a list of cases in
12 which you did give a deposition?
13     A. They're included in that list.
14     Q. I had looked at this list and I
15 don't see any designation on here as to
16 whether a deposition was given or not. Are
17 you telling me that you can tell me which
18 ones you did give a deposition in?
19     A. There's a deposition in all of
20 them, but all of them did not go to trial.
21 The ones that I actually went to trial, I
22 tried to designate that it did, in fact, go
23 to trial. Let me see if I can give you an

Page 22

1  example, that on the first page on the
2  Keith versus MVT Services, at the bottom of
3  the page you will notice that I've got the
4  date and the trial right beside the date.
5      Q.  All right.  So where you have
6  the word "trial" written on that Keith
7  versus MVT, that indicates you actually
8  testified at trial?
9      A.  That's correct.
10     Q.  But then wherever there's that
11  designation that says "trial", you would
12  have testified at trial; is that right?
13     A.  That's correct.
14     Q.  Then all the other ones that are
15  listed, you've actually given depositions
16  in?
17     A.  Well, I actually gave a
18  deposition in the Keith versus MVT before
19  trial, before trial.
20     Q.  All right.  Well, what I'm
21  trying to get at is there's multiple pages
22  here of cases you've been involved in.  I'm
23  trying to find out did you give a

Page 23

1  deposition in every one of these that's
2  listed on Exhibit 5?
3      A.  As far as I recall, yes, sir.
4      Q.  Is that everything that you
5  would consider responsive to number one on
6  the request?
7      A.  Yes, sir.
8      Q.  Okay.  All right.  Number two,
9  we asked for any photographs, video tapes,
10  charts, diagrams, drawings, electronic or
11  computer-generated data, or other
12  documentary evidence by whatever nature or
13  designation known that you have reviewed,
14  considered, compiled or prepared in regard
15  with regard to your evaluations,
16  inspections or opinions.  Do you have any
17  of that information here today?
18         MR. JOHNSON:  Where's your
19  notice?  You may want to read along with
20  him.
21         THE WITNESS:  You've got my
22  notice.
23         MR. JOHNSON:  I've got your copy

Page 24

1  of it, but he's got -- well, here, use
2  mine.  Sorry.  And he's reading from number
3  two.
4      A.  Yes, sir.  It's on the credenza
5  at the end of the room.
6      Q.  Do you mind getting it all so we
7  can just look at what it?
8         MR. JOHNSON:  Well, I'll get it
9  for him.  Where do you want it, Mitch?
10        MR. FROST:  I guess we can just
11  set it next to him and he can take it out
12  and show us.
13     Q.  (By Mr. Frost:)  Mr. Turner, I'm
14  not going to mark all of -- the majority of
15  this is exhibits.  You can just tell me
16  what it is and then you can set it aside
17  and we can just have an understanding of
18  what all it is you have looked at.
19     A.  Okay.  What is on top and what's
20  probably the most handy and probably the
21  best way to handle it, unless you've got
22  other suggestions, is a deposition of
23  Robert Marcus Camp.

Page 25

1      Q.  All right.  Did you read the
2  entire deposition of Mr. Camp?
3      A.  Yes, sir.
4      Q.  All right.
5      A.  The deposition of Mr. Adam
6  Waterman.
7      Q.  Did you read that entire
8  deposition?
9      A.  I did.  The deposition of Joshua
10  Cook.
11     Q.  Did you read that entire
12  deposition?
13     A.  I did.  The deposition
14  transcript of Mr. Drollinger, Dustin
15  Drollinger.
16     Q.  Yes, sir.  Did you read that
17  entire deposition?
18     A.  I did.  The deposition of Mr.
19  Eric Davis.
20     Q.  And did you read that entire
21  deposition?
22     A.  I did.  And the deposition of
23  Jeff Silva.

Page 26

1 Q. Did you read that entire
2 deposition?
3 A. I did. The deposition of Jason
4 Cook.
5 Q. Did you read that entire
6 deposition?
7 A. I did. The deposition of
8 Nathaniel Ross.
9 Q. Did you read that entire
10 deposition?
11 A. I did. The deposition of
12 Charles Randall Wheeler.
13 Q. Did you read that entire
14 deposition?
15 A. I did. The deposition of
16 Matthew Deadmond.
17 Q. Did you read that entire
18 deposition?
19 A. I did. I also reviewed a group
20 of CDs that had been provided by counsel,
21 and I present those to you.
22 Q. Are these all photographs?
23 A. Not all of them, no, sir.

Page 27

1 Q. All right. Well, what is this
2 one?
3 A. Those were photographs.
4 Q. All right. Let me mark as
5 Exhibit 6, it appears to be a CD. It's
6 labeled "Cotton, taken by Clay at Frost's
7 office 2-2-07, Rope pics." Is that your
8 understanding what that is labeled?
9 (WHEREUPON, a document was
10 marked as Defendant's Exhibit Number 6 and
11 is attached to the original transcript.)
12 A. That's correct.
13 Q. Okay. Did you print any
14 photographs off from this CD?
15 A. No, sir.
16 Q. Let me show you Defendant's
17 Exhibit 7. And this says "Cotton versus
18 Beta, produced by WesTower." Can you tell
19 me what that is?
20 (WHEREUPON, a document was
21 marked as Defendant's Exhibit Number 7 and
22 is attached to the original transcript.)
23 A. I don't recall at the moment.

Page 28

1 Q. All right. Let me show you
2 Defendant's Exhibit 8. This says "Cotton
3 photos and maps, 2-28-2007." Do you know
4 what that is?
5 (WHEREUPON, a document was
6 marked as Defendant's Exhibit Number 8 and
7 is attached to the original transcript.)
8 A. The photos is what I recall.
9 Q. Do you know what the maps are?
10 A. I don't recall it.
11 Q. Have you ever looked at any
12 maps?
13 A. Seems like I did, but I don't
14 recall it.
15 Q. Did you print any maps off of
16 Exhibit 8?
17 A. No, sir.
18 MR. FROST: Do y'all have a way
19 to look at these during this deposition?
20 MR. JOHNSON: I can get a laptop
21 down here if you want to look at them.
22 Would that be all right?
23 MR. FROST: Yeah. This is just

Page 29

1 so fancy I thought I'd push a button and
2 something would come out of the ceiling or
3 out of the walls.
4 MR. JOHNSON: I wish. Do you
5 need to look at them right now?
6 MR. FROST: No, that's fine.
7 MR. JOHNSON: Good.
8 Q. Let me show you Defendant's
9 Exhibit 9. It says "Training Forms." It
10 looks like it says "CD #1." Have you
11 looked at that?
12 (WHEREUPON, a document was
13 marked as Defendant's Exhibit Number 9 and
14 is attached to the original transcript.)
15 A. I've looked at it. Seems like
16 it was some forms that was used in a
17 training program.
18 Q. Do you know what kind of forms?
19 A. I don't recall.
20 Q. Did they play a part in any way
21 in your opinions you're going to offer
22 today?
23 A. No, sir.

Page 30

1    Q.  All right.  Let me show you
2  Defendant's Exhibit 10.  It says "Training
3  Presentation, CD #2."  Did you look at
4  this?
5         (WHEREUPON, a document was
6  marked as Defendant's Exhibit Number 10 and
7  is attached to the original transcript.)
8    A.  I did.
9    Q.  Do you remember anything about
10 it?
11   A.  I think it was something to do
12 with the Train Com presentations that were
13 made on the training for the tower
14 climbing.
15   Q.  Does that play any part in your
16 opinions you're offering today?
17   A.  Not really.
18   Q.  Well, explain "not really" to
19 me.  Does it play a part in any way in your
20 opinions you're offering today?
21   A.  It only tells me -- or what the
22 training program consisted of, and I do not
23 have any criticism of it.

Page 31

1    Q.  All right.  Let me show you
2  Defendant's Exhibit Number 11.  And this CD
3  is labeled American Business Review
4  'Accidents'."  Do you know what that's
5  about?
6         (WHEREUPON, a document was
7  marked as Defendant's Exhibit Number 11 and
8  is attached to the original transcript.)
9    A.  I don't recall it.
10   Q.  All right.  Now, it says at the
11 bottom CD 3 & 4.  We've got a 1, a 2.  Was
12 this combined or --
13        MR. JOHNSON:  I don't know.
14        MR. THOMASON:  Mitch, what I
15 think the numbers refer to is the way that
16 they were produced by ALT, to us from ALT,
17 either first or second supplemental
18 discovery responses.  There were five
19 discs.
20        MR. FROST:  Oh, and y'all just
21 put them on the CDs?
22        MR. JOHNSON:  Well, I think we
23 took the CDs that were given to us and just

Page 32

1  copied them and then sent them on to Mr.
2  Turner.
3         MR. FROST:  Oh, okay.
4         MR. JOHNSON:  I think that's the
5  mode of production.
6    Q.  (By Mr. Frost:)  But, Mr.
7  Turner, you don't recall what's on
8  Defendant's Exhibit 11?
9    A.  Not really.
10   Q.  Do you know whether it played a
11 part in the opinions you're going to offer
12 today?
13   A.  Apparently not.
14   Q.  All right.  Now, Defendant's
15 Exhibit 12 says "CD #5", and it's entitled
16 "Tower Safety".  Do you know what is on
17 this CD?
18        (WHEREUPON, a document was
19 marked as Defendant's Exhibit Number 12 and
20 is attached to the original transcript.)
21   A.  That was, here again, going back
22 to the training that was provided on that
23 job site, which I don't really have any

Page 33

1  criticism of.
2    Q.  All right.  Let me show you what
3  I've marked as Defendant's Exhibit 13, and
4  it's entitled "Monopole, CD #6".  Do you
5  know what's contained on that CD?
6         (WHEREUPON, a document was
7  marked as Defendant's Exhibit Number 13 and
8  is attached to the original transcript.)
9    A.  If I recall correctly, it was
10 some documentation of photographs that was
11 really two fenced-in areas on that job
12 site.  One was a monopole and the other one
13 was the subject tower in which the antenna
14 was being replaced.
15   Q.  Does Exhibit 13 play any part in
16 the opinions you're going to offer today?
17   A.  I would say no.
18   Q.  Let me show you Defendant's
19 Exhibit 14.  It's entitled "DBI Trailer, CD
20 #7".  Do you know what's on that CD?
21        (WHEREUPON, a document was
22 marked as Defendant's Exhibit Number 14 and
23 is attached to the original transcript.)

Page 34

1  A.  I don't recall.
2  Q.  So I assume, then, that it does
3  not play a part in your opinions as well?
4  A.  Apparently not.
5  Q.  And let me show you Defendant's
6  Exhibit 15. It is entitled "Cotton,
7  Produced by ALT, ALT Photos." Do you know
8  what's on this CD?
9  (WHEREUPON, a document was
10  marked as Defendant's Exhibit Number 15 and
11  is attached to the original transcript.)
12  A.  I remember a bunch of pictures.
13  Other than that, that's about all I can
14  tell you.
15  Q.  Okay. Have you selected any
16  particular photograph that you deem
17  important or which you're going to use in
18  offering your opinions today?
19  A.  Not that I recall.
20  Q.  All right. What else do you
21  have with you?
22  A.  A copy of the ALT safety manual.
23  Q.  All right. Is there anything in

Page 35

1  the ALT safety manual that you considered
2  or relied upon in offering your opinions
3  today?
4  A.  On page 17 of that document,
5  it's got a section that addresses synthetic
6  rope, and it's only two items. In item two
7  I would like to read into the record. "Use
8  the proper rope for the job. Rope used in
9  rigging and for lifelines must be of higher
10  quality and higher mechanical properties
11  than that used for material tie downs and
12  short lines."
13  Q.  Does that play a part in your
14  opinions you're offering today?
15  A.  Yes, sir.
16  Q.  In what way?
17  A.  In the fact that the ALT knew
18  that there's a difference in ropes and the
19  quality of ropes. And the rope that was
20  the subject in this case did not meet the
21  criteria of higher quality.
22  Q.  Are you going to offer an
23  opinion here today that the rope being used

Page 36

1  as a short line lowering the antenna and
2  which ultimately broke was not an
3  appropriate rope to be used for that
4  purpose?
5  A.  Absolutely.
6  Q.  I just asked that because I did
7  not see that on your designation. All
8  right. Well, let me mark that as an
9  exhibit then since that is part of your
10  opinions. I'll make that Exhibit 16.
11  (WHEREUPON, a document was
12  marked as Defendant's Exhibit Number 16 and
13  is attached to the original transcript.)
14  Q.  What else do we have, sir? And
15  was that the only thing within the manual
16  that you are relying upon with regard to
17  your opinions?
18  A.  The best that I recall, yes,
19  sir.
20  Q.  All right.
21  A.  This is a document, or a group
22  of papers or whatever, that appears to me
23  is the BetaCom/OSHA report. An OSHA

Page 37

1  citation is included in it.
2  Q.  All right. Is there anything
3  within that group of documents that you
4  relied upon in any way in offering your
5  opinions?
6  A.  Yes, sir.
7  Q.  And can you tell me what that
8  is?
9  A.  The OSHA citation itself where
10  OSHA had cited BetaCom is a serious item of
11  the 100(a): "Employees were not protected
12  by protective helmets while working in
13  areas where possible danger of head injury
14  from impact, or from falling or flying
15  objects, or from electrical shock and
16  burns."
17  And on March the 10th of 2006,
18  employees were working where overhead
19  hazards were present, were not wearing head
20  protection resulting in a proposed penalty
21  of forty-nine hundred dollars.
22  Q.  Okay. Now, you disagree with
23  that citation, don't you?

10 (Pages 34 to 37)

Page 38

1  A. That, I do.
2  Q. Okay. All right. Let me mark
3  this group of documents collectively as
4  Exhibit 17 to your deposition.
5      (WHEREUPON, a document was
6  marked as Defendant's Exhibit Number 17 and
7  is attached to the original transcript.)
8  Q. What else do you have, sir?
9  A. A copy of the Handbook for
10 Riggers, which I have an actual copy in my
11 library at home of the printed matter that
12 was produced by the publisher. And that is
13 only a photocopy of one of those. But that
14 was provided to me by counsel, but I really
15 didn't need it, I had a copy already.
16 Q. All right. And is there
17 anything about the Handbook for Riggers
18 that you've relied upon in offering your
19 opinions?
20 A. Only the fact it was the
21 renowned recognized standard of the
22 industry that I've never heard any
23 criticism on about changing slings and

Page 39

1  fiber ropes and et cetera, whatever you
2  would use in the rigging, whether it be for
3  a crane or whatever for lifting purposes.
4  Q. Well, is there anything actually
5  in the Handbook for Riggers that you will
6  cite to in offering your opinions?
7  A. Not that I recall.
8  Q. All right.
9  A. But it does, in fact, address
10 synthetic roping in that book.
11 Q. All right. What do we have
12 next, sir?
13 A. I think this is the plaintiffs
14 exhibits on Silva, the deposition. And it
15 includes some of the things that we've
16 already talked about.
17 Q. All right. Did you review all
18 those exhibits?
19 A. I did.
20 Q. Is there anything in those
21 exhibits, other than what we've already
22 talked about, that you would be relying
23 upon in offering your opinions?

Page 40

1  A. Included in here I notice a copy
2  of the OSHA citation for ALT, which I have
3  under a separate cover. So it's almost
4  duplicating some of the other things that
5  we will address otherwise.
6  Q. Sure. Okay. Well, let's go
7  through the other things then and then we
8  can come back to that if there's anything
9  in addition to it.
10 A. Here is a copy of the OSHA
11 citation to ALT, including a copy of the --
12 well, it's a copy of the OSHA report, which
13 includes a copy of the actual citation to
14 ALT. It's a serious condition, Citation 1,
15 Item 1, a violation of 29 CFR
16 1926.251(a)(1). "Rigging equipment for
17 material handling was not inspected prior
18 to use on each shift and as necessary
19 during its use to ensure that it was safe.
20 Defective rigging equipment was not removed
21 from service. On or about March the 10th
22 of 2006, the rope was not inspected, nor
23 was the defective rope removed from

Page 41

1  service, resulting in a proposed penalty by
2  OSHA for twenty-eight hundred dollars."
3  Q. All right. Was that the initial
4  citation issued by OSHA?
5  A. Yes, sir.
6  Q. Do you know what the resulting
7  citation was?
8  A. It's my -- from what I recall,
9  the resulting citation was the same, the
10 penalty was only reduced.
11 Q. Is that what you recall?
12 A. That's what I recall.
13 Q. Do you know if the settlement
14 citation is in that group of documents you
15 have?
16 A. That was the amended citation, I
17 think, because there originally was quoted
18 -- I'm sorry. Let me back up.
19    In the informal settlement
20 agreement, it was amended to read "Rigging
21 equipment for material handling shall be
22 inspected prior to use on each shift and as
23 necessary during its use to ensure that it

Page 42

1 was safe to use. Defective rigging shall
2 be removed from service on or about March
3 the 10th of 2006."
4 Q. In fact, the amended citation
5 does not say that it was not inspected; is
6 that correct?
7 A. It indicates to me that there is
8 a violation, and they only put the date.
9 They did not go into the other verbiage.
10 Q. Yes, sir. All right. And I
11 assume that that OSHA citation for ALT, you
12 did consider in offering your opinions?
13 A. Yes, sir.
14 Q. All right. Let me mark that
15 then. That is Exhibit 18.
16 (WHEREUPON, a document was
17 marked as Defendant's Exhibit Number 18 and
18 is attached to the original transcript.)
19 Q. What's next, please, sir?
20 A. A group of exhibits to the
21 Waterman deposition that also include some
22 photographs, some of the same material
23 we've talked about as far as the rigging

Page 43

1 handbook and some tests I think he took
2 when he --
3 Q. Is there anything, in
4 particular, in this set of exhibits to Mr.
5 Waterman's deposition that you're relying
6 upon in offering your opinions that we've
7 not already talked about?
8 A. No, I don't think so.
9 Q. All right. A group of exhibits
10 from Mr. Cook's deposition, number one,
11 this is Josh Cook's deposition.
12 MR. JOHNSON: Yeah.
13 Q. (By Mr. Frost:) Is there
14 anything in that group of exhibits from
15 Josh Cook's deposition that you're relying
16 upon in offering your opinions that we have
17 not previously talked about?
18 A. There are some photographs.
19 There's also a copy of the tower safety
20 manual, which I think we are going to have
21 under a different label.
22 Q. All right.
23 A. But other than that, I don't

Page 44

1 know of anything.
2 Q. All right. Well, we'll get to
3 that, then, as you go through your
4 documents.
5 A. A group of photographs provided
6 by counsel that are actually in color. I
7 had seen, I think, all of these. I think,
8 all of these in the black and white are on
9 the floppies. But at least they gave me a
10 hard copy of it to take a look at.
11 Q. All right. Are you relying upon
12 any of these photographs in particular in
13 offering your opinions?
14 A. I think they just gave me an
15 understanding of the overall layout of the
16 job site.
17 Q. All right. What I'm asking you
18 is: In explaining your opinions to me
19 today, will you need to refer to any of
20 these in particular?
21 A. I hope not.
22 Q. All right.
23 MR. GANN: Have we marked those

Page 45

1 in any way? Do you mind marking them? He
2 said he used them in some respects.
3 MR. FROST: All right. Well,
4 I'm going to mark these. They are gem
5 clipped. I'm going to mark them
6 collectively as 19 and we'll say how many
7 there are here in just a second.
8 (WHEREUPON, a document was
9 marked as Defendant's Exhibit Number 19 and
10 is attached to the original transcript.)
11 MR. JOHNSON: For the record,
12 too, I handed him those yesterday. I'm not
13 a hundred percent sure if that is a
14 complete copy of the police photographs and
15 I'm guessing that's why you're counting, to
16 make sure, because if it's not let me make
17 sure I've got a complete set.
18 MR. FROST: How many are in the
19 police?
20 MR. JOHNSON: I thought there
21 were like forty. Oh, God, I don't
22 remember, forty.
23 MR. FROST: I don't remember

12 (Pages 42 to 45)

Page 46

1  either.
2      MR. THOMASON: I don't know.
3      MR. JOHNSON: No, I do know,
4  we've talked about this.
5      MR. GANN: I'm counting
6  forty-nine.
7      MR. JOHNSON: I think that's
8  right.
9      Q. (By Mr. Frost:) What do you
10  have in front of you now, sir?
11      A. This is a request for production
12  from Defendant ALT Second Supplement to its
13  Responses to Plaintiff's First Set of
14  Request for Production. And then it
15  includes a lot of the other things that we
16  were just talking about, including some
17  photographs of the tower training manual,
18  the rigging manual, et cetera.
19      Q. All right. Is there anything in
20  there that we have not already talked about
21  that you're going to use in offering your
22  opinions?
23      A. Not that I can recall at the

Page 47

1  moment.
2      Q. Okay. Well, we don't need that
3  then.
4      A. This is a packet that was
5  provided by counsel and the Lexington
6  Insurance Company for ALT, and it gives the
7  limits and criteria.
8      Q. Does the insurance policy in any
9  way play a part of your opinions you're
10  offering?
11      A. No, no, sir. Defendant ALT's
12  Answers to Interrogatories and Request for
13  Production that was provided by counsel.
14      Q. All right. Is there anything
15  within this document that you relied upon
16  in offering your opinions?
17      A. Not that I recall.
18      Q. All right.
19      A. Defendant ALT's First Supplement
20  to its Responses to Plaintiff's Request for
21  Production. This was also provided by
22  counsel.
23      Q. Anything within this particular

Page 48

1  document that you relied upon in offering
2  your opinions?
3      A. Not that I recall. Defendant
4  ALT's Second Supplement to Response to
5  Plaintiff's First Set of Request For
6  Production, also provided by counsel.
7      Q. Anything in that particular
8  document you relied upon in offering your
9  opinions?
10      A. Not that I recall, sir.
11  Defendant WesTower's Answers to
12  Interrogatories and Request For Production
13  provided by counsel.
14      Q. Anything in that particular
15  document you relied upon in offering your
16  opinions?
17      A. Not that I recall. Defendant's
18  Initial Disclosures Pursuant to Rule 26.
19  And maybe you can explain that to me or to
20  the record better than I can.
21      Q. All right. Is there anything in
22  that particular document you relied upon in
23  offering your opinions?

Page 49

1      A. Not that I recall.
2      Q. All right.
3      MR. JOHNSON: Mitch, just for a
4  point of clarification requested, it's been
5  a while since you asked the initial
6  question for him to bring in all these
7  documents. But are you asking him for his
8  whole file or for stuff that's responsive
9  to the notice?
10      MR. FROST: Well, it's probably
11  quicker to just go through his whole file
12  and then we'll be answering all those
13  questions.
14      MR. JOHNSON: Yeah. I was
15  curious what was your question? I've
16  forgotten it.
17      MR. FROST: I think we went off
18  on that tangent, but I think it's probably
19  quicker to do this.
20      MR. JOHNSON: Well, okay. Yeah.
21  All right.
22      A. Responses of Crown Counsel South
23  to Plaintiff's Interrogatories and Request

Page 50

1  for the Production of Documents, also
2  provided by counsel.
3      Q.  Is there anything within this
4  particular document that you relied upon in
5  offering your opinions?
6      A.  Not really.  I know in this
7  document was a copy of an accident
8  investigation by BetaCom.  There was a copy
9  of the site plan for that job site, a
10  WesTower incident report as a result of
11  this mishap.
12      Q.  And you read all those
13  documents?
14      A.  I read them, yes, sir.
15      Q.  Did they play a part in any way
16  in the opinions you're going to offer?
17      A.  I don't recall any.
18      Q.  And the next document, sir?
19      A.  Defendant Cingular Wireless'
20  Response to Plaintiff's Request For
21  Production of Documents.
22      Q.  Is there anything, in
23  particular, in that document that you

Page 51

1  relied on in any way in offering your
2  opinions?
3      A.  In this packet, there was a copy
4  of the agreement between NSORO, N-S-O-R-O,
5  and Cingular Wireless.  It has an effective
6  date of 8-1-2004.  And in there I noticed a
7  section that would be 3.5, Compliance with
8  Laws, "Supplier shall comply with all
9  applicable Federal, State, County and Local
10  rules, including without limitations, all
11  statutes, laws, ordinances, regulations and
12  codes (laws)."  So from this I am relying
13  upon that that Cingular is trying to compel
14  the contractors to comply with all laws
15  without exception.
16      And I also notice in there that
17  on 3.13, there's a section titled
18  "Governing Law.  This agreement and
19  performance hereunder shall be governed by
20  the laws of the State of Georgia exclusive
21  of its choice of laws provisions."
22      Now, from that I derived a
23  question, is this site located in Alabama

Page 52

1  be compelled with the Georgia law.  And I
2  had not really made up my mind to this date
3  what the legality of that is, whether we're
4  being in the State of Alabama do we comply
5  with the Alabama law or the Georgia law.
6  And that question, in my mind, to this
7  point has not been resolved.
8      Q.  Does that play a part in any way
9  in the opinions you're going to offer
10  against Cingular or any of the other
11  defendants?
12      A.  It plays a part in whether I use
13  a Georgia code or an Alabama code.
14      Q.  Okay.  Well, let me mark that
15  then.  And by that, you mean in your
16  initial expert disclosures you cited to an
17  Alabama code as opposed to a Georgia code;
18  is that right?
19      A.  That's correct.
20      Q.  Let me mark -- it's titled
21  Defendant Cingular Wireless' Responses to
22  Plaintiff's Request for Production of
23  Documents.  I'm going to mark that as

Page 53

1  Defendant's Exhibit 20.
2          (WHEREUPON, a document was
3  marked as Defendant's Exhibit Number 20 and
4  is attached to the original transcript.)
5          MR. JOHNSON:  You're marking the
6  whole response, is that what you're
7  marking?
8          MR. FROST:  Yeah, he's got a lot
9  of marks on there.
10      Q.  (By Mr. Frost:)  What do you
11  have next, sir?
12      A.  I'm not sure I know how to
13  identify this one.  The first page of this
14  group that is stapled together says "Daily
15  Work Report" by Josh Cook's name on it.
16  And it's on a WesTower job site in
17  Talladega.
18      Q.  Is there anything about that
19  group of documents that you relied upon in
20  offering your opinions today?
21      A.  Here again, this document has a
22  copy of the OSHA report, with the 1(b)
23  where they were citing the 29 CFR

Page 54

1  1926.251(a)(1) and it goes back to the
2  initial OSHA citation.
3      Q. Yes, sir. And we've already
4  discussed that as being a part of your
5  opinions. Is there anything independent of
6  that within the document that you would be
7  relying on in offering your opinions?
8      A. Not that I recall.
9      Q. All right. Here's a photograph
10 that stands alone. I don't really
11 understand what document it came -- I don't
12 know what document it came off of.
13 Apparently, it was the last sheet or
14 something, but I don't know how to explain
15 it. Are you relying on this particular
16 black and white photograph in any way in
17 offering your opinions?
18     A. No, sir.
19     Q. All right.
20     A. Here's a copy of the Tower
21 Climbing Safety & Rescue safety program or
22 book that has been provided to me by
23 counsel.

Page 55

1      Q. Are you relying upon that book
2  in any way in offering your opinions?
3      A. Yes, sir.
4      Q. In what way?
5      A. On page 57 of that document,
6  it's titled "Tools and Equipment". And in
7  there it states "Before each use, all
8  equipment should be inspected for wear,
9  damage, and other deterioration. Defective
10 components shall be removed from service.
11 This actually should be done twice. First,
12 as you load it to be transported to the job
13 site and again at the site safety meeting
14 before you climb. This is not only a good
15 practice for your own safety but also an
16 OSHA regulation 29" -- I'm sorry, it just
17 says 1926.502 Subpart M, d(21).
18     And then again on there it says
19 "The ANSI standards state that each element
20 of the PFAS", which stands for personal
21 fall -- my mind went blank on me, arrest
22 systems, "be inspected prior to each use
23 and lists damage concerns as cuts, cracks,

Page 56

1  tears or abrasions, undue stretching,
2  overall deterioration, mildew, operational
3  defects, heat, corrosion, and springs or
4  snap-hooks that are defective or distorted.
5  Check for manufacturer's information, which
6  must be clearly attached to or provided
7  with any PFAS equipment. The ANSI
8  standards require that all such equipment
9  be indelibly printed or stamped onto the
10 device or a tag securely attached. This
11 marking must include the trademark or name
12 of the manufacturer, the model number of
13 the equipment and the date of the
14 manufacture. Special note: Always know
15 the Working Load Limit of any rigging
16 equipment, including safety rigging
17 (PFAS)."
18     That alone gives me the
19 knowledge from this training package that
20 you don't override a manufacturer's
21 recommendation, regardless of who, what,
22 where or when.
23     Q. All right. Let me mark that as

Page 57

1  Defendant's Exhibit 21.
2      (WHEREUPON, a document was
3  marked as Defendant's Exhibit Number 21 and
4  is attached to the original transcript.)
5      Q. What do you have next, sir?
6      A. I have reference material that
7  was not provided by counsel that I have on
8  my own. One is a copy of the OSHA law,
9  commonly known as the Public Law 91-596,
10 dated November the 5th -- December the 29th
11 of 1970.
12     MR. JOHNSON: These are copies
13 of it.
14     A. And I have brought you copies of
15 excerpts from this document.
16     Q. All right. And what your
17 counsel has just handed me, are these the
18 excerpts that you will be relying upon in
19 offering your opinions?
20     A. Absolutely.
21     Q. All right. Let me mark them
22 collectively as Defendant's Exhibit 22.
23     (WHEREUPON, a document was

15 (Pages 54 to 57)

Page 58

1   marked as Defendant's Exhibit Number 22 and
2   is attached to the original transcript.)
3       Q.  And what do you have next, sir?
4       A.  Next is the booklets that I have
5   brought out where those excerpts came from.
6   So I'm letting you know that I'm not trying
7   to pull something on you that we could
8   verify that it was a true copy from the
9   existing documents.
10      Q.  Sure.
11      A.  The same thing as the code book.
12  This one is dated July 1 of 1999. It's 29
13  CFR 1926, which is the OSHA construction
14  standards.
15      Q.  All right, sir.
16      A.  Those standards are identical.
17  That was a hard copy that it was easy for
18  me to reproduce. But I have also brought a
19  CD, which is a copy of everything that OSHA
20  had to offer on January of 2006, which
21  means these were the exact same documents
22  that were prevailing at the date of this
23  mishap. So there's been no change in them

Page 59

1   even though my hard copy is a 1999 date.
2   This would be an electronic device to show
3   that they were the same or identical as the
4   ones that I had produced in this packet.
5       Q.  Let me just ask you then, is it
6   your understanding that what you have on
7   the 2006 CD, the regulations you're relying
8   upon in offering your opinions are
9   identical to Exhibit 22?
10      A.  Right. And below it's got a
11  1999 date on it.
12      Q.  Sure.
13      A.  But I have verified that there
14  has not been a change.
15      Q.  All right.
16          MR. JOHNSON:  Exhibit 22 is not
17  1999, that's 1990.
18          MR. FROST:  No, this is all of
19  them. He's got all of them.
20          MR. JOHNSON:  Oh, excuse me.
21  Excuse me. All the way up through? I see.
22          MR. FROST:  Right. He's got all
23  the ones he's relying on.

Page 60

1           THE WITNESS:  See, these will
2   have the 1999 date on them.
3           MR. JOHNSON:  I wasn't
4   listening.
5       A.  I have been involved with
6   creating, writing, editing, advising,
7   whatever you want to call it, a safety
8   video produced by ERI, that is Educational
9   Resources, Inc. out of Lexington, South
10  Carolina. I have done many of these videos
11  over the years, but this one happens to be
12  under the name of High Impact Personal
13  Protective Equipment. And it has a number
14  associated with it of 9826.
15          In this video, it shows that a
16  hard hat has got a limit of forty foot
17  pounds. At the end of that video is also
18  my name as being a credit to the production
19  development of this video. And it only
20  verifies what -- is the same as what I'm
21  going to be testifying to here as far as
22  the limits of a hard hat.
23      Q.  Is this the only copy you have

Page 61

1   of that?
2       A.  That is correct. And I do not
3   own that copy, it is only on loan to me.
4   And there is some kind of a chip in this --
5   it's my understanding it's been told there
6   is some kind of chip or protective system
7   within that video that is not to be
8   produced. And if it was reproduced, then
9   it could be verified as to who reproduced
10  it. And I will state to you if you want a
11  copy of it to go to the ERI to get you a
12  copy, but not to be reproduced from this
13  one.
14          MR. FROST:  How do you gentlemen
15  suggest we mark this?
16          MR. JOHNSON:  I think it's okay
17  to mark it if Mr. -- and let Mr. Turner
18  take it with him. But as far as getting
19  your own copy of it, I think you're going
20  to have either buy it or something from
21  what I understand. But if y'all want to
22  watch it today we can do that, too.
23          MR. FROST:  Okay. I'll just

Page 62

1    mark it and then we can decide later.
2        Q.  (By Mr. Frost:)  You don't have
3    any problem with me marking it?
4        A.  As long as you just mark the
5    case and not the product.
6        Q.  Yes, sir.  All right.  That will
7    be Exhibit 23.
8            (WHEREUPON, a document was
9    marked as Defendant's Exhibit Number 23 and
10   is attached to the original transcript.)
11       Q.  Have you ever been involved in
12   the creating or editing or participating in
13   the preparing of a video tape dealing with
14   rigging of towers and hoisting and lifting
15   of antennas, the type we have today?
16       A.  Not that specific, no, sir.
17   I've been involved with some rigging for
18   general application regardless of what
19   industry it was used in.
20       Q.  Have you done a video tape about
21   that?
22       A.  I don't recall.  I cannot -- I'd
23   hate to say, no, I haven't, when, in fact,

Page 63

1    I have.  But I can't verify, I can't recall
2    whether I have or not.
3        Q.  All right.  What else do you
4    have with you?
5        A.  I have a copy of a Modern
6    Technical Physics textbook, my advisor,
7    this is the one that I studied when I went
8    to college and I spent many hours of agony
9    in this book.  This was copyrighted in 1966
10   and I understand I do have a copy of a
11   later edition that I've always marveled at
12   that I don't know that -- I don't know that
13   that one says which edition, but I know the
14   later edition is a third edition.
15           But I do have a copy of the
16   third edition of the same textbook, and I
17   often go back and compare notes between the
18   two and see if there's -- you don't change
19   physics.  You may change the textbook, but
20   the laws of physics are going to remain the
21   same throughout.
22       Q.  Is there anything in either one
23   of those textbooks you specifically relied

Page 64

1    upon in offering your opinions today?
2        A.  I don't know that I relied upon
3    them because my opinions on this is not
4    really finalized.  I've done some playing
5    around with it as far as the velocity of
6    the antenna as it struck Mr. Cotton.  I've
7    just been curious to know some idea.
8            Of course, in physics you have
9    work under absolute scenarios of
10   conditions, such as a falling body in a
11   vacuum.  We know that's the case out here.
12   Then, too, is the falling body we normally
13   think about as a sphere or a ball falling
14   so we don't have the resistance because of
15   the shape or size.  It goes back to mass
16   with the laws of physics and Newton's law.
17           So in this case I have not
18   examined the antenna.  I have not actually
19   had my hands on it.  So therefore any
20   calculations I have to date would be
21   speculation and just as imperial (sic)
22   factors and not absolutes.
23           MR. JOHNSON:  Empirical.

Page 65

1            THE WITNESS:  Thank you.
2        Q.  (By Mr. Frost:)  Well, what have
3    you used those books for in any way in
4    offering your opinions?
5        A.  I have made some calculations as
6    to what the velocity would be.  And from
7    that, I have also taken some photo -- a
8    photocopy of some pages out of that book
9    when it's talking about the acceleration
10   distance and time, the velocity of fallen
11   bodies.  And I think I have photocopied
12   three pages out of it.
13       Q.  What was the purpose of your
14   doing calculations about the fall rate of
15   the antenna?
16       A.  Because of the weight of the
17   antenna and the distance in which it fell,
18   I did some calculations to find out what
19   the impact would be as it hit Mr. Cotton.
20       Q.  Would that -- did you do that in
21   relationship to your opinion that his
22   wearing a hard hat would not have mattered?
23       A.  Absolutely.

Page 66

1 MR. FROST: Does anybody want to
2 mark those books as an exhibit or we'll
3 just get the name and title of them?
4 MR. GANN: I don't think we need
5 the book. We'll just get the title.
6 Q. (By Mr. Frost:) If you would
7 just read the full name and title and date
8 of edition on each of those books, please,
9 sir.
10 A. The textbook title is Modern
11 Technical Physics, the author is Beiser,
12 B-e-i-s-e-r. It is published by the
13 Addison Wesley Publishing Company out of
14 Reading, Massachusetts.
15 MR. JOHNSON: Arthur Beiser is
16 the name of the author, by the way.
17 THE WITNESS: Thank you.
18 MR. JOHNSON: Copyright 1966.
19 A. Correct. And there's a Library
20 of Congress catalog number, 66-10829. And
21 at that time there was apparently an office
22 or whatever, warehouse or whatever, for
23 Addison Wesley Publishing Company in

Page 67

1 Atlanta.
2 Q. If you can just give us the same
3 information on the other book, please, sir.
4 A. The other one is titled Physics,
5 Third Edition, also by Beiser. And this is
6 under a Benjamin Cummings Publishing
7 Company, Inc. Also, Reading, Massachusetts
8 as well as other locations. It's
9 copyrighted in 1982.
10 Q. Is there a Library of Congress
11 number for it?
12 MR. JOHNSON: ISBN, that's the
13 Library of Congress number.
14 A. They have changed, I think, from
15 the Library of Congress number to the ISBN
16 0-8053-0381-2.
17 Q. All right. Thank you, sir. And
18 what else do you have?
19 A. Back when I was studying
20 physics, there was also a document of what
21 we call a study catalog, a soft back unit.
22 And it's Schaum's, S-c-h-a-u-m-'-s, Theory
23 and Problems of College Physics, Sixth

Page 68

1 Edition. It is published by McGraw Hill,
2 and the author of that is Daniel Schaum,
3 S-c-h-a-u-m.
4 MR. JOHNSON: Are you looking
5 for the publication date?
6 A. There's a publication date.
7 This is the last one that I've got in here
8 is 1961, when it was copyrighted. In fact,
9 it says Sixth Edition, March of 1961
10 Reprinted. But I don't see a Library of
11 Congress number.
12 Q. And I understand the two books
13 and then this booklet or manual, you
14 maintain those at your home; is that right?
15 A. That's correct.
16 Q. So if we did need to get a copy
17 we could get one from you; is that right.
18 A. Absolutely.
19 Q. And what else do you have, sir?
20 MR. GANN: May I see that book
21 before you put it back? Thank you.
22 A. And, I did, in fact, copy the
23 excerpts from the cover the pages in there

Page 69

1 of an example in Chapter 5 of force. I
2 think there's what, four pages of it in
3 here.
4 Q. And you have relied on these
5 particular pages in regard to your
6 opinions?
7 A. That is correct.
8 Q. All right. Let me mark that
9 excerpt from the College Physics Sixth
10 Edition as Exhibit 24.
11 (WHEREUPON, a document was
12 marked as Defendant's Exhibit Number 24 and
13 is attached to the original transcript.)
14 Q. And what else, do you have,
15 please, sir?
16 MR. GANN: Do you need to mark
17 his notes over there?
18 MR. FROST: I don't know if
19 we've gotten there yet.
20 A. The only other thing I've got is
21 a copy of my working file.
22 Q. All right. Well, let's go
23 through it, please, sir.

Page 70

1    A.   The first section of is a copy
2  of the correspondence that I have received
3  from counsel.  It is virtually no more than
4  cover letters on the documents that we have
5  just discovered -- or discussed as they
6  sent them to me.
7    Q.   All right.  Well, if you'll undo
8  that and just hand each thing to me.
9        MR. JOHNSON:  I've got a set,
10  too.
11       MR. FROST:  Oh, okay.
12    A.   I'll run you off copies.  We
13  hoped to do that without tearing my file to
14  pieces.
15    Q.   And what I've just been handed
16  by your counsel, are these all the
17  correspondences that you've received from
18  plaintiff's counsel?
19    A.   In letter form, I have gotten
20  three e-mails, if I recall correctly.
21    Q.   But these would be all the
22  letters?
23    A.   That is correct.

Page 71

1    Q.   All right.  Let me mark those as
2  Exhibit 25, collectively.
3        (WHEREUPON, a document was
4  marked as Defendant's Exhibit Number 25 and
5  is attached to the original transcript.)
6    Q.   And then what do you have next,
7  please, sir?
8    A.   In one of the depos -- well, two
9  of the depositions came with an e-mail
10  cover on it and it's attached to the copy
11  -- as I printed them out on my computer it
12  was attached to it.  So there's a copy with
13  that.  Here's a copy of my motel
14  reservation for last night.  If you'd like
15  a copy of that we could probably get you
16  one.
17    Q.   No, sir.
18       MR. JOHNSON:  Are you sure?
19    A.   All right.  There's also an
20  e-mail that was included with the Notice,
21  if you'd like to see it.  I also obtained
22  copies of two ANSI standards, the two ANSI
23  standards are virtually identical.  The

Page 72

1  ANSI stands for the American National
2  Standards Institute, Z89.1 of 1969, which
3  is the one that OSHA addressed in the 29
4  CFR 1926.100(a).
5        So that is the standard that
6  OSHA would enforce and I have provided you
7  with a copy of.  I knew there was a later
8  edition of it in 1986, and I have also
9  included that in my file folder and
10  providing you with a copy of said document.
11    Q.   All right.  Let me mark the
12  first ANSI standard you discussed, the 1969
13  version, as Exhibit 26.
14       (WHEREUPON, a document was
15  marked as Defendant's Exhibit Number 26 and
16  is attached to the original transcript.)
17    Q.   And I'll mark the 1986 version
18  as Exhibit 27.
19       (WHEREUPON, a document was
20  marked as Defendant's Exhibit Number 27 and
21  is attached to the original transcript.)
22    Q.   Now, as I understand it, you are
23  disagreeing with OSHA that this standard

Page 73

1  should be cited because you don't think it
2  should -- that wearing head protection
3  would have done any good; is that right?
4    A.   That was not really the reason I
5  don't agree with OSHA.  It's the fact that
6  Mr. Cotton had no way of knowing, he had
7  not been noticed, put on notice that there
8  was any overhead work going on outside of
9  the building.  As long as he was inside of
10  that building he did not have a need for
11  head protection.  But this document will
12  verify that the drop test and what the
13  capacity of a hard hat would be at the
14  forty-pound limit.
15    Q.   What do you have next, please,
16  sir?
17    A.   In the 1988 edition of that
18  document -- in the 1988 edition of the same
19  ANSI Z-89.1, in the Forward it plainly
20  states in the second paragraph "It is
21  intended that this standard be applied in
22  an industrial environment where the primary
23  hazard is from small falling objects

Page 74

1  striking the top of the head. Protective
2  caps and hats provide protection for the
3  top of the head against small falling
4  objects striking the top of the shell, and
5  against light bumps. They are effective
6  against small tools, small pieces of wood,
7  bolts and nuts, rivets, sparks from
8  overhead work, and similar hazards.
9  Protective caps and hats only reduce the
10 amount of force from an impact blow and do
11 not provide complete head protection from
12 severe impact loads."
13     Q. All right. Did you say you were
14 reading from the 1989 version?
15     A. 1986 version.
16     Q. All right. I wanted to make
17 sure we weren't talking about another one.
18     MR. JOHNSON: '88, sir.
19     MS. HAND: '88.
20     MR. FROST: Wait a minute. This
21 is --
22     MR. THOMASON: It says '88 but
23 it's 86.

Page 75

1     MR. FROST: Yeah, I heard
2  another year. Okay. So we're not talking
3  about a different one, we're talking about
4  1986?
5     MR. JOHNSON: That's a 6.
6     A. If I said eight, I'll admit to
7  my blurred view. My eyes aren't the best
8  in the world anyway. But I think it's a
9  1986 version of it.
10     Q. All right. Anything else in
11 your documents there that you need to show
12 us?
13     A. And it plainly states in the
14 third paragraph "40 foot-pounds in the
15 impact resistance test". So, in essence,
16 there's a limit or the amount of protection
17 a hard hat can, in fact, provide and the
18 intent of that standard. Of course, in my
19 case file I've got a copy of my expert
20 witness report.
21     Q. Is that this document, sir?
22     A. That is correct.
23     Q. Let me mark that as Defendant's

Page 76

1  Exhibit 28.
2     (WHEREUPON, a document was
3  marked as Defendant's Exhibit Number 28 and
4  is attached to the original transcript.)
5     MR. FROST: Do y'all have a
6  clean copy? Mine is highlighted.
7     MR. JOHNSON: We've got a bunch
8  of clean ones here. Do y'all want some
9  clean ones?
10     MS. HAND: Sure.
11     Q. (By Mr. Frost:) And what else
12 do you have in there, please, sir?
13     A. In my file, I've also got a copy
14 of the tag and I have actually taken the
15 liberty to enlarge the back side of that
16 tag for my easier reading that was attached
17 to a piece of poly rope that appears to be
18 the identical rope that was used on that
19 job site by the same manufacturer, the same
20 skew number, the same everything.
21     Q. All right. And who provided
22 that rope to you?
23     A. I purchased pit myself.

Page 77

1     Q. When did you purchase it?
2     A. On April the 3rd of 2007.
3     Q. And you're saying that the
4  documents I've been handed by your counsel
5  are copies of the tag that is on the rope
6  that you purchased?
7     A. That's correct.
8     Q. Let me mark that as Exhibit 29.
9     (WHEREUPON, a document was
10 marked as Defendant's Exhibit Number 29 and
11 is attached to the original transcript.)
12     Q. And what else do you have,
13 please, sir?
14     A. Which I think we've already
15 marked, but the excerpts from the OSHA
16 Public Law 91-596. There's only two pages
17 of it.
18     MR. JOHNSON: I believe that was
19 22.
20     Q. (By Mr. Frost:) That would be
21 included in that? Okay.
22     A. That's correct. I also have a
23 copy of a directive put out by OSHA. By

Page 78

1 the way, this is on the web page. This is
2 where I got my copy, it's on the web site.
3 The www.osha.gov, and this is entitled the
4 Multi Employer Citation Policy, CPL2-0.124,
5 dated 12-10 of 1999. It was in effect on
6 the day of this mishap, and it is a later
7 version of the preceding directive that I
8 had used in years when I was employed with
9 OSHA and it talks about the different types
10 of employers that would be on a multi
11 employer work site.
12     Q. And I'm looking at the same
13 thing you're looking at. Those are
14 included in Exhibit 22 as well; is that
15 right?
16     A. That's correct.
17     Q. All right. What else do you
18 have, please, sir?
19     A. A copy of the OSHA standards
20 from 29 CFR 1926.
21     Q. And those are also included in
22 Exhibit 22; is that right?
23     A. That is correct.

Page 79

1     Q. And what else do you have,
2 please, sir?
3     A. A copy of the Alabama code
4 25-1-1, titled "Duties of employers, etc.,
5 with respect to provision of safe
6 employment."
7     Q. That's also included at the end
8 of Exhibit 22; is that right?
9     A. That is correct.
10     Q. All right.
11     A. So that's an Alabama law. I
12 said something earlier about a Georgia law,
13 and if I look at the Georgia law it would
14 be under an OCGA, Georgia Code, 34-2-10,
15 and it will be the exact same language,
16 including all punctuation. But it will
17 have a year of date of two years earlier
18 than this.
19     Q. All right. What else do you
20 have, please, sir?
21     A. And a copy of the Georgia code
22 was not included as it's not included in my
23 file. But if we do go back to Georgia law,

Page 80

1 that's what it would be.
2     A copy of what I refer to as
3 index sheets. As I read depositions, I
4 will make notes as to what's on that page.
5 I have no idea what's important and what is
6 not. But as I read those depositions, I
7 try to make a note of what would be
8 expected to find on that page. And I did
9 that for each of the depositions with the
10 exception of two, the two that was handed
11 to me yesterday afternoon. And I have not
12 had time to make notes.
13     Q. Which two were those?
14     A. That would be Mr. Camp and --
15     MR. JOHNSON: Ross. Mr. Ross is
16 the ones I gave you yesterday.
17     A. Mr. Ross, is it Daniel Ross?
18     MR. JOHNSON: It's Nathan Ross.
19     A. Nathan D. Ross.
20     Q. All right. Let me mark
21 collectively as Exhibit 30 your -- what did
22 you call these, please, sir?
23     A. Index sheets.

Page 81

1     Q. Indexes of the depositions?
2     A. Correct.
3     (WHEREUPON, a document was
4 marked as Defendant's Exhibit Number 30 and
5 is attached to the original transcript.)
6     A. And I put no importance of one
7 item over the other because I don't know
8 what's in there as I'm writing them down.
9     Q. Sure. And what else do you have
10 have, please, sir?
11     A. A copy of my time activity diary
12 from this case up until yesterday, which I
13 think I have also included a copy of that
14 as handout material that we will get in a
15 minute. It keeps a log of the hours that I
16 have put on this case and what dates I did
17 it; a copy of a Fed Ex bill where I had
18 sent a copy of my report in; a copy of the
19 sales slip, a receipt from the Home Depot
20 in Florence, South Carolina where I
21 purchased that rope; and a copy of the
22 purchase of the two ANSI standards that we
23 have previously discussed from IHS or a

Page 82

1  supply house for such documents.
2      Q.  All right. Let me mark those
3  documents. I'm going to mark your case
4  file activity diary as Defendant's Exhibit
5  31.
6          (WHEREUPON, a document was
7  marked as Defendant's Exhibit Number 31 and
8  is attached to the original transcript.)
9      Q.  And then I'm going to mark your
10  invoice for the purchase of the rope as
11  Defendant's Exhibit 32.
12          (WHEREUPON, a document was
13  marked as Defendant's Exhibit Number 32 and
14  is attached to the original transcript.)
15          MR. JOHNSON: You're including
16  in that 31 these three pages, this, the
17  invoice for the ANSI stuff.
18          MR. FROST: No, I didn't.
19          MR. JOHNSON: You've got them
20  separate. I'm sorry. Okay. Just this
21  right now?
22          MR. FROST: That's 31.
23          MR. JOHNSON: Okay.

Page 83

1          MR. FROST: The Home Depot
2  receipt is 32. Do you see any reason to
3  mark these?
4          MR. GANN: Just go ahead and
5  mark them.
6      Q.  (By Mr. Frost:) I'll mark your
7  invoice and your Fed Ex statement
8  collectively as 33.
9          (WHEREUPON, a document was
10  marked as Defendant's Exhibit Number 33 and
11  is attached to the original transcript.)
12      Q.  Anything else you have with you
13  today, sir?
14          MR. JOHNSON: We've already got
15  a 33.
16          MR. FROST: Two pieces of paper,
17  an invoice purchase and the ANSI standards
18  and his Fed Ex statement.
19          MR. JOHNSON: Did you mark this?
20          MR. FROST: That's 32.
21          MR. JOHNSON: Oh, I'm sorry.
22  Gotcha.
23      A.  As far as attached to my working

Page 84

1  case file to date, that is all that has
2  been attached.
3      Q.  Can I just look at that file
4  itself just for a moment?
5      A.  It hasn't been attached yet.
6          (Off-the-record discussion.)
7          MR. JOHNSON: Mitch, there are
8  some additional things, I think, that are
9  not attached. I think it's like physically
10  attached to his file. You've got -- you're
11  looking at his depo indexes, but there are
12  underneath what you're looking at.
13          MR. FROST: Yeah, I was just
14  going to ask him one thing about this real
15  quick.
16          MR. JOHNSON: Sure.
17      Q.  (By Mr. Frost:) I'm looking at
18  Exhibit 30, your deposition indexes.
19      A.  Yes, sir.
20      Q.  And it appears to me there are
21  some pages at the end that don't appear to
22  be deposition indexes, that appear to be
23  some other documents you may have prepared.

Page 85

1  What would those be?
2      A.  This is it the ALT Second
3  Response for Request for Production. As I
4  looked through that packet, I made notes,
5  an index, so to speak, of what was in that
6  packet.
7      Q.  So these additional pages at the
8  end of that exhibit are indexes, just not
9  deposition indexes?
10      A.  That's correct.
11      Q.  Okay.
12      A.  Same thing as ALT's Response to
13  Request for Production. Another one is
14  ALT's Answers to Interrogatories and
15  WesTower Answers to Interrogatory Index
16  sheets of the packet that were provided.
17      Q.  Okay. And those are also
18  included on Exhibit 30?
19      A.  That's correct.
20          MR. FROST: And what were you
21  pointing to?
22          MR. JOHNSON: Yeah, I was going
23  to say I think that there were some loose

22 (Pages 82 to 85)

Page 86
1  sheets.
2        THE WITNESS: That's loose
3  sheets that is not attached.
4        MR. FROST: We have this
5  already.
6        MR. JOHNSON: In your right
7  hand, though, I think that's an excerpt
8  from one of the textbooks the two of you
9  talked about a moment ago.
10       MR. FROST: Right. And we have
11  not marked this yet, I don't think.
12       MR. JOHNSON: Right.
13       MR. FROST: Let me mark --
14       MR. THOMASON: Mitch, we have a
15  copy.
16    Q.  (By Mr. Frost:) I'm marking
17  this excerpt. It appears -- what book is
18  this from, this excerpt, Exhibit 34?
19       (WHEREUPON, a document was
20  marked as Defendant's Exhibit Number 34 and
21  is attached to the original transcript.)
22       MR. JOHNSON: What page is that,
23  50?

Page 87
1        THE WITNESS: 50.
2        MR. JOHNSON: Yeah, acceleration
3  distance and time. Yeah, it's the same
4  book. Does the next picture have the
5  leaning tower of Pisa and an airplane?
6    A.  This came from the Modern
7  Technical Physics by Beiser of the 1966
8  publication date, or copyright date.
9    Q.  And you already gave us the
10  information about that book earlier, right,
11  sir?
12    A.  Correct.
13       MR. FROST: All right. We've
14  been going for an hour and a half. Can we
15  have a little break for a few minutes?
16       MR. JOHNSON: Yeah, certainly.
17           10:37 a.m.
18           (Short recess)
19           10:53 a.m.
20    Q.  (By Mr. Frost:) All right. Mr.
21  Turner, have you showed us everything that
22  you have either reviewed or looked at or
23  contemplated with regard to offering your

Page 88
1  opinions today?
2    A.  Unless I'm overlooking
3  something. Oh, I've got some calculations
4  that I've crunched some numbers on.
5    Q.  All right. And these are with
6  regard to your speed of the antenna
7  opinions?
8    A.  That's correct.
9    Q.  Okay. Let me mark this as
10  Defendant's Exhibit 35.
11       (WHEREUPON, a document was
12  marked as Defendant's Exhibit Number 35 and
13  is attached to the original transcript.)
14    Q.  Have you also referred us to or
15  shown me anything you've been provided by
16  anybody with regard to this case?
17    A.  As far as I know, you've seen it
18  all. I may be overlooking something in all
19  this mass of documents, but I think you've
20  seen it all.
21    Q.  All right. Other than your
22  calculations and your review of the physics
23  books with regard to the hard hat

Page 89
1  protective equipment issue, have you done
2  any other investigation or research or
3  performed any other calculations in any way
4  in this case?
5    A.  Not at this point, I haven't.
6        MR. JOHNSON: Well, what
7  about -- did you go to the site?
8        THE WITNESS: Oh, yeah, I went
9  by the site.
10       MR. JOHNSON: I think that's
11  what he's asking you, too.
12    A.  I went by that site yesterday
13  and observed from outside the fence, I did
14  not go inside the fence, even though there
15  was a truck backed -- parked or backed up
16  in that fence way or gateway and there were
17  some people working inside that building.
18  But I did not actually set foot inside that
19  fenced compound.
20    Q.  So was that the first time you
21  had been to the site?
22    A.  That is correct.
23    Q.  So the first time that you went

23 (Pages 86 to 89)

www.AmericanCourtReporting.com
August 23, 2007

Page 90

1   to the site was August 22nd --
2       A.  22nd, that's correct.
3       Q.  -- 2007?
4       A.  That's correct.
5       Q.  Okay.  Did your visit to the
6   site change your opinions in any way?
7       A.  It only enhanced my opinions.
8           MR. JOHNSON:  Are these all the
9   exhibits, depo exhibits here?
10          MR. FROST:  I think so.
11          MR. GANN:  Let me ask you.  Page
12  1 of Exhibit 35 appears to be calculations.
13  Page 2 has a note at the top talking about
14  no notice of overhead work and things of
15  that nature.  Those do not appear to be
16  calculations.
17          THE WITNESS:  Those are not
18  calculations other than the fact how do you
19  calculate the fall zone.  So you would take
20  the radius of the fall zone would be half
21  the height, so if you've got a 400-foot
22  tower it would extend 200 feet.  In those
23  notes, I don't recall how I came up with

Page 91

1   those notes.  It just happened to be on the
2   piece of paper that I was jotting down some
3   calculations on.
4       Q.  Do you have any other pieces of
5   paper where you've jotted down any notes
6   other than what is Exhibit 35?
7       A.  No, sir.
8       Q.  Did you have any drafts of your
9   opinions before Exhibit 28 was produced?
10      A.  I hand write it.  Of course, a
11  lot of it is nothing more than boilerplate
12  that I have used over the numbers of years.
13  Sometimes I will take an existing one,
14  photocopy it and scratch through the style
15  of that one and mark through it and then my
16  wife types it up for me.
17      Q.  Do you know where your
18  handwritten notes would be?
19      A.  After she gets through typing it
20  up, I will actually burn them, literally
21  put a match to it and burn them in a 55-
22  gallon drum.
23      Q.  Why is that?

Page 92

1       A.  Just so they won't appear
2   nowhere else.
3       Q.  Did your wife type up Exhibit
4   28?
5       A.  That's correct.  And if you saw
6   my notes, you'd understand why I have her
7   type it up and then I destroy them.  The
8   same thing with the index sheets.
9   Sometimes I can't even read them myself.
10  How she does, I don't know.
11      Q.  Did you consult with anyone else
12  in arriving at any of the opinions you
13  intend to offer?
14      A.  No, sir.
15      Q.  When were you first contacted
16  about being an expert in this case?
17      A.  At some time prior to March the
18  17th of 2007, by telephone.
19      Q.  All right.  I'm looking at
20  Defendant's Exhibit 31, which is entitled
21  your case file activity diary.  And that,
22  as I understand from your earlier comments,
23  that's where you note all the time that you

Page 93

1   spend on the file; is that right?
2       A.  That's correct.
3       Q.  But you don't have any notations
4   before March 17, 2007; is that right?
5       A.  That is correct.
6       Q.  But since you were receiving and
7   looking at materials on that day, you
8   obviously had been contacted prior to that
9   day; is that right?
10      A.  That's correct.
11      Q.  But you just don't know when
12  that date was?
13      A.  That's correct.
14      Q.  Do you know who contacted you?
15      A.  Mr. Eddie Johnson.
16      Q.  Do you know what depositions and
17  materials you reviewed on March 17, 2007?
18      A.  The only way I would know that
19  would be going back and looking at the
20  cover letters and what materials he had
21  sent me on that day, prior to that day.
22          MR. JOHNSON:  25.
23      Q.  (By Mr. Frost:)  All right.

Page 94

1  Within Exhibit 25, there appears to be a
2  letter dated March 13, 2007.
3      A.  Yes, sir.
4      Q.  Is that the correspondence that
5  you're talking about?
6      A.  In fact, there were two letters
7  on that date.
8      Q.  Yeah.  Okay.  They're separated
9  by several other pages.  Is it this letter
10  that you're talking about, the March 13,
11  2007 letter?
12      A.  That's correct.  And all it does
13  it says "Enclosed for your review are
14  copies of the following items."  And those
15  are the items that I have been reviewing.
16      Q.  Do you have a second page to
17  that letter?
18      A.  No, sir.
19      Q.  Okay.  There's not a second page
20  on this one.
21          MR. JOHNSON:  Oh, on the copy.
22  We'll make one at a break.
23      Q.  It's not a problem.  We can fix

Page 95

1  that later.
2      A.  I didn't do that intentionally.
3      Q.  Okay.  So the March 17, 2007
4  entry relates to the fact that you read all
5  of the information and documents provided
6  to you on that March 13 letter; is that
7  right?
8      A.  That is correct.
9      Q.  After reading all that
10  information, did you formulate the opinions
11  that you're offering today?
12      A.  At that time, I had not
13  formulated any opinions as such.  I was
14  just reviewing material to try to prepare
15  myself to make the formulation of opinions.
16      Q.  When was it that you did
17  determine the opinions -- or your initial
18  opinions that you're offering today?
19      A.  That would have been after I
20  read the depositions on June the 3rd of
21  2007 and all in between, as I wrote the
22  report on June the 4th of 2007.
23      Q.  So you did not come to your

Page 96

1  conclusions and opinions until after you
2  received additional depositions on June 3,
3  2007?
4          MR. JOHNSON:  Object to the
5  form.
6      A.  That is correct.
7      Q.  And the depositions, what did
8  you receive then?  I see a June 1, 2007
9  letter in Exhibit 25 and it says you were
10  provided Jeff Silva, Adam Waterman and Josh
11  Cook.  Is that your understanding?
12      A.  That is correct.
13      Q.  Okay.  So after reviewing those
14  depositions, you then were able to make
15  your opinions; is that right?
16      A.  I think I can agree with that
17  statement, yes.
18      Q.  All right.  Because as we know,
19  as you pointed out to me on Exhibit 28,
20  which is your initial opinions, you
21  assigned those on June 4, 2007?
22      A.  That is correct.  But I did not
23  receive the exhibits until after I had

Page 97

1  written the report.
2      Q.  All right.  Now, Exhibit 32
3  indicates that you purchased the exemplar
4  rope that you have with you today on April
5  3, 2007; is that right?
6      A.  That's correct.
7      Q.  How did you know on that date
8  what kind of rope to purchase?
9      A.  By looking at the photographs.
10      Q.  All right.  So you had been
11  provided photographs by that time?
12      A.  Yes, sir.
13      Q.  When were you able to confirm
14  that the exemplar rope you purchased was
15  identical, as you said, to the rope used in
16  the accident?
17      A.  To this date, I have not.
18      Q.  You've not been able to do that
19  yet?
20      A.  I've never seen the actual rope,
21  nor the antenna.
22      Q.  Well, having not ever seen the
23  actual rope, how are you able to come to

American Court Reporting
toll-free (877) 320-1050

Page 98

1  the conclusion that the rope used at the
2  time of the accident was not appropriate?
3      A.  It appears to me that it is the
4  same type rope, it's the same manufacturer,
5  same skew number, same everything.  And I
6  would be rather amused and amazed if it's
7  not the same rope.
8      Q.  Okay.  If you could, please,
9  sir, with regard to ALT, the company
10 that I represent, could you tell me what
11 opinions you are offering against ALT in
12 this case?
13     A.  That they were an employer who
14 had created a hazardous condition by
15 climbing that tower, and using a rope that
16 was not approved for lifting purposes to
17 hoist the antenna or lower antennas off of
18 that job site, creating the hazardous
19 condition.
20     Q.  Any other opinions directed to
21 ALT?
22     A.  That they had failed to warn the
23 employees of another contractor, which was

Page 99

1  BetaCom, that was working on that same
2  compound within the fall radius of that
3  tower.
4      Q.  Any other opinions directed to
5  ALT?
6      A.  I would go so far as to say that
7  they, in this rope that they had purchased,
8  knowing that the warnings was on that tag
9  saying not to be used for lifting purposes,
10 they violated a principal any prudent,
11 diligent employer would have not used that
12 rope for lifting purposes.  So they did not
13 respond or act in the same capacity as a
14 prudent, diligent employer.
15     Q.  Any other opinions you intend to
16 offer against ALT in this case?
17     A.  Not that I can think of at the
18 moment.  There may be further discovery yet
19 to be provided to do otherwise, but at the
20 moment I don't recall anything else.
21     Q.  Why don't we try to take each
22 one of those one at a time.
23         MR. NORRIS:  What are you

Page 100

1  looking for, Mitch?  Can I help you?
2         MR. FROST:  Here it is.
3      Q.  (By Mr. Frost:)  As I
4  understand, your first opinion is that ALT
5  and/or its employees created a hazardous
6  condition at the job site; is that right?
7      A.  That is correct.
8      Q.  What hazardous condition did
9  they create?
10     A.  The fact that they were working
11 above the heads of others on that job site
12 and especially when they were using
13 materials such as the subject rope that
14 have been -- put the employer on notice
15 with the warning label on the tag at the
16 time of purchase that it was not to be used
17 for that purpose.
18     Q.  All right.  So the basis of that
19 opinion is two-fold then, that they were
20 working overhead of others and they were
21 using materials that you say they had been
22 warned they should not use; is that right?
23     A.  Absolutely.

Page 101

1      Q.  What have you reviewed or
2  considered that supports that first
3  opinion?
4      A.  That they were working aloft.
5  Is that what you're asking?
6      Q.  I assume you've reviewed
7  depositions; is that right?
8      A.  That's correct.
9      Q.  Okay.  In the depositions you've
10 reviewed, have you reviewed any depositions
11 that told you that the BetaCom employees
12 working inside the building knew that the
13 ALT employees were working overhead?
14     A.  No, sir.
15     Q.  Did you review Jason Cook's
16 deposition?
17     A.  I did.
18     Q.  Did you note in that deposition
19 that Mr. Cook, who was a BetaCom employee,
20 knew they were working overhead?
21         MR. DEAN:  Object to the form.
22     A.  I don't recall that.
23     Q.  Let me show you some excerpts

www.AmericanCourtReporting.com
August 23, 2007

Page 102

1  from Mr. Cook's deposition. And I'll show
2  you particularly page 14 and ask you if you
3  remember seeing where he was asked "At the
4  time you arrived on the day of the
5  accident, did you see any signs or warnings
6  that said overhead work was being performed
7  on the site?" And his answer, "When I
8  arrived, I seen people climbing the tower
9  so common sense I knew they were working
10 overhead." Did you read that testimony,
11 please, sir?
12     A. I did.
13     Q. Does that change your earlier
14 testimony that, in fact, there was a
15 BetaCom employee there who knew that the
16 ALT employees were working overhead prior
17 to the accident?
18         MR. JOHNSON: Object to the
19 form.
20         MR. DEAN: Object to the form.
21     A. I will agree with his statement
22 in his deposition when he said that, that
23 he would have known.

Page 103

1     Q. All right. Are you aware of
2  whether any other BetaCom employees, who
3  were at the site that day, knew that the
4  ALT employees were working overhead before
5  the accident?
6         MR. JOHNSON: Object to the
7  form.
8     A. No, sir.
9     Q. Can you tell me, please, sir,
10 when you received, for your review,
11 Defendant's Exhibit 20, which is Defendant
12 Cingular Wireless' Response to Plaintiff's
13 Request for Production of Documents?
14     A. When I reviewed it, is that the
15 question?
16     Q. When you received it for review,
17 yes, sir.
18     A. And this is what, again?
19         MR. JOHNSON: Cingular.
20     Q. (By Mr. Frost:) It's
21 Defendant's Exhibit 20, and it's entitled
22 Defendant Cingular Wireless' Responses to
23 Plaintiff's Request for Production of

Page 104

1  Documents.
2         MR. JOHNSON: Do you want to
3  look at the exhibit, Mr. Turner, that he's
4  referring to?
5         THE WITNESS: Please.
6     Q. (By Mr. Frost:) I believe it
7  may be referenced in the May 1, 2007 letter
8  you received in regard to Defendant's
9  Exhibit 25.
10     A. That is correct, and it would be
11 a day or so after the May 1st.
12     Q. But in any event, before you
13 came to your conclusions and opinions,
14 right, sir?
15     A. That is correct.
16     Q. All right. If you would, look
17 with me at Defendant's Exhibit 20 and I'll
18 ask if you remember reviewing the BetaCom
19 investigation report?
20     A. I remember reading it, yes, sir.
21     Q. All right. Would you look with
22 me on page two of that document, on number
23 9C. Could you read that paragraph, number

Page 105

1  9C?
2     A. I have read it, yes, sir.
3     Q. All right. Can you read it for
4  the record, please, sir?
5     A. "At eleven thirty a.m. BetaCom
6  Employees, Jason Cook and Eric Davis,
7  arrived at the site. They had come to meet
8  up with Wheeler and Cotton to go to lunch.
9  Both noticed the tower crew on the tower
10 but made no reference of it to Wheeler and
11 Cotton when they went inside.".
12     Q. All right. Are you aware, then,
13 sir, that both Mr. Jason Cook and Mr. Eric
14 Davis, who were BetaCom employees at the
15 site the day of the accident, knew that the
16 ALT employees were working overhead that
17 day?
18         MR. JOHNSON: Object to the
19 form.
20         MR. DEAN: Object to the form.
21     A. I do not know that other than
22 what you just showed me in Mr. Cook's
23 deposition.

Page 106

1  Q. Well, do you have any reason to
2  dispute the investigation report prepared
3  by BetaCom that states they did see the
4  tower crew on the tower?
5  A. No, sir.
6  Q. All right. Do you have any
7  reason to dispute Jason Cook's testimony in
8  which he says that he knew they were
9  working overhead on the tower that day
10 prior to the accident?
11     MR. DEAN: Object to the form.
12     MR. JOHNSON: Object to the
13 form.
14 A. No, sir.
15 Q. Does the fact that these two
16 documents have been brought to your
17 attention, both Mr. Cook's testimony and
18 the BetaCom investigation report, change
19 your opinion in any way that the BetaCom
20 employees did not know that ALT was working
21 overhead on the day prior to the accident?
22     MR. JOHNSON: Object to the
23 form.

Page 107

1  A. From this document, those two
2  employees may have known. But I have no
3  evidence that the rest of them inside the
4  building knew anything about it.
5  Q. Yes, sir, but does it change
6  your opinion that the BetaCom employees did
7  not know that ALT was working overhead on
8  the day prior to the accident?
9      MR. JOHNSON: Object to the
10 form.
11 A. No, sir. It may affect those
12 two employees, but not the other employees.
13 Q. So you would admit to me now
14 that you understood that Jason Cook and the
15 other employee, Mr. Eric Davis, did know,
16 as far as you can tell from the documents
17 provided to you, did know that ALT was
18 working overhead prior to the accident?
19     MR. DEAN: Object to the form.
20     MR. JOHNSON: Object to the
21 form.
22 A. This report that you have gotten
23 in front of me from BetaCom and their

Page 108

1  investigation states that, and Mr. Cook's
2  deposition states that, but I have seen
3  nothing nowhere that Mr. Davis knew.
4  Q. Other than the BetaCom
5  investigation report?
6  A. That's correct.
7  Q. So would it be fair to say that
8  prior to the accident, on that day, two of
9  the four BetaCom employees who were on the
10 work site did know that, as far as the
11 information provided to you, did know that
12 ALT employees were working overhead?
13     MR. DEAN: Object to the form.
14     MR. JOHNSON: Object to the
15 form, asked and answered.
16 A. I thought I'd answered that.
17 Q. What was your answer? I'm
18 sorry, sir.
19     MR. JOHNSON: Object to the
20 form.
21     MR. DEAN: Object to the form.
22     MR. JOHNSON: Asked and
23 answered.

Page 109

1  A. That Mr. Cook, in his
2  deposition, admits that he saw it
3  apparently. But I've seen nothing in Mr.
4  Davis' other than the BetaCom investigation
5  report.
6  Q. All right. As an employee of
7  BetaCom, when Mr. Cook, Jason Cook, is
8  aware that there are ALT employees working
9  overhead, is he under any obligation or
10 duty to inform his co-employees of that
11 fact, in your opinion?
12 A. I would think he would, yes.
13 Q. Do you know of any --
14 A. But here again, I don't know
15 whether he was in a supervisory capacity.
16 Q. Okay. Are you aware of any
17 evidence or testimony that indicates that
18 he did inform the other BetaCom employees
19 of the fact that the ALT employees were
20 working overhead?
21 A. I've seen no evidence to that
22 effect that I can recall.
23 Q. All right. Let me refer you to

Page 110

1  Mr. Cook's testimony again, please, sir, on
2  page 20, line 15. If you'll look at that
3  and read that into the record, please, sir,
4  page 20, line 15.
5      A. "Do you recall hearing a comment
6  or telling anybody out there was overhead
7  work occurring?"
8      And his answer is "I actually
9  mentioned it."
10     Q. All right. Thank you, sir. Did
11 you see that testimony when you read it the
12 first time?
13     A. I've read that deposition, but I
14 don't recall that statement.
15     Q. Now, I think you made an index
16 when you read the depositions -- let me ask
17 you this: Exhibit 30 is the index that you
18 made when you reviewed the depositions; is
19 that correct?
20     A. That is correct.
21     Q. Okay. Now, when you read the
22 depositions, what is the purpose of the
23 index? Are you writing down things that

Page 111

1  you think are important that you might rely
2  on in making your opinions later?
3      A. I've answered that one time
4  earlier. I do not put importance on those
5  index sheets. I only state what's on that
6  page.
7      Q. Well, why would you select a
8  particular page as opposed to something
9  else?
10     MR. JOHNSON: Object to the
11 form, not specific.
12     A. In the process of reading a
13 deposition, not knowing what I'm getting
14 involved with, I just try to make notes
15 from one page to the next as I go along.
16     Q. But are you noting on these
17 indexes things that you think might be
18 important to you?
19     MR. JOHNSON: Object to the
20 form.
21     A. Not necessarily. I don't know
22 what's important.
23     Q. All right. Let me show you

Page 112

1  within deposition Exhibit 30 your index of
2  Jason Cook. And I believe you note -- you
3  write down about page 17, you say "Was
4  aware of work overhead and natural dangers
5  of falling objects." Do you see that, sir?
6      MR. JOHNSON: Do you mean Jason
7  Cook or Joshua Cook?
8      MR. FROST: Jason Cook.
9      A. I see the note, yes.
10     Q. Okay. Was that something that
11 would be important to you in considering
12 your opinions as to whether the BetaCom
13 employees knew there was overhead work
14 being done at the time prior to the
15 accident?
16     MR. JOHNSON: Object to the
17 form.
18     MR. DEAN: Object to the form.
19     A. I think that would be a
20 consideration I would have in the process
21 of forming my opinion, yes.
22     Q. Would that lead you to believe
23 that the BetaCom employees, or at least

Page 113

1  Jason Cook, who was on the site, knew that
2  the ALT employees were working overhead
3  prior to the accident?
4      MR. DEAN: Object to the form.
5      MR. JOHNSON: Same.
6      A. That would be Mr. Cook, only.
7      Q. Now, do you have an opinion,
8  sir, whether it was appropriate or not for
9  ALT employees to be working overhead if
10 they understood the BetaCom employees would
11 be working inside the shelter at the site?
12     A. I think that would have been a
13 time to call a meeting and say, hey, one of
14 us has got to go, either we've got to come
15 off the tower, you've got to leave the
16 site. There's got to be a compromise here
17 somewhere.
18     Q. So you're saying -- and you need
19 to answer my question if you can. So are
20 you telling me that you think it would not
21 be appropriate for ALT to be working
22 overhead even though the BetaCom employees
23 would be working in the shelter?

Page 114

1    A.   As long as they didn't come out
2  of the shelter it would be appropriate.
3    Q.   Oh, okay.  That's what I was
4  asking then.  All right.  So it's your
5  opinion that if they were in the enclosed
6  shelter and were not coming out within the
7  fall zone area, then it would be okay?
8    A.   I wouldn't have no problem with
9  it.
10    Q.   All right.  Now, if that was, in
11  fact, what was happening at the job site,
12  that the ALT employees were working
13  overhead and they understood the BetaCom
14  employees were inside the shelter, all four
15  of them were inside the shelter, when it
16  came time that the BetaCom employees wanted
17  to exit the shelter, what, in your opinion,
18  needed to happen?
19         MR. JOHNSON:  Object to the
20  form.
21         MR. DEAN:  Object to the form.
22    A.   That's a point in which there
23  would actually be a direct communication

Page 115

1  between all concerned.
2    Q.   All right.  And do you have an
3  opinion as to who would have to initiate
4  that conversation?
5    A.   That should be something that
6  would be predetermined before they allowed
7  the work to continue from -- before they
8  climbed the tower or either before they
9  came out of the building.
10    Q.   Okay.  So it is your opinion
11  that under that scenario that the ALT
12  employees and the BetaCom employees should
13  have had a predetermined method of
14  communication if the BetaCom employees were
15  going to exit the building; is that right?
16    A.   That is correct.
17    Q.   Okay.  All right.  Do you place
18  any particular responsibility on either
19  one, either ALT or BetaCom, to make sure
20  they have that predetermined communication?
21    A.   I would think in this case
22  BetaCom (sic) would take the precedence as
23  far as having the duty because they're the

Page 116

1  ones who went aloft.  They created that
2  hazard.  Before you start creating that
3  hazard you need to put others on notice.
4    Q.   I believe you meant to say ALT
5  went aloft; is that right?
6    A.   That's correct.
7         MR. JOHNSON:  You said BetaCom.
8    A.   I'm sorry.
9    Q.   We'll keep it straight.  So
10  you're saying that ALT --
11         MR. JOHNSON:  So will we.
12    Q.   (By Mr. Frost:)  You're saying
13  that ALT, because it was creating the
14  hazard, had the responsibility to do a
15  predetermined form of communication; is
16  that right?
17    A.   Absolutely.
18    Q.   Okay.  You don't find fault in
19  any way with BetaCom for not doing that?
20    A.   Not really.
21    Q.   What do you mean "not really"?
22    A.   Because they didn't know they
23  were going up.

Page 117

1    Q.   Well, we've already established,
2  sir, that at least two of the BetaCom
3  employees did know that, haven't we?
4         MR. DEAN:  Object to the form.
5         MR. JOHNSON:  Object to the
6  form.
7    A.   You may have, but I haven't.
8    Q.   Well, we've established, sir,
9  haven't we, that at least Jason Cook, one
10  of the BetaCom employees, knew that prior
11  to the accident, haven't we, sir?
12         MR. DEAN:  Object to the form.
13         MR. JOHNSON:  Same objection.
14    A.   Yes, sir.  That reduces it by
15  fifty percent.
16    Q.   Well, we have, haven't we, sir?
17         MR. DEAN:  Object to the form.
18         MR. JOHNSON:  Object to the
19  form.
20    A.   I'll agree to that.
21    Q.   Okay.  And what form of
22  communication are you saying would have
23  been preferable between ALT and BetaCom if

Page 118

1  and when the BetaCom employees were going
2  to exit the building?
3      A. I would have no preference as
4  long as it was effective.
5      Q. Okay. And when you say you
6  would have no preference, that could have
7  been speaking to somebody, using a radio,
8  communicating with whoops, or any kind of
9  communication; is that right?
10         MR. DEAN: Object to the form.
11     A. Whatever is effective, that is
12  correct.
13     Q. Okay. And on that job site and
14  on that day, were there any forms of
15  communication that you thought could not be
16  effective for any reason?
17     A. Unless it was sign language
18  where you couldn't see.
19     Q. All right. Thank you. Now, is
20  your opinion against ALT related to the
21  OSHA multi employer work site regulations,
22  or do they play a part at all in your
23  opinions against ALT?

Page 119

1      A. It's a multi employer work site
2  citation, policy by OSHA, that each one has
3  a stand-alone duty as well as the Alabama
4  law, which said the employers shall have a
5  duty.
6      Q. All right. If you would, sir,
7  go to your multi employer work site OSHA
8  regulations and point out to me which ones
9  you say relate to what ALT was doing at the
10  job site.
11         MR. JOHNSON: What exhibit is
12  that, Mitch?
13         MR. FROST: It's 22.
14     A. It should be in here.
15     Q. Yes, sir, I was looking for one
16  other thing. I must have misplaced it.
17  Let me come back to that. I'm going to
18  have to find something else.
19         All right. Let's just go ahead
20  and get that. What is it about the multi
21  employer OSHA regulations that you say ALT
22  was somehow in violation of?
23     A. On each job site there are four

Page 120

1  employers on each job site on a multi
2  employer work site according to this
3  policy. You've got the creating employee,
4  that was definitely ALT. No one else on
5  that job site created this condition.
6      Q. And what else, anything?
7      A. They could also be considered
8  the correcting employer, which they had a
9  duty to correct that hazard and others
10  exposed by either coming down off the
11  tower, leaving that job site, or get the
12  others to remove themselves from the
13  hazard.
14     Q. But who has the obligation to be
15  the correcting employer?
16     A. In this case, I think ALT would.
17     Q. Would BetaCom not have any
18  responsibility in that regard?
19     A. Not unless they had been put on
20  notice, and I don't think they had been.
21     Q. Okay. Let's talk about that
22  then. If BetaCom, its employees, were on
23  notice that ALT's employees were working

Page 121

1  overhead and had created a hazard, were
2  they under an obligation to correct the
3  situation?
4          MR. DEAN: Object to the form.
5          MR. JOHNSON: Object to the
6  form.
7      Q. (By Mr. Frost:) Per the OSHA
8  regulations?
9      A. I don't think it would be really
10  a correcting. I think it would be an
11  exposing, but not a correcting employer.
12  The creating had the duty to correct it.
13     Q. You said they would be what kind
14  of employer, though?
15     A. An exposing employer.
16     Q. And what does that mean?
17     A. It means they had employees
18  exposed to the hazard.
19     Q. All right. And as an exposing
20  employer, what obligations or duties do you
21  have to protect your employees?
22     A. Each employer has a stand-alone
23  duty to protect his employees on any job

Page 122

1    site.
2        Q.   All right.  Well, what about the
3    BetaCom employees on this particular job
4    site, what was their obligation to protect
5    themselves?
6        A.   To protect themselves from
7    overhead hazards, anybody working within
8    the fall radius of it they had the job of
9    -- they had the duty for their own
10   employees as well as other employees who
11   would infringe upon that fall safety zone,
12   or fall radius zone.
13       Q.   And how would they have done
14   that in this case, please, sir?
15       A.   Putting them on notice and have
16   an understanding, hey, we're going aloft,
17   we're going to have hazards from above,
18   therefore we need to get you off of this
19   job site.
20       Q.   And that was the obligation of
21   the BetaCom employees?
22       A.   Absolutely.  They created the
23   hazard.

Page 123

1        Q.   All right.  We've got to be
2    careful.
3        A.   Oh, no, I'm sorry.  ALT, ALT.
4        Q.   All right.
5        A.   They created the hazard.
6            MR. DEAN:  Who is "they"?  Who
7    is "they", who are you saying is "they"?
8            MR. JOHNSON:  Who are you saying
9    is "they".
10       A.   That ALT has the duty.  They
11   created the hazard, they had the duty.  ALT
12   had the duty to correct.
13       Q.   All right.  Were you telling me
14   earlier that BetaCom, whose employees were
15   within the shelter, was an exposing
16   employer, that it was allowing its
17   employees to be exposed to a potential
18   hazard, is that what you said earlier?
19       A.   If they come out without the --
20   knowing that they were -- the hazard was
21   there, then they would be an exposing
22   employer.
23       Q.   All right.  And that's what I

Page 124

1    was asking you.  What is the obligation of
2    the exposing employer when there is a
3    potential for its employees to be in a
4    hazard?
5        A.   Remove the employee from the
6    hazard or protective measures to deal with
7    the problem.
8        Q.   All right.  And what was done by
9    the BetaCom employees in that regard on
10   this particular job site?
11       A.   They were working inside of a
12   structure and I don't -- I have seen
13   nothing to indicate to me that the
14   employees that were inside working on that
15   structure had been put on notice.
16       Q.   Put on notice about what,
17   please, sir?
18       A.   The overhead hazard.
19       Q.   Do I need to show you Jason
20   Cook's deposition again, please, sir?
21           MR. JOHNSON:  Object to the
22   form.
23           MR. DEAN:  Object to the form.

Page 125

1        Q.   (By Mr. Frost:)  That is
2    evidence.  He was under oath.  That is
3    evidence, I believe, that at least one of
4    the BetaCom employees knew there was
5    overhead working, right, sir?
6        A.   One knew, that's correct.  But
7    the others didn't.
8        Q.   All right.  But what obligation
9    did Jason Cook have, knowing that there was
10   a potential hazard, what obligation did he
11   have as an exposing employer to remedy the
12   situation?
13       A.   I don't know his capacity or
14   what control he had of that job site.  I do
15   know he exposed himself to the overhead
16   hazard.
17       Q.   Well, let's assume that he did
18   not have managerial capacity at the job
19   site.  Is he under any obligation to inform
20   his fellow employees of a potential hazard?
21       A.   Well, I think he's got a moral
22   obligation.
23       Q.   A moral obligation?

Page 126

1  A. Yes, sir.
2  Q. Is there any OSHA regulation,
3  ANSI standard, or otherwise, that would
4  require Mr. Cook, as a BetaCom employee, to
5  inform his fellow employees of the
6  potential hazard?
7  A. I know of none unless he's in a
8  management position.
9  Q. So you don't place a burden on
10 the individual employees to inform their
11 co-employees of potential hazards?
12        MR. JOHNSON: Object to the
13 form.
14 A. I think it could be a nice thing
15 to do, but I don't know of any regulation
16 that says he had to.
17 Q. Okay. Well, do you know if
18 BetaCom had anybody in management
19 authority, or whatever level you say they
20 need to be before they have to inform the
21 other employees, at the job site that day
22 before the accident?
23 A. No, sir.

Page 127

1  Q. Do you know what position Mr.
2  Cook -- I mean, yeah, Mr. Jason Cook held
3  on that job site?
4  A. No, sir.
5  Q. Do you what position Mr. Eric
6  Davis held on the job site?
7  A. No, sir.
8  Q. Do you know what position Mr.
9  Cotton held on the job site?
10 A. I understand he was a lead man
11 on that job site.
12 Q. Mr. Cotton was? All right. And
13 do you know what position Mr. Wheeler held
14 on the job site?
15 A. I'm sorry. Mr. Wheeler was the
16 lead man. Mr. Cotton was a helper.
17 Q. All right. Now, as a lead man
18 on the job site, what obligations did Mr.
19 Wheeler have with regard to safety?
20 A. I think he had a duty and
21 obligation.
22 Q. To do what, please, sir?
23 A. To protect his employees.

Page 128

1  Q. And on that particular job site,
2  what would that entail? If he knew that
3  the ALT employees were there, and I believe
4  his testimony is to the effect he knew they
5  were there and would be working that day,
6  what duty or obligation did Mr. Wheeler, as
7  the lead man or supervisor, have to provide
8  a safe workplace for the other BetaCom
9  employees?
10 A. I did not get that out of his
11 deposition. In his deposition, he stated
12 he did not know they were working overhead
13 until he heard "headache" at noon.
14 Q. Yes, sir, I understand he did
15 say that. What I'm asking you, though, is
16 you did read in his deposition that he did
17 know the ALT employees were at the job site
18 and would be working that day?
19 A. But not aloft. He believed they
20 were doing ground work.
21 Q. Okay. But you do know that he
22 testified he knew they were there?
23 A. That's correct.

Page 129

1  Q. Okay. And what obligations
2  would he have, if any, in your opinion, to
3  provide a safe work place for his
4  employees?
5        MR. DEAN: Object to the form.
6        MR. JOHNSON: Same.
7  A. I think he has the duty to
8  protect his employees on that job site if
9  they -- provided he knew that the condition
10 existed. You can only ask out of anyone
11 what a prudent, diligent employee would be
12 expected to do. And if he was working
13 inside the building and did not know, you
14 can't hold him accountable for that.
15 Q. Okay. Well, I assume you know
16 there has been testimony that Mr. Wheeler
17 was informed, Mr. Cook and Mr. Wheeler both
18 were informed by Mr. Josh Cook that they
19 would be working overhead that day. You're
20 aware of that, aren't you, sir?
21        MR. DEAN: Object to the form.
22        MR. JOHNSON: Same objection.
23 A. Mr. Josh Cook is the only

Page 130

1 deposition I have seen that says he told
2 them. But I have seen no other evidence to
3 uphold what he has said in his deposition.
4 Q. Well, is there any reason you're
5 discounting completely Mr. Josh Cook's
6 deposition testimony?
7 A. Other than the fact that it did
8 not happen.
9 Q. How do you know that didn't
10 happen, sir?
11 A. We've got a fatality.
12 Q. So the fact that Mr. Cotton is
13 deceased leads you to totally discount Mr.
14 Cook's testimony where he says he informed
15 Mr. Cotton and Mr. Wheeler that they would
16 be working overhead?
17 A. So it wasn't effective.
18 Q. He wasn't effective?
19 A. If he informed anybody, it sure
20 wasn't effective.
21 Q. So you don't -- you don't
22 disagree that he may have informed them, do
23 you?

Page 131

1 MR. DEAN: Object to the form.
2 MR. JOHNSON: Same objection.
3 A. His testimony in his deposition
4 is the only evidence I've got that he did.
5 Q. Okay. Well, let me back up for
6 a minute. You've got Jason Cook, who was a
7 BetaCom employee, he says he knew they were
8 working overhead. You understand that; is
9 that right?
10 A. That's what he says in his
11 deposition, correct.
12 Q. And you understand from Mr.
13 Cook's testimony that he says he mentioned
14 it to the other BetaCom employees when he
15 went into the building. You're aware of
16 that, aren't you?
17 MR. JOHNSON: Object to the
18 form.
19 A. The only thing I remember
20 reading in there is he did, in fact,
21 mention it. But who did he mention it to,
22 I don't know.
23 Q. Well, we'll stop there then.

Page 132

1 But you are aware that Mr. Jason Cook
2 testified that he mentioned it to the other
3 people in the building; is that your
4 understanding?
5 MR. JOHNSON: Object to the
6 form.
7 A. Yes, sir.
8 Q. Okay. And you're also aware of
9 Josh Cook's testimony in which he said he
10 informed Mr. Cotton and Mr. Wheeler that
11 they would be working overhead. Are you
12 aware of that?
13 A. I'm aware he made that statement
14 in his deposition.
15 Q. Okay. Well, I guess I'm still
16 trying to understand then how you come to
17 the conclusion that the BetaCom employees
18 did not know there was any work being done
19 overhead?
20 MR. JOHNSON: Object to the
21 form.
22 A. Because Mr. Cotton went into
23 that building before the ALT employees even

Page 133

1 arrived on the job site that morning. I
2 have seen no evidence nowhere that
3 indicates that he had ever been out of that
4 building since until he went to lunch and
5 nobody -- of course, I can't talk to him,
6 but nonetheless I seen no evidence where
7 anybody informed him. Because if the lead
8 man didn't know it, and he testified that
9 he didn't know it until noon as he was
10 walking out and heard "headache".
11 Q. I guess what I'm trying to
12 understand, it appears to me, and you
13 correct me if I'm wrong, but it appears to
14 me you are totally disregarding what Mr.
15 Jason Cook has testified and what Mr. Josh
16 Cook has testified; is that correct?
17 MR. DEAN: Object to the form.
18 MR. JOHNSON: Object to the
19 form.
20 Q. (By Mr. Frost:) As to what the
21 BetaCom employees either were told or what
22 they knew?
23 MR. JOHNSON: Object to the

Page 134

1   form.
2          MR. DEAN: Object to the form.
3       Q. (By Mr. Frost:) I mean to
4   arrive at your opinion that the BetaCom
5   employees did not know they were working
6   overhead, you would have to totally
7   discount those two deponents; isn't that
8   correct?
9          MR. DEAN: Object to the form.
10          MR. JOHNSON: Object to the
11   form.
12       A. I won't say I didn't totally
13   ignore them, but I'll tell you that
14   whatever they did or whatever measures they
15   took were sure not adequate.
16       Q. Well, what measures are you
17   aware of that they took?
18       A. The only thing that I know is
19   from reading the depositions that Mr. Jason
20   Cook said he was aware of it when he went
21   in the building. If he was aware of it,
22   why did he even bother to go in that
23   building, why didn't he back off. If he'd

Page 135

1   have took the appropriate action, he would
2   have backed off and never went in that
3   building. And he'd have put somebody on
4   notice.
5       Q. All right. But --
6       A. Mr. Joshua Cook, he knew they
7   were in that building. He knew they were
8   in there working. They were subject to
9   come out at any time. Why did he send his
10   crew aloft. Therefore, he created the
11   hazard knowing that these people were there
12   and subject to it.
13       Q. All right. So you're of the
14   opinion, I think I just heard you say, that
15   Jason Cook, the BetaCom employee, was under
16   an obligation to either back off and go
17   away from the site, or inform the other
18   employees of what was going on; is that
19   right?
20       A. Correct. Now, if he was not in
21   a management position, he had no really
22   legal obligation to do so.
23       Q. Now, are you aware of Mr. Jason

Page 136

1   Cook's testimony, Mr. Eric Davis' testimony
2   and Mr. Wheeler's testimony to the effect
3   that they were aware that when someone
4   works overhead that there is a potential
5   for a hazard?
6       A. I think they were aware of that,
7   yes.
8       Q. So is it your understanding that
9   when Mr. Cook saw that there were people
10   working overhead that he understood that
11   was a potential danger?
12       A. I think he understood that.
13       Q. That's your understanding. All
14   right. And I think you're also aware, I
15   think, that Mr. Wheeler has testified that
16   he had many years of tower climbing
17   experience and fully understood the dangers
18   of falling objects; is that correct?
19       A. That is correct.
20       Q. So would it be your opinion that
21   if Mr. Wheeler was informed by Josh Cook
22   that they would be working overhead that
23   Mr. Wheeler should have known fully the

Page 137

1   potential danger?
2          MR. DEAN: Object to the form.
3          MR. JOHNSON: Object to the
4   form.
5       A. That's not what I'm getting out
6   of these depositions. When Mr. Wheeler
7   testified that he did not know they were
8   working overhead until he walked out at
9   noon and heard "headache".
10       Q. I understand, sir. I'm just
11   asking you for your opinion based on this
12   hypothetical. Let's assume that Mr. Josh
13   Cook did inform Mr. Wheeler that he would
14   be working overhead with his crew that day
15   before the accident. Let's assume that,
16   okay. Let's assume that Mr. Wheeler has
17   testified that he understood that when
18   someone did work overhead there was a
19   potential fall hazard. He fully understood
20   that.
21          With those two things in mind,
22   if he was told by Mr. Cook they were
23   working overhead, what obligation did he

Page 138

1  have as the lead man on the job?
2       MR. DEAN: Object to the form.
3       MR. JOHNSON: Same objection.
4    A. I think that's when they need to
5  come to a meeting of the minds. Who's
6  going to leave this job site, both of us
7  don't need to be here.
8    Q. Okay.
9    A. Because if he's working inside
10  that building, then his people are not to
11  leave that building. I know, you know, and
12  everybody else on the jury would know that
13  if you're in that building there's some --
14  I don't know if there's a restroom in that
15  building, in fact, I don't think there is,
16  and I saw evidence yesterday there's not.
17  But nonetheless, see, sooner or later
18  somebody has got to come out of there. And
19  when you come out, what controls have you
20  got with whoever is on the ground working
21  for ALT is how you're going to control the
22  situation.
23    Q. Yes, sir. And what I asked you

Page 139

1  a second ago, though, is about Mr. Wheeler,
2  the BetaCom lead man on the job. If he
3  knew that the ALT employees would be
4  working overhead, if he knew, as you just
5  said, that at some point somebody is going
6  to have to leave that building either to go
7  to the restroom or eat or something of that
8  nature, and he understood the dangers, as
9  he's already testified, assuming those
10  things, what obligations did Mr. Wheeler
11  have to protect the BetaCom employees --
12       MR. DEAN: Object to the form.
13       MR. JOHNSON: Object to the
14  form.
15    Q. (By Mr. Frost:) -- as the lead
16  man on the job?
17       MR. DEAN: Same objection.
18       MR. JOHNSON: Same.
19    A. To put his employees on notice
20  or remove them from the hazard or remove
21  the hazard from the exposed employees.
22    Q. All right. He should put his
23  employees on notice of the potential

Page 140

1  hazard; is that correct?
2    A. Correct.
3    Q. He should then either remove the
4  hazard; is that right?
5    A. Either eliminate the hazard or
6  evacuate the area so you won't be exposed
7  to the hazard.
8    Q. All right. And that would be
9  Mr. Wheeler's obligations under the
10  scenario I presented to you; is that right?
11       MR. DEAN: Object to the form.
12    A. That's correct.
13    Q. Now, under this fact -- that
14  fact scenario and what you know about the
15  accident, how could Mr. Wheeler have
16  eliminated the hazard?
17    A. By having the ALT employees to
18  remove themselves from the tower and come
19  back to the ground, or leave the job site.
20    Q. Okay. And at that point -- and
21  then I believe evacuation is
22  self-explanatory. He and his employees, he
23  would take them away from the job site; is

Page 141

1  that right?
2    A. One or the other would have to
3  go.
4    Q. All right. The second prong of
5  your opinion, as I understand it, against
6  ALT, under your first opinion, A and B
7  under number one is that they were using
8  materials that they were on notice they
9  should not have been using; is that right?
10    A. That's correct.
11    Q. What are you aware of, either in
12  documentation you've been provided or
13  testimony, that ALT -- the ALT employees on
14  the job site that day knew or should have
15  known of any warning not to use that
16  particular short rope?
17    A. In reading Mr. Nathaniel Ross'
18  deposition last night, and I apologize I
19  didn't have time to make my index sheet to
20  be able to refer back to this because of
21  the time factor, but in his deposition I
22  can point back to you on page 60 he talks
23  about the different ropes, the different

36 (Pages 138 to 141)

Page 142

1  materials, and he talked about the
2  polyester power braid rope.
3        He knew the difference in ropes.
4  He knew that this was not the "power braid"
5  rope that they would normally use in a load
6  line. It looks different, it's a different
7  texture, it's a different everything. He
8  knew the difference in a rope.
9        When he purchased that unit, and
10 I've forgotten what page it's on, he talked
11 about when he bought it for thirteen
12 dollars for a hundred foot length and he
13 was asked about the tag that was on there
14 and he said I probably threw it in the
15 trash, he never bothered to read it. I
16 think with all of his training and his
17 experience he should have recognized that
18 rope is not to be used in this type of
19 situation and he threw caution to the wind.
20     Q. You're saying Mr. Ross threw
21 caution to the wind. What do you mean by
22 that?
23     A. Well, buying an inferior product

Page 143

1  it was not to be used for lifting. It was
2  plainly warned by the manufacturer of that
3  unit, and yet he placed it in a tool bin
4  with other materials that would have been
5  used for lifting by other employees on that
6  job site or any job site with ALT.
7        Q. Well, are you aware of his
8  testimony in which he states that although
9  it was not the best rope or the one he
10 would choose if he had options between it
11 and a load line rope, that it was
12 acceptable in his understanding to use that
13 rope for the application that it was being
14 used?
15     A. He may say that, but I don't
16 think he's got the power to override a
17 manufacturer. It plainly states in their
18 warning tag it's not to be used for
19 hoisting, lifting.
20     Q. I understand that, sir. But I
21 think you just told me that you knew from
22 his testimony that he did not see the
23 warning tag?

Page 144

1              MR. JOHNSON: Object to the
2  form.
3     A. That's not what he testified to.
4  He said the warning tag, he probably threw
5  it in the trash.
6     Q. Yes, sir. What I meant to say
7  is his testimony is that he did not read
8  the warning on the back of the tag. You
9  understand that?
10             MR. DEAN: Object to the form.
11    A. That's my understanding is what
12 he testified to.
13    Q. Then, let me go back then to
14 what basis do you have to offer the opinion
15 that the ALT employees on the job site that
16 day knew or should have known about the
17 warning and not to use that rope?
18    A. They should have recognized that
19 rope is not a load line of the type and
20 condition that they are accustomed to
21 using. This was something new, something
22 they had not used previously, so therefore
23 it should have brought up questions.

Page 145

1     Q. All right. Which Beta -- which
2  ALT employee has testified that they had
3  never used that kind of rope before?
4         (Off-the-record discussion.)
5              12:02 p.m.
6              (Lunch break.)
7              1:03 p.m.
8         THE COURT REPORTER: You
9  understand you're still under oath.
10        THE WITNESS: Yes, sir.
11    Q. (By Mr. Frost:) Mr. Turner, let
12 me show you what's previously been marked
13 to Matt Deadmond's deposition as Number 2
14 and Number 1. Have you ever seen this rope
15 before?
16    A. No, sir.
17    Q. I will represent to you this is
18 the rope that was involved in the accident.
19    A. Okay.
20    Q. Now, I think we established
21 earlier today that you had not seen this
22 rope before coming to your opinions; is
23 that right?

Page 146

1     A.   That is correct.
2     Q.   Okay.  Do you know whether this
3  type of rope, polypropylene rope, is
4  acceptable to be used as a short line in
5  the rigging industry?
6         MR. JOHNSON:  Object to the
7  form.
8     A.   Not to be used for lifting
9  purposes.
10    Q.   When did you come to that
11 understanding?
12    A.   Because there is no identifying,
13 because in the OSHA and the ANSI standards
14 that it says you shall have used components
15 that are tagged with the manufacturer's
16 specification, the load rating lifting,
17 capacities depending on the hitch that you
18 may use.  And there's three hitches.
19 You've got a vertical hitch, which is
20 straight up and down; you have a basket
21 hitch; and you have got a choker hitch.
22 And each one will have different load
23 rating capacities.

Page 147

1         Now, in some cases where you do
2  not have affixed tags that would show this,
3  it is acceptable to have charts that will
4  identify that are acceptable in the
5  industry depending on what -- a lot of
6  times why rope will not have an affixed
7  tag.  Some do, some don't.  So therefore,
8  you can have a chart that's perfectly
9  acceptable for those type situations.
10    Q.   Do you know what the load
11 bearing capacity was rated for this rope by
12 the manufacture?
13    A.   The tag on the piece of sample
14 that I bought was 244 pounds.
15    Q.   Do you know how much the antenna
16 weighed?
17    A.   Depends on what document you're
18 reading.  I've seen it anywhere from 40
19 pounds to 62 pounds.
20    Q.   40 pounds to 62 pounds?
21    A.   That is correct.
22    Q.   Do you know if the
23 manufacturer's load capacity rating for

Page 148

1  this rope was within acceptable limits to
2  lift 40 to 62 pounds?
3         MR. JOHNSON:  Object to the
4  form.
5     A.   Not for lifting.
6     Q.   All right.  How do you come to
7  that conclusion?
8     A.   Because of the one label that
9  came with that rope that said not to be
10 used for lifting purposes.
11    Q.   All right.  Let's assume that
12 you have this rope without the warning
13 label.
14    A.   Yes, sir.
15    Q.   All right.  Is there anything
16 about the rope that would lead you to
17 believe that it could not be used for the
18 purpose it was being used at the time of
19 this accident?
20        MR. JOHNSON:  Object to the
21 form.
22    A.   If you do not have a tag for
23 rigging on whatever device that you're

Page 149

1  using, whether it be a web sling, alloy
2  steel chain or a rope, wire rope or
3  synthetic rope, if you do not have the
4  manufacturer's nomenclature you do not use
5  that rope for lifting purposes, period.
6     Q.   Are you saying that every short
7  rope that is used in the tower rigging
8  industry should have a tag on it saying
9  what its load capacity is?
10        MR. JOHNSON:  Object to the
11 form.
12    A.   Or some identifying capacity in
13 order to be able to trace that rope, that's
14 correct.
15    Q.   What kind of identifying
16 capacities are you aware of?
17    A.   You can get certification when
18 you buy a reel of rope.  If he's talking
19 about 1200 feet, 1400 feet load line, you
20 can get a certificate saying that this load
21 line or this rope is rated for such and
22 such by whatever manufacturer and get the
23 documentation to back it up.

Page 150

1    Q. All right. Let me make sure
2  we're clear. This has been identified as a
3  sample of a load line.
4    A. Yes, sir.
5    Q. Are you familiar with something
6  like this?
7    A. Yes, sir. Many feet of it.
8    Q. All right. And this is Exhibit
9  4 to Deadmond. And there's been testimony
10  that this kind of load line does come to
11  the purchaser on the spool that it's on
12  with a certification?
13    A. That's correct.
14    Q. Are you aware of that testimony?
15    A. That's what I was just saying.
16    Q. Okay. Now, this is what has
17  been called a short line. It is not a load
18  line, it is a short line. Do you know
19  whether short lines that don't have tags or
20  any kind of identifier on them are
21  acceptable to be used in the tower rigging
22  industry?
23    A. In no industry. I don't care

Page 151

1  whether it's tower industry, ship building
2  or whatever. You don't use rigging
3  material that is not rated and classified.
4    Q. So are you of the opinion that
5  the only kind of short line rope that
6  should have been used on this particular
7  job site by ALT would have been short
8  pieces of this load line, Exhibit 4 to
9  Deadmond?
10    A. Of course you could buy that
11  also in smaller sizes that it would have a
12  lesser load rating capacity.
13    Q. Well, that's what I'm asking
14  you. Are you saying that this is the only
15  kind of rope, a certified rope, load rope,
16  are you saying that's the only kind you
17  would find to be acceptable to be used on
18  this job site?
19    A. No, sir, you could have used
20  manila rope.
21    Q. You could have used manila rope?
22    A. Sure.
23    Q. Of what size and strength?

Page 152

1    A. Whatever the manufacturer would
2  rate it at. It's got to be certified as
3  well.
4    Q. All right. And what other kind
5  of ropes could you use?
6    A. It could be nylon, it could be
7  polypropylene. It's got to be certified.
8    Q. So you're okay with using
9  polypropylene rope on a job site such as
10  this as long as it's certified?
11    A. Correct.
12    Q. Okay. Is this polypropylene
13  rope, do you know?
14    A. That's what the manufacturer
15  says it is, but I don't know.
16    Q. You couldn't tell what kind it
17  is by looking at it, could you?
18    A. I can't.
19    Q. Okay. Have you ever had any
20  training or experience in how to determine
21  what ropes are made out of by looking at
22  them?
23    A. Not per se, no, sir. No formal

Page 153

1  training.
2    Q. All right. So if you were at
3  this job site working for ALT trying to
4  determine what rope to use, you wouldn't
5  have the skills available to you to
6  determine which one you could or couldn't
7  use, do you?
8    MR. JOHNSON: Object to the
9  form.
10    A. Not without the certification
11  ticket. No ticket, no laundry. If you
12  can't show me the certification, it's not
13  legal.
14    Q. Okay. Do you know how the use
15  the calculations in the Rigger's Handbook
16  on how to determine what rope is acceptable
17  to use?
18    A. I'm sure I could.
19    Q. Have you ever done that before?
20    A. In certain instances, depending
21  on the -- you have to figure the sling
22  angle whether you're going to use it at a
23  30 degree, 45 degree, 60 degree angle.

39 (Pages 150 to 153)

Page 154

1 Then you have to make your calculations
2 accordingly.
3    Q. Have you ever tried to determine
4 what kind of short rope to use in a rigging
5 situation on a tower?
6    A. No, sir.
7    Q. Okay. Now, you have cited to an
8 OSHA regulation about the ropes and
9 requirements, et cetera, and I think it's
10 1926.251 entitled "Rigging equipment for
11 material handling"; is that right?
12    A. Yes, sir.
13    Q. Does that regulation relate to
14 short ropes like this, polypropylene ropes,
15 or do you know?
16    A. It will relate to anything being
17 used as a lifting device, regardless of
18 what it is.
19    Q. Can you point to me where it
20 says that in that regulation?
21    A. All right. I'm going to read
22 you the first two paragraphs that would be
23 entitled 261 -- I'm sorry 251 "Rigging

Page 155

1 equipment for material handling.
2         (a) General (1) Rigging
3 equipment for material handling shall be
4 inspected prior to use on each shift and as
5 necessary during its use to ensure that it
6 is safe. Defective rigging equipment shall
7 be removed from service.
8         (2) Rigging equipment shall not
9 be loaded in excess of its recommended safe
10 working load as prescribed in Tables H-1
11 through H-20 in this subpart, following
12 Section 1926.252(e) for the specific
13 equipment."
14    Q. All right. Do you know what a
15 sling is?
16    A. Yes, sir.
17    Q. What is a sling?
18    A. A sling could be made of
19 different components: Manila rope, it
20 could be alloy steel chain, it could be
21 wire rope, it could be web, whether it be
22 metal webbing or synthetic webbing. But
23 each one of them shall have a tag affixed

Page 156

1 stating the manufacturer, the load rated
2 capacity in each position, whether it be a
3 vertical, a basket or a choker hitch.
4    Q. Now, these Exhibits 1 and 2,
5 they're not slings; is that correct?
6    A. That is correct.
7    Q. Are you familiar with the
8 definition of the scope of Section 1926.21
9 (sic) as to what it actually relates to?
10        MR. GANN: 1926.251.
11    Q. (By Mr. Frost:) 251. Are you
12 familiar with the scope of what it relates
13 to? Well, let me ask you this first. Let
14 me ask you this first, sir. What does OSHA
15 mean when they say the scope of the
16 regulation?
17    A. How is this regulation going to
18 be applied and to what.
19    Q. Okay. And are you familiar with
20 the scope of the regulation 1926.251?
21    A. It is so stated in (a)(5)
22 section. It's entitled "Scope. This
23 section applies to slings used in

Page 157

1 conjunction with other material handling
2 equipment."
3    Q. All right. Now, let me just
4 stop you there for a moment. The scope of
5 Section 1926.251 applies to slings. Is
6 that what it says, sir?
7    A. That's correct.
8    Q. Okay. It doesn't apply to
9 Exhibits 1 and 2, does it?
10    A. Because that is not a sling,
11 it's a piece of rope.
12    Q. Exactly. Exactly. Do you know
13 if they were using any slings on this
14 particular job site?
15    A. My understanding, they did, in
16 fact, have synthetic web slings on this job
17 site.
18    Q. But were they using them at the
19 time of the accident in the rigging?
20    A. To my understanding, it was. It
21 was up there at the stiff arm and the load
22 block, between them.
23    Q. Well, is it your understanding

40 (Pages 154 to 157)

Page 158

1  they were using any slings that were being
2  used to lower the antenna that broke?
3          MR. DEAN: Objection.
4          MR. JOHNSON: Objection.
5      Q. (By Mr. Frost:) The rope that
6  broke, were they using a sling?
7      A. I haven't seen any evidence of
8  it.
9      Q. Okay.
10         MR. JOHNSON: Are you talking
11 about any slings for use in that short rope
12 application, is that what your question
13 was?
14     Q. (By Mr. Frost:) Yeah, I'm just
15 asking: Have you seen anything that would
16 indicate they were using a sling to lower
17 the antenna as opposed to using this
18 Exhibit 1 and 2?
19     A. They were using a sling to
20 support the load block between the stiff
21 arm and the head block. And I think there
22 was a shackle involved between that.
23     Q. All right. But were the ALT

Page 159

1  employees using a sling attached to the
2  antenna that ended up hitting Mr. Cotton?
3      A. I've seen no evidence of it.
4  They were using this short rope stuff.
5      Q. Right. Okay. So would it be
6  fair to say, sir, that with regard to
7  section 1926.251, it had no application
8  because it relates to slings; isn't that
9  true?
10         MR. DEAN: Object to the form.
11         MR. JOHNSON: Object to the
12 form.
13     A. I don't agree with that at all.
14 I'm saying in order to comply with this you
15 would have to use a sling, not a piece of
16 junk rope.
17     Q. Oh, okay. Well, now -- so
18 you're saying that they should have been
19 using a sling and not a short rope?
20     A. Absolutely.
21     Q. Okay. Are you aware of any
22 other tower rigging or cell tower company
23 that uses slings instead of short ropes in

Page 160

1  their rigging?
2      A. I have no idea.
3      Q. Have you researched the industry
4  at all to determine what the industry
5  standard is?
6      A. No, sir. I know what the OSHA
7  standards and I know what the ANSI
8  standards are.
9      Q. All right.
10     A. Regardless of the industry.
11     Q. All right. Can you point to me,
12 sir, any OSHA regulation that says you must
13 use slings as opposed to short ropes in the
14 kind of application we are here today
15 about?
16     A. I think you're making a very
17 skilled evasion of what the intent of the
18 standards is. In order to hoist and rig
19 any material, then you have to follow this
20 set of standards as far as OSHA is
21 concerned.
22     Q. Well, you've made the
23 distinction, sir, between a short rope and

Page 161

1  a sling. This is not a sling, you've told
2  us that, okay. You've told us what a sling
3  is, you've told us that this section
4  applies to slings and not to short rope.
5  And I'm just asking you: Is there anything
6  in that section or in any OSHA regulation
7  that says you have to use a sling as
8  opposed to a polypropylene rope in the
9  rigging application that we were doing in
10 this incident?
11     A. The intent of this standard is
12 to use slings. This is so asinine that
13 OSHA didn't even bother addressing this
14 standard. They didn't think anybody would
15 come to this kind of conclusion to use that
16 in lieu of a sling.
17     Q. But you can't tell me, sitting
18 here today, sir, that you know of one
19 single company in the tower industry that
20 uses this, a sling, as opposed to this, a
21 rope, in their short lines, can you?
22     A. ALT used it up there at the head
23 block. They have them on the truck and

41 (Pages 158 to 161)

Page 162

1    they do, in fact, use them.
2        Q.   I'm talking about in the
3    attachment rigging when you're lowering,
4    for this instance, the antenna. Are you
5    aware of any tower company that uses slings
6    currently, other than ALT, that uses slings
7    as opposed to ropes?
8        A.   I'm not that familiar with the
9    tower industry, no, sir.
10       Q.   Are you familiar with the tower
11   and rigging industry at all?
12       A.   Not really. The rigging
13   industry, yes. But the tower industry, no.
14       Q.   Hmm. Let me mark this as
15   Defendant's Exhibit 36. This is just an
16   exemplar sling, and whether this will stay
17   on, I don't know, but we'll try.
18           (WHEREUPON, a document was
19   marked as Defendant's Exhibit Number 36 and
20   is attached to the original transcript.)
21       Q.   Is this a sling, sir?
22       A.   Yes, sir.
23       Q.   Okay. Thank you.

Page 163

1        A.   It's got a manufacturer's label
2    on it giving it a load rated capacity in
3    all three vertical, whether it be a
4    vertical, choker or a basket hitch.
5        Q.   All right. The fourth opinion
6    that you gave as I wrote it down was that
7    ALT was not a prudent, diligent employer
8    because they did not tell the employees
9    about the warning on the rope tag; is that
10   right?
11       A.   They did not -- that is one
12   thing, and they didn't, also, I don't think
13   they adequately warned -- if they, in fact,
14   did any warning to the employees of
15   BetaCom.
16       Q.   Okay. What I'm asking you
17   first, though, is you gave the opinion
18   earlier that knowing there were warnings on
19   the tag, ALT violated the prudent employer
20   standard because they did not act knowing
21   the warnings. I mean what information do
22   you have that ALT at any point in time knew
23   there was a warning tag on this particular

Page 164

1    rope, Exhibits 1 and 2?
2        A.   Because the guy that purchased
3    that rope said in his deposition, and I was
4    reading it last night, and I cannot go back
5    to the exact page because I didn't have
6    time to make my notes as such, and Mr.
7    Nathan Ross said he threw the tag in the
8    trash can, he never even bothered to read
9    it.
10       Q.   All right. And that's what I'm
11   asking you. Knowing that that's the only
12   testimony about the tag, what is it about
13   that testimony that leads you to believe
14   that ALT knew there was a warning on the
15   rope that it should not be used for
16   lifting?
17       A.   Because he was a lead man with
18   ALT when he purchased it.
19       Q.   So even though he didn't read
20   it, he should have -- are you saying he
21   should have read the warning?
22       A.   Absolutely, or he shouldn't have
23   purchased it without a certification or a

Page 165

1    tag by the manufacturer.
2        Q.   Okay. So number one, Nathan
3    Ross should have read the warning. And
4    then, number two, he shouldn't have even
5    purchased this rope to begin with because
6    he should only be purchasing certified
7    rope; is that right?
8            MR. JOHNSON: Object to the
9    form.
10       A.   That should be used for lifting,
11   that is correct.
12       Q.   Okay. Now, this particular
13   rope, Exhibits 1 and 2, has all sorts of
14   other applications other than lifting,
15   though; is that right?
16       A.   Sure. Tie-downs, whatever.
17       Q.   So you don't find fault with
18   Nathan Ross buying it for purposes other
19   than lifting?
20       A.   As far as the rope itself, no,
21   sir.
22       Q.   And you don't have any fault
23   with the fact that it was on the ALT truck

42 (Pages 162 to 165)

Page 166

1  the day of the incident; is that right?
2      A.  I sure wouldn't put it in the
3  same bin as I would put with the load
4  lifting lines and slings.
5      Q.  I understand.  I'm just saying
6  you don't have -- you don't find fault with
7  the fact that it was on the truck because
8  it could have been used for other purposes,
9  right?
10     A.  That's correct.
11     Q.  You're just of the opinion
12 because it has a warning that says do not
13 lift, you don't think it should have been
14 used as a short line; is that right?
15         MR. JOHNSON:  Object to the
16 form.
17     A.  That is correct.
18     Q.  Okay.  Are you a licensed
19 engineer in the State of Alabama?
20     A.  Not in the State of Alabama, no,
21 sir.
22     Q.  Where are you currently licensed
23 as an engineer?

Page 167

1      A.  There's only two states and
2  there was three, but I understand it's only
3  down to two states that license a safety
4  engineer discipline, and I am licensed in
5  the State of Massachusetts.  Texas has done
6  it in the past but I understand they have
7  withdrawn, and the State of California
8  does.
9      Q.  What is your hourly rate?
10     A.  A hundred dollars, plus
11 expenses.
12     Q.  What have you billed the
13 plaintiff so far in this case?
14     A.  Nothing.
15     Q.  What is your total outstanding
16 bill that has not been billed?
17     A.  We could figure up the hours
18 according to the daily log that I provided
19 you earlier.
20     Q.  Now, that log didn't include
21 what you've done the last few days, does
22 it?
23     A.  Yesterday and today, no, sir.

Page 168

1      Q.  How many hours did you spend
2  yesterday?
3      A.  Six hours of hard driving, plus
4  I made a site visit and then I came in and
5  unloaded these documents and made sure that
6  we had everything that was requested in the
7  notice.
8      Q.  Do you have -- do you currently
9  work for anybody?
10     A.  No, sir.
11     Q.  Is being an expert your only
12 source of income at this time?
13     A.  No, sir.
14     Q.  What other sources of income do
15 you have?
16     A.  Previous investments and real
17 estate.
18     Q.  Does your wife work?
19     A.  She is retired.
20     Q.  Where is she retired from?
21     A.  The State of Georgia.
22     Q.  Have you ever offered testimony
23 in a case relating to a cell tower?

Page 169

1      A.  No, sir.
2      Q.  Have you ever offered testimony
3  in a case dealing with the failure of a
4  short rope in a rigging?
5          MR. JOHNSON:  Object to the
6  form.
7      A.  I think I have when I was still
8  a compliance officer with the U.S.
9  Department of Labor with OSHA.
10     Q.  You testified as an OSHA
11 officer?
12     A.  Yes, sir.
13     Q.  In what context?
14     A.  I was the compliance officer
15 that went out on the job site and did the
16 evaluation and made the recommendation for
17 citations.  When the employer contested the
18 citation, I was the one that was called
19 upon for testimony.
20     Q.  Was that some kind of an OSHA
21 administrative law hearing?
22     A.  That's correct.
23     Q.  It wasn't in a court of law?

Page 170

1    A. I'm sorry?
2    Q. It wasn't in a civil action?
3    A. Well, it was a civil action, but
4  I don't think it was in the private sector
5  or private domain that you're trying to
6  allude it is.
7    Q. Right. It was a government
8  administrative law hearing, not a private
9  civil action?
10    A. That's correct.
11    Q. Would your testimony in that
12  context as an OSHA officer be under seal?
13  I mean it's not available for public use,
14  or do you know?
15    A. I do not know. I do know that
16  anything -- that my opinions were under
17  seal, per se, and just like when you get an
18  OSHA report today there's a lot of things
19  that's been blacked out. My opinions would
20  have been blacked out.
21    Q. All right. And have you ever
22  investigated, on behalf of OSHA, any
23  accident scene involving a cell tower or a

Page 171

1  rigging accident for failure of a short
2  line?
3    A. Not on a cell tower. But
4  rigging, many of them.
5    Q. Okay. Tell me one you can
6  remember about an incident involving the
7  failure of a short line in a rigging
8  incident.
9    A. You're throwing the short line
10  in there. If you're talking about the
11  failure of the unloading process with
12  material handling equipment, there's been
13  many of them. I can remember chains
14  breaking, alloy steel chains that were not
15  -- they were proof coiled, they were not
16  considered qualified, bona fide lifting
17  devices that would have been okay for
18  binding or holding down. But when you
19  don't have alloy steel fittings, you have
20  make shift devices such as nuts and bolts,
21  or what we refer to as a cold ship, these
22  type things disqualify that chain as being
23  used for a lifting device. But if you want

Page 172

1  to hold something or pull something or tow
2  something, that's one thing and it's legal.
3    Q. So is the answer, no, you've
4  never been involved in an investigation of
5  an incident involving the failure of a
6  short line, a short line rope?
7    A. I've investigated where ropes
8  have broken where they've been used for
9  lifting purposes, yes.
10    Q. All right. Tell me about the
11  one you can remember.
12    A. They were loading pipe to go
13  into a trench and they were trying to lower
14  the pipe in a trench and it broke.
15    Q. What kind of rope was that?
16    A. It was a synthetic rope. That's
17  all I can tell you.
18    Q. Did you issue a citation?
19    A. Yes, sir.
20    Q. What was the citation you
21  issued?
22    A. For not using approved devices
23  for hoisting.

Page 173

1    Q. What did you think they should
2  have used?
3    A. Something that was approved. I
4  didn't care what they used as long as they
5  had something to back it up, whether it be
6  alloyed steel chain, whether it be wire
7  rope, synthetic rope, I didn't care what it
8  was.
9    Q. Have you ever testified by way
10  of deposition or in trial in a case
11  involving an injury from cell tower
12  rigging?
13    A. No, sir.
14    Q. Have you ever testified by way
15  of deposition or trial in a case involving
16  the failure of a short line rope in
17  rigging?
18    A. I think I just answered that in
19  the trench situation where they lost a pipe
20  trying to lower it down into the trench.
21    Q. Well, you said you had
22  investigated that. Did you also testify in
23  that?