Case 1:06-cv-01486-KOB   Document 127-2   Filed 05/06/08   Page 1 of 44

FILED

American Court Reporting
toll-free (877) 320-1050

2008 May-06  PM 06:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 174

1    A.  If I'm not mistaken, the
2  employee challenged that and it went to
3  hearing in, if I'm not mistaken,
4  Jacksonville.
5    Q.  Well, let me ask you:  To your
6  Exhibit 5, you've got a list that we
7  discussed earlier today about the cases
8  that you have been involved in and provided
9  testimony, either by deposition or trial.
10  Can you tell me if there are any of these
11  cases that involved cell towers or some
12  kind of rigging application?
13    A.  Cell towers, I can tell you
14  absolutely no.
15    Q.  All right.  Any in here that
16  have any rigging involved?
17    A.  On 11-16-05, Michael McCollum
18  versus Cives Steel.  That was a materials
19  handling issue.  And beyond that, I am not
20  going to say any more.  That case is still
21  active and open.  If you would like to talk
22  about it, I will give you the opportunity
23  to make contact with Mr. Jule Peek.

Page 175

1    Q.  All right.  Well, I'm not going
2  to ask you about your opinions in the case,
3  okay?
4    A.  Okay.
5    Q.  But I do know need to know when
6  you say "material handling" what do you
7  mean?
8    A.  I've said all I'm going to say
9  about that.
10    Q.  Well, does it involve rigging?
11    A.  I've said all I'm going to say
12  about that case.  If it was a closed case,
13  I would talk differently about it.
14    Q.  Well, I understand, Mr. Turner.
15  I'm not asking you about any opinions, any
16  formulations, anything that you've done
17  with it.  I just need to find out from a
18  factual basis does it involve rigging or
19  failure of a short rope, that kind of
20  thing?
21    A.  Sorry.  Enough said.
22    MR. JOHNSON:  Let me talk to him
23  about that and see if I can help you out

Page 176

1  here, Mitch.
2    MR. FROST:  All right.  Thank
3  you.
4        1:33 p.m.
5      (Short recess)
6        1:40 p.m.
7    MR. FROST:  Are we going to be
8  able to go into them?
9    MR. JOHNSON:  Yeah, just -- we
10  can put this on the record if you want to
11  or not.  I think what he's fixing to tell
12  you is that the material handling in this
13  case involved rigging, but I think, for the
14  purposes of the fact, he doesn't want to go
15  into the details of this case because it's
16  still in litigation.
17    MR. FROST:  Sure.
18    MR. JOHNSON:  He can't go into
19  the details any further than that.
20    MR. FROST:  The only other
21  question I need answered is whether it
22  regarded a rope.
23    MR. JOHNSON:  Do you feel

Page 177

1  comfortable answering at least that much,
2  whether it involved a rope.
3    MR. FROST:  I don't want to know
4  anything else about it.
5    MR. JOHNSON:  Yeah.
6    A.  It did not involve a synthetic
7  or natural fiber rope, no.
8    Q.  All right.  That's fine.  Now,
9  did any of these cases that you've got
10  listed here then involve any kind of rope
11  in a rigging process failing?
12    A.  On 2-16 of 2000, Shane Tillman
13  versus Howard Ray Construction Company,
14  right now I could not answer that question.
15  I know the victim was struck by flying
16  debris, and what was the result of that one
17  I do not know or the cause or contributing
18  factor to it or cause -- root cause or
19  whatever of it, I cannot recall to save my
20  neck right now.
21    Q.  Is that case over?
22    A.  As far as I know, it is.
23    Q.  Did you give a deposition in

Page 178

1  that case?
2     A.  I did.
3     Q.  Did it involve rigging and the
4  breaking of a rope?
5     A.  I cannot recall.
6     Q.  Any others, sir?
7     (Off-the-record discussion.)
8     A.  None that I can seem to recall.
9     Q.  So if I was going to try to find
10  some of your prior testimony about rigging
11  or rope or falling objects, the only one
12  that might relate to that would be the
13  Tillman case?
14         MR. JOHNSON:  Object to the
15  form.
16     A.  I think that is correct.
17     Q.  Now, let me show you what had
18  been marked -- I'll just mark it a
19  different number.  Let me show you what
20  I'll mark as Defendant's Exhibit 37.  And
21  I'll ask you if you've ever seen this label
22  before.  Again, that's a blow-up of a
23  label.

Page 179

1         (WHEREUPON, a document was
2  marked as Defendant's Exhibit Number 37 and
3  is attached to the original transcript.)
4         MR. JOHNSON:  This is from your
5  notes.  Is that a copy?
6         THE WITNESS:  This came from
7  there.
8         MR. JOHNSON:  Okay.
9     Q.  (By Mr. Frost:)  Have you seen
10  Exhibit 37 before?
11     A.  I have not seen this exact
12  document, but it looks like it's just an
13  enlargement of what I have got that you
14  can't really read some of the, I guess is
15  it Spanish, or Hispanic, notes that's on
16  it.  And, in fact, on the one that I
17  reproduced I couldn't get them all either,
18  it turned out somewhat dark and this one is
19  black.
20         MR. JOHNSON:  His question was
21  if you'd ever seen that particular exhibit
22  before.
23     A.  No, sir.

Page 180

1     Q.  Do you know where Exhibit 37
2  came from?
3     A.  It appears that it came off of a
4  tag that was attached to a bundle of rope
5  somewhere.
6     Q.  Are you saying it appears
7  similar to your Exhibit 29?
8     A.  Correct.
9     Q.  Do you know which of these
10  Exhibits, 29 or 37, was the actual warning
11  label or is a warning label that relates to
12  the same kind of rope used in this
13  incident?
14     A.  I don't know the origin of that
15  one.  I do know the origin of Exhibit --
16         MR. JOHNSON:  29.
17     A.  29.
18     Q.  Well, do you know which of these
19  labels you would say ALT should have been
20  aware of prior to the accident?
21     A.  They should have been aware of
22  the one that was attached to the rope in
23  which they purchased, whichever one that

Page 181

1  is.
2     Q.  Well, that's what I'm asking
3  you.  Which one of these are you saying is
4  similar to the one they should have been
5  aware of?
6         MR. JOHNSON:  Object to the
7  form.
8     A.  I don't know that I can answer
9  that.  I know that one came off the rope --
10  piece of rope that I bought which appears
11  to be similar to the rope in question.
12     Q.  Well, that's what I'm asking
13  you.  You went out and bought an exemplar
14  rope, right?
15     A.  That's correct.
16     Q.  Okay.  And it had Exhibit 29 on
17  it; is that right?
18     A.  That is correct.
19     Q.  Okay.  But you don't know what
20  the label had on it, you do not know what
21  the label or warning label had written on
22  it that Mr. Ross threw away, do you?
23     A.  No, sir.

Page 182

1    Q.   Do you have any way of finding
2    that out?
3    A.   Not when he threw it in the
4    trash.
5    Q.   Do you know where your rope,
6    your exemplar rope, was manufactured?
7    A.   It states on the tag, Made in
8    China.
9    Q.   Do you know where the rope that
10   was allegedly -- that supposedly -- do you
11   know where the rope that was involved in
12   the incident was manufactured?
13   A.   I have no way of knowing without
14   knowing the origin of it.
15   Q.   Okay. Do you know what kind of
16   rope the rope is that you purchased?
17   A.   It states on it it's a diamond
18   braid poly rope, and that's all it states.
19   Q.   Does it state on there, Exhibit
20   29, what it is made out of?
21   A.   Contains one or both:
22   Polypropylene and polyester.
23   Q.   Do you know what the rope

Page 183

1    involved in the accident contained or was
2    made out of?
3    A.   No, sir.
4    Q.   Now, you made a comment a few
5    moments ago that you do not feel that ALT's
6    employees or ALT adequately warned of the
7    potential hazards; is that correct?
8    A.   They did not take the warning by
9    the manufacturer of that rope apparently,
10   plus they did not warn the people on that
11   job site adequately. That is correct.
12   Q.   All right. When you say they
13   did not warn them adequately, are you aware
14   that they did warn them or attempt to warn
15   them at all?
16   A.   It's my understanding they did,
17   in fact, have a sign on the fence at one
18   time. The wind had blown it down the night
19   before. To some degree, or of what degree,
20   I do not know.
21   Q.   Okay. What do you say warnings
22   should have been, pursuant to OSHA
23   regulations or industry standards, on that

Page 184

1    job site about possible overhead working?
2        MR. JOHNSON: Object to the
3    form.
4    A.   Before anybody climbed that
5    tower there should have been a job site
6    meeting with all concerned on that job
7    site. Everybody.
8    Q.   All right. Are you aware of any
9    testimony that says that that was a meeting
10   with the ALT employees and the BetaCom
11   employees?
12   A.   Not to include everybody.
13   Q.   What do you mean by that?
14   A.   In essence, I don't think Mr.
15   Cotton was ever included in that meeting.
16   Q.   Are you aware that Josh Cook has
17   testified that he did, in fact, meet with
18   Mr. Wheeler and Mr. Cotton and inform them
19   they would be overhead working that day?
20   A.   That's what he says in his
21   deposition.
22   Q.   Are you totally discounting that
23   again?

Page 185

1        MR. DEAN: Object to the form.
2        MR. JOHNSON: Asked and
3    answered.
4    Q.   (By Mr. Frost:) I guess I'm
5    just trying to find out: What is it about
6    Mr. Cook's deposition that leads you to
7    just totally discount it?
8        MR. JOHNSON: Object to the form.
9    A.   Because I can't get anybody else
10   to substantiate it.
11   Q.   No one else to be substantiate
12   it?
13   A.   And, in fact, Mr. Wheeler didn't
14   substantiate it. He said he didn't know
15   until he heard "headache" at noon.
16   Q.   Well, you have Mr. Wheeler that
17   says, no, there was no meeting. You have
18   Mr. Cook that says, yes, there was a
19   meeting. How do you make the determination
20   that you go with Mr. Wheeler's testimony as
21   opposed to Mr. Cook's?
22   A.   Because I didn't see any
23   evidence of any action to be taken to

Page 186

1  comply with.
2      Q.  And again, what would that
3  action have been on the part of Mr.
4  Wheeler, if he had known?
5      MR. DEAN:  Object to the form.
6      A.  Either remove his people, keep
7  them all inside the building, and have
8  established some means of warning if he
9  decided he wanted to come outside of that
10  building to stop the work in process.
11      Q.  All right.  So as far as
12  warning, you would have a job site meeting.
13  Anything else?
14      A.  I'd document it.
15      Q.  All right.  And how would you
16  document it?
17      A.  In writing.
18      Q.  All right.  Would that have
19  been, for instance, on one of Josh Cook's
20  daily reports?
21      A.  I don't care if it had been on
22  the back of a napkin, I'd have had me some
23  documentation of it.

Page 187

1      Q.  All right.  Anything else you
2  would have done to warn of the potential of
3  overhead working?
4      A.  I would call my boss and say,
5  hey, we've got other people out here
6  working in the area in which I'm going to
7  be working, I don't think it's a safe
8  condition, one of us needs to leave, now,
9  who shall it be.
10      Q.  Okay.  And would that have been
11  if you were Mr. Wheeler or Mr. Cook?
12      A.  Yes, sir.
13      Q.  Okay.  Would you have -- I mean
14  is there any requirement in your mind,
15  either OSHA, ANSI, or otherwise, of any
16  signage, any warning signs or anything to
17  be placed at the site?
18      A.  There's requirements to have
19  some warning signs.  However, you cannot
20  rely on warning signs alone.  It does not
21  stop it from happening, it is just not
22  adequate.
23      Q.  Okay.  But you are aware through

Page 188

1  the testimony that ALT's employees had
2  placed a warning sign earlier, a few days
3  earlier, at the site.  You're aware of
4  that, aren't you?
5      MR. JOHNSON:  Object to the
6  form.
7      A.  Yes, sir.
8      Q.  And you're aware that Mr.
9  Wheeler said that he did see that warning
10  sign a few days prior to the accident?
11      A.  That's correct.  But here's the
12  reason I don't agree that it's adequate.
13      Q.  All right.
14      A.  Because if it was placed there
15  before they started climbing the tower it
16  loses significance.
17      Q.  So you should take it down each
18  day and put it up each day?
19      A.  Why put it up when they didn't
20  even climb the tower?
21      Q.  Well, you realize there's been
22  testimony that the ALT employees had
23  previously, on a previous occasion before

Page 189

1  the day of the accident, climbed the tower.
2  You're aware of that, aren't you?
3      A.  That's correct, but not the day
4  before.
5      Q.  So are you of the opinion they
6  should have taken it down the day before
7  and then put it back up the day they were
8  going to climb the tower?
9      A.  If I wasn't going to climb the
10  tower that day, I would have.
11      Q.  Now, I've got laid out here on
12  the floor a similar signage that would have
13  been placed out there on the fence per the
14  testimony.  In your opinion, would this be
15  an adequate sign as far as warning on that
16  job site of various hazards?
17      MR. DEAN:  Object to the form.
18      MR. JOHNSON:  Object to the
19  form.
20      MR. DEAN:  I don't believe
21  that's at all similar to the one in the
22  picture.  It's got other things added to
23  it.

48 (Pages 186 to 189)

Page 190

1    MR. JOHNSON: It's not even the
2  same sign. In fact, it says it's an ALT
3  sign as opposed to a WesTower sign.
4    MR. FROST: I'm just helping
5  Keith out.
6    MR. DEAN: Well, we object to
7  the witness testifying about a sign
8  different than the one that was out there.
9    MR. FROST: Well, we don't have
10  the sign that was out there. This is a
11  same or similar sign.
12    MR. DEAN: Well, it includes
13  different warnings, too.
14    MR. FROST: All the warnings are
15  the same.
16    Q. (By Mr. Frost:) Would you think
17  this is -- would this be adequate as a
18  warning sign at that site for warning of
19  various potential hazards?
20    MR. JOHNSON: Object to the
21  form.
22    A. I do not have any criticism of
23  that sign, per se.

Page 191

1    Q. Okay. Let me mark that as
2  Defendant's Exhibit 38.
3    (WHEREUPON, a document was
4  marked as Defendant's Exhibit Number 38 and
5  is attached to the original transcript.)
6    Q. And again, I guess I'll hold on
7  to it. All right. Other than using
8  Exhibits 1 and 2, which you say they should
9  not have done --
10    A. That is correct.
11    Q. -- do you have any criticisms of
12  the rigging and how it was done that day?
13    A. The load line was not done in
14  accordance to the guidelines provided by
15  the contractor, WesTower.
16    Q. In what way, sir?
17    A. That it did not use a tag line.
18    Q. What did the WesTower
19  requirements say?
20    A. If I recall correctly, to use a
21  tag line. And one was not used.
22    Q. Do you have those here available
23  for you to look at?

Page 192

1    A. Somewhere.
2    MR. JOHNSON: You went through
3  them.
4    MR. FROST: I didn't know if we
5  marked those.
6    MR. JOHNSON: Probably be --
7  there you go. You want to use it out here.
8  It was in response to, I think, one of
9  y'all's interrogatories y'all have been
10  through. This is Exhibit 17 to Mr. Silva's
11  deposition. This is the WesTower/ALT
12  agreement.
13    Q. (By Mr. Frost:) Can you find
14  for me what you are talking about, sir?
15    A. On page 12 of 16 of that
16  document entitled "Cranes and Material
17  Handling. Subcontractor shall provide the
18  resources necessary for inspection and
19  maintenance of rigging and lifting
20  equipment and shall monitor all lifts to
21  ensure that acceptable lifting practices
22  are followed. Tag lines shall be used on
23  all lifts."

Page 193

1    Q. Can you tell me what the
2  difference is between a tag line and a
3  self-tagging line?
4    MR. JOHNSON: Object to the
5  form.
6    A. The contract, according to this,
7  calls for a tag line. And there is no
8  substitution as far as I'm concerned. The
9  difference is that one is actually attached
10  from the load line whether it's going up or
11  down the two are somehow attached together
12  to try to control that. But that is no
13  substitute for a tag line.
14    Q. Where do you come with the
15  expertise to offer that opinion?
16    A. From courses I've attended at
17  the OSHA Institute with the material
18  handling and rigging courses that I have
19  attended at the OSHA Institute.
20    Q. All right. Can you tell me what
21  OSHA regulation says that you must use a
22  separate tag line when lifting an object as
23  opposed to a self-tagging line?

49 (Pages 190 to 193)

Page 194

1    A. It does not state that. But the
2  contract, according to this, says that. So
3  therefore, the manufacturers of the
4  contract would take -- accept a more
5  stringent standard than OSHA, so therefore
6  OSHA would enforce the employer's safety
7  rule.
8    Q. Now, as I understand what you
9  just read says that you have to use a tag
10 line when lifting; is that right?
11   A. Lifting or lowering, it makes no
12 difference. That's -- lowering is lifting
13 in reverse.
14   Q. A lowering is a lifting in
15 reverse?
16   A. Correct.
17   Q. Does that WesTower contract say
18 you must use a tag line when lowering?
19   A. It says all lifts, whether it's
20 a positive or negative lift. That's the
21 best explanation I can give you.
22   Q. Okay. Do you have any opinion
23 as to whether using a separate tag line was

Page 195

1  feasible at all at this particular job
2  site?
3    A. From walking that job site
4  yesterday, yes, sir, I would think that I
5  could have arranged that to where I could
6  have used a tag line, but it would take a
7  third party, another employee on that job
8  site or a fourth employee, to have
9  accomplished it.
10   Q. Have you ever rigged a cell
11 tower before?
12   A. No, sir.
13   Q. Do you know all the difficulties
14 or hazards involved in rigging a cell
15 tower?
16   A. I have never been on a cell
17 tower.
18   Q. Okay. Well, how can you make --
19 offer an opinion today or a judgment as to
20 whether or not a self-tagging load line or
21 a separate tag line would have been
22 appropriate at that site?
23         MR. JOHNSON: Object to the

Page 196

1  form.
2         MR. DEAN: Object to the form.
3    A. Because there's not an option to
4  have a -- anything other than a tag line.
5  Here it is in the employer's safety and
6  health standards, Section 1, Basic
7  Requirements. And then when you get over
8  in there to the Cranes and Material
9  Handling, it says tag line shall be used on
10 all lines. It don't give you an option, it
11 says shall.
12   Q. Can you tell me how using a
13 separate tag line would have made a
14 difference in this case?
15   A. Because in this case Mr. Cook
16 wouldn't have had to have been flipping the
17 line, so to speak, in order to free it up
18 and it made contact with another object on
19 that tower, another antenna.
20   Q. How do you know they may not
21 have been shaking the tag line?
22         MR. JOHNSON: Object to the
23 form.

Page 197

1         MR. DEAN: Object to the form.
2    Q. That's just as likely an
3  occurrence, wouldn't it?
4         MR. JOHNSON: Object to the
5  form.
6    A. The deposition says that he was
7  shaking his load line in order to --
8    Q. I'm saying if they had used a
9  separate tag line, what is it about the
10 circumstances that would have you say that
11 they may not have had to shake it as well?
12         MR. DEAN: Object to the form.
13   A. Because you were going to pull
14 the load to avoid it making contact.
15   Q. Well, aren't you doing that the
16 same with a self-tagging line? In fact,
17 it's even farther away from the cell tower
18 than it would have been with a separate tag
19 line?
20         MR. JOHNSON: Objection to the
21 form.
22   A. It appeared they didn't do it.
23 They made contact from the depositions of

Page 198

1 the people on the tower.
2    Q.  All right. Well, do you know
3 from experience or qualifications whether a
4 self tagging line would have held the
5 antennas farther from the cell tower than a
6 separate tag line, do you know that?
7         MR. JOHNSON: Object to the
8 form.
9    A.  My understanding and the way
10 they had this rigged, it would have held
11 them from the tower itself, yes.
12    Q.  The self-tagging would have held
13 it farther?
14         MR. JOHNSON: Object to the
15 form.
16    A.  Correct. Now, if you'd have had
17 a tag line I could have held it out even
18 further than that.
19    Q.  But you just told me you have no
20 experience in doing that. How can you
21 offer that opinion, sir?
22    A.  I have done that, but not on a
23 cell tower.

Page 199

1    Q.  What have you done it on? I'm
2 sorry. What have you done it on?
3    A.  High elevations of grain
4 elevators and material handling devices in
5 industrial plants.
6    Q.  All right. You have actually
7 rigged a grain elevator with a tag line and
8 a load line?
9    A.  Sure, I have. I'm an old farm
10 boy.
11    Q.  All right. When was the last
12 time you did that, sir?
13    A.  It's probably been forty years.
14    Q.  On whose farm?
15    A.  The family farm.
16    Q.  Where is that located?
17    A.  Lamar, South Carolina.
18    Q.  Did you still own that family
19 farm?
20    A.  The family does.
21    Q.  Who lives on the farm?
22    A.  There's -- we rent the house,
23 old home place, the old homestead, as such,

Page 200

1 we rent it out. There's no -- there's not
2 a family member on it.
3    Q.  Okay. Is there still a grain
4 elevator on it?
5    A.  No, sir.
6    Q.  Okay.
7    A.  I'm sure the old remnants of the
8 barns are still there, but the grain
9 elevator is not.
10    Q.  Now, when you rigged that grain
11 elevator forty years ago, did you use a
12 certified stamped load line?
13    A.  Absolutely not.
14    Q.  Did you use a certified stamped
15 sling?
16    A.  No, sir. There was no OSHA at
17 that time.
18    Q.  Just to make sure I'm sure, I
19 think I may have asked this before. But
20 have you told me about and shown me
21 everything that you've possibly reviewed or
22 considered in offering your opinions today?
23    A.  I think so. However, I would

Page 201

1 like to go back to the OSHA standards when
2 you tried to get me -- or you got me to
3 read a portion of the scope of 251 and I
4 only read about half of that. I would like
5 to go back and read the other half of that.
6    Q.  All right. Are you saying you
7 want to change your testimony?
8    A.  No, sir.
9    Q.  All right. What are you wanting
10 to read?
11    A.  All right. Then Scope on 5, I
12 only read into the record the first
13 sentence, if I recall correctly. No, you
14 stopped me at the end of handling equipment
15 and stopped me at that point.
16    Q.  All right. Go ahead.
17    A.  All right. Let me go back and
18 start the whole thing over and read the
19 entire paragraph into the record. "This
20 section applies to slings used in
21 conjunction with other material handling
22 equipment for the moving of a material by
23 hoisting, in employments covered" --

Page 202

1    MR. JOHNSON: By this part?
2    A. "By hoisting and employments
3 covered by this part. The types of sling
4 covered are those made from alloyed steel
5 chain, wire rope, metal mesh, natural or
6 synthetic fiber rope (conventional three
7 strand construction), and synthetic web
8 (nylon, polyester and polypropylene)."
9    Now, when you pick this up and
10 you go on through the standards and it
11 first starts addressing in the (b) the
12 alloyed steel, you go on down till you get
13 to the (d) section on page 219, it talks
14 about the natural rope and synthetic fiber.
15    "When using natural or synthetic
16 fibers, rope slings, Tables 8 through 15,
17 16, 17 and 18 shall apply." So when you go
18 on over to those tables and you begin to
19 pull out the values in those tables,
20 starting with Table 16, that's for nylon
21 rope slings, Table 17 is for polyester rope
22 slings, and Table 18 is for polypropylene
23 rope slings.

Page 203

1    Then you look at the rope or
2 diameter in nominal sizes and it only
3 starts at a half inch. What we're talking
4 about here is a three-eighths. So it don't
5 even approach the table.
6    Q. Well, the rope used was not a
7 sling, sir. You've already established
8 that.
9    MR. DEAN: Object.
10    MR. JOHNSON: Object. He's
11 still trying to answer.
12    MR. FROST: Well, he was trying
13 to make a point. I just wanted to make
14 sure we cleared it up.
15    MR. JOHNSON: Okay. Well, you
16 can clear it up, I think, at the
17 appropriate time, after he's finished
18 testifying.
19    MR. FROST: Okay.
20    A. And then the minimum breaking
21 strength in pounds, for a half inch is
22 three thousand nine hundred and ninety.
23 And if you use it in an endless sling in a

Page 204

1 vertical hitch, it's only good for twelve
2 hundred pounds. But that would be the
3 minimum as set by the OSHA standards and
4 the ANSI standards. And the subject rope
5 we're talking about does not even approach
6 these type of values. So therefore, it's
7 substantiates that I have said it is not a
8 sling. It is a piece of junk rope. So
9 therefore, I don't understand what the
10 question may be.
11    Q. Well, thank you for clearing
12 that up. This code section, as you've just
13 confirmed, relates to the use of slings and
14 not rope. Thank you.
15    MR. DEAN: Object to the form.
16    MR. JOHNSON: Object to the
17 form.
18    A. Sir, let me go back -- and I
19 told you and I read into the record that
20 Table 8, polypropylene rope slings. So you
21 can make a sling out of a rope, but you
22 can't make it out of this type of rope.
23    Q. Did you take any measurements of

Page 205

1 the site when you visited it yesterday?
2    A. No, sir.
3    Q. You've never weighed the antenna
4 yourself, have you?
5    A. I've never seen the antenna.
6    Q. Have you ever tested any
7 exemplar rope to determine its load
8 strength?
9    A. No, sir, I take the
10 manufacturer's warning label to be superior
11 to anything I've done.
12    Q. Do you think it would be
13 appropriate at any time on any job site for
14 any employee to be smoking marijuana?
15    A. Absolutely not.
16    Q. If the testimony from toxicology
17 experts is that Mr. Cotton had smoked
18 marijuana within ninety minutes of this
19 accident, would that have been
20 inappropriate on his part?
21    A. Sir, I am not an expert on
22 drug-related issues. I know in OSHA we
23 have encouraged the use of drug testing

52 (Pages 202 to 205)

Page 206

1  programs and official drug programs, but
2  that is not an issue -- that's a criminal
3  offense, not an OSHA offense.
4      Q. I'm just asking you with your
5  industry knowledge, qualifications, et
6  cetera, is it your opinion that it would
7  have been inappropriate and against
8  basically all rules of employment for Mr.
9  Cotton to have been smoking marijuana on
10  the job within ninety minutes of this
11  accident?
12      A. I would think so, yes, sir.
13          MR. JOHNSON: Would you still
14  have the same opinion about Mr. Cook
15  smoking marijuana.
16          THE WITNESS: Absolutely.
17  Anybody else.
18      Q. (By Mr. Frost:) Now, I
19  understand that you believe that OSHA
20  correctly cited ALT for violation of
21  1926.251, but you do not believe OSHA
22  correctly cited BetaCom for the lack of
23  personal protection equipment; is that

Page 207

1  correct?
2      A. That is correct.
3      Q. Are you critical in any other
4  way of how OSHA handled the investigation
5  of this incident?
6      A. So far, I don't know of any
7  reason to be critical of OSHA on this one,
8  other than that.
9      Q. You've read all the depositions
10  taken to date as I understand. Do you have
11  any criticisms of the qualifications and
12  experience and expertise of the ALT
13  employees at the job site?
14      A. I don't think so.
15          MR. FROST: I think that's all
16  I've got at this time. Thank you, sir.
17          2:17 p.m.
18          (Short recess)
19          2:27 p.m.
20  EXAMINATION BY MR. GANN:
21      Q. Mr. Turner, my name is Keith
22  Gann. Defendant's Exhibit 17 to your
23  deposition, what is that, please?

Page 208

1      A. This is the OSHA report, if I
2  recall correctly, for BetaCom, including
3  the citation.
4      Q. And as I understand from your
5  prior testimony, that is something that you
6  relied on in forming your opinions, right?
7      A. That is correct.
8      Q. And you actually took the time
9  to tab with a yellow tab that citation and
10  you made some handwritten notes on it,
11  correct?
12      A. Just to let me know where to put
13  my hands on the OSHA citation item.
14      Q. Okay. And I take it you've read
15  the findings within this Exhibit 17?
16      A. I think on the next page.
17  That's correct.
18      Q. All right. And there are some
19  -- what does the term "employer knowledge"
20  mean in the OSHA vernacular?
21      A. That your employer must have
22  knowledge through actual knowledge or
23  through what would be expected of a

Page 209

1  reasonable, diligent employer to know the
2  potential of that hazard was there, that
3  there would be employees exposed to that
4  hazard.
5      Q. And, of course, the only way an
6  employer could have knowledge of a hazard
7  would be for the employees that worked for
8  the employer to know about it, correct?
9          MR. JOHNSON: Object to the
10  form.
11          MR. DEAN: Object to the form.
12      A. It does not have to be the
13  employees. It must be a management
14  position, whether it be a lead man, foreman
15  or superintendent, someone who's been
16  designated by the employer as his
17  representative on that job site.
18      Q. So employee knowledge, as
19  referenced in this OSHA citation, would
20  reference knowledge of some person in a
21  supervisory capacity; is that correct?
22      A. That is correct.
23      Q. All right. And, of course, you

Page 210

1  have mentioned in OSHA -- well, first of
2  all, who was in a supervisory capacity for
3  BetaCom on this job on site?
4      A.  The only one I'm aware of would
5  be -- that could possibly be linked to that
6  would be Randy Wheeler.
7      Q.  All right.  Now, if you would
8  read into the record from that Exhibit 17,
9  what it says about the employer knowledge.
10  But before we read into the record, you see
11  there's a blacked-out section.  What is
12  under that blacked-out section, based on
13  your knowledge of how these OSHA reports
14  are prepared?  Is that the name of the
15  people who made the statement?
16      A.  That is correct.
17      Q.  All right.  So underneath the
18  blacked out section under item 23 of
19  Exhibit 17 are names of people?
20      A.  That is correct.
21      Q.  And they would be BetaCom
22  employees, correct?
23      A.  Yes.

Page 211

1      Q.  And it would make sense that
2  they were BetaCom employees on site,
3  wouldn't it?
4          MR. DEAN:  Object to the form.
5      A.  That is correct.
6      Q.  Read into the record what item
7  23 says with regard to employer knowledge.
8      A.  Colon.  Then it says --
9      Q.  You don't need to do the colons.
10  Just read what it says, please.
11      A.  "Yes," then it's laundered out,
12  it's blackened out, whatever you want to
13  refer it, but OSHA uses the term laundered.
14  In essence, they are protecting the
15  identity of the informants.  "Both" -- who
16  both is I have no idea, "stated that they
17  were aware of the crew working over them
18  and there was a potential hazard."
19      Q.  Go on and read the next
20  sentence, please.
21      A.  "They both stated that they had
22  hard hats in their trucks but chose not to
23  wear them because they were only walking to

Page 212

1  and from the tower hut where they were
2  installing radio equipment, the owner of
3  the company made the statement in front of
4  Captain Jones, Chief of Detectives, that he
5  knew hard hats were required in jobs like
6  this but he did not enforce their use as
7  most times there was no one working above
8  his crew but on occasion there would be
9  another tower crew working above them."
10      Q.  Uh-huh.  And so this is a
11  document that we've marked as Exhibit 17,
12  which is just further evidence that two
13  people within the crew, "stated they were
14  aware of the crew working over them".  Did
15  I read that correctly?
16      A.  That's correct.
17      Q.  Of course, we don't know who
18  those two members of the crew are because
19  OSHA laundered their names.  But we know it
20  had to be two people on site, don't we?
21          MR. DEAN:  Object to the form.
22          MR. JOHNSON:  Same objection.
23      A.  According to the OSHA -- what is

Page 213

1  known as a common, that sheet is an OSHA 1B
2  form.  And according to that form, that's
3  what it states.
4      Q.  And there were four crew members
5  on site; is that correct, when the accident
6  happened?
7      A.  How many was on site, I do not
8  know.  There was four that walked out of
9  the building at one time going to lunch.
10  If there was any more of them, I'm not
11  aware of it.
12      Q.  All right.  From what you
13  understand there were four BetaCom
14  employees on site when the accident
15  happened; is that correct?
16      A.  That's my understanding.
17      Q.  And, of course, one of those is
18  deceased so he could not be one of the two
19  people mentioned here, could he?
20      A.  That's a good summation, yes,
21  sir.
22      Q.  So two of the three people have
23  told OSHA -- two of the three people who

Page 214

1  could talk to OSHA have told OSHA they were
2  both aware that the crew was working over
3  them and that there were potential hazards,
4  correct?
5       A.  That's correct.
6       Q.  You didn't seem to take that
7  into account when you gave your prior
8  testimony that you were aware of no other
9  evidence to support the crew's knowledge
10 that they were working overhead except for
11 Josh Cook's testimony.  You didn't take
12 that OSHA statement into account, did you?
13      A.  That is correct because I don't
14 know the source of that information.
15      Q.  Well, you relied on that
16 document as being evidence that you relied
17 on, didn't you?
18          MR. JOHNSON:  Object to the
19 form.
20      A.  The citation.
21      Q.  And as an OSHA representative
22 who worked for OSHA before, you know how
23 that works, don't you?

Page 215

1       A.  Sure.
2       Q.  You know they go out and take
3  statements?
4       A.  That is correct.
5       Q.  And are the statements that they
6  take typically accurate?
7          MR. DEAN:  Object to the form.
8          MR. JOHNSON:  Same objection.
9       A.  Not always.
10      Q.  Are they typically accurate?
11      A.  Not always.
12      Q.  I didn't ask if they always are.
13 Nothing is always.  Are they typically
14 accurate?
15          MR. JOHNSON:  Object to the
16 form.
17      A.  The best I can answer that is
18 this:  Normally, when I take a statement
19 from an employee or witness on those job
20 sites they tell me the best to their
21 ability as honest as they know how to state
22 it.  However, the physical evidence on the
23 job a lot of times does not support what

Page 216

1  they're telling me in writing even though
2  they'd swear to it in a courtroom.  The
3  physical evidence does not support it, so
4  therefore just because they tell me that I
5  can't take that verbatim.
6       Q.  Well, there's no physical
7  evidence in this situation which would be
8  contrary to the statement in the OSHA
9  report that two of the employees there on
10 site stated that they were aware of the
11 crew working over them and that there was a
12 potential hazard.  There's no physical
13 evidence to the contrary of that, is there?
14          MR. JOHNSON:  Object to the
15 form.
16          MR. DEAN:  Object to the form.
17      A.  There's no physical to support
18 that either.  I don't know who it would be.
19 The only one that I've seen that made that
20 statement in his deposition was Mr. Cook.
21      Q.  And, of course, you are aware
22 that there's another Mr. Cook who says that
23 he told others there at BetaCom?

Page 217

1          MR. JOHNSON:  Object to the
2  form.
3       Q.  (By Mr. Gann:)  Correct?
4          MR. DEAN:  Object to the form.
5       A.  I'll agree he has made that
6  statement in his deposition.
7       Q.  Do you think it is fair and
8  reasonable to take into account all
9  evidence, all documents, all records, and
10 weigh all of those equally when making a
11 decision about what opinions you're going
12 to reach?
13      A.  Not necessarily equal, no, sir.
14      Q.  All right.  What factors do you
15 use to throw out some evidence and accept
16 others?
17      A.  The expertise and whether he has
18 the educational background or experience to
19 make a judgment call.  A lot of times
20 people will tell me things and when I look
21 at the physical evidence there's no way in
22 the world it could have happened the way
23 they tell me it is.

55 (Pages 214 to 217)

Page 218

1    Q.  No, sir, I'm not asking about
2  that. I'm saying when you come into a
3  court of law in a situation where you're
4  asked to review testimony and documents by
5  the lawyer that's paying you by the hour,
6  do you have some criteria by which you
7  filter out some evidence and consider other
8  evidence more highly, or do you take it all
9  with equal weight?
10    A.  If there's something in there
11  that -- from a deposition that says one
12  thing and I'm not finding the physical
13  evidence to support it, I may not take as
14  much credence, give as much credibility to
15  that statement, as I would to something
16  else.
17    Q.  All right. What about in issues
18  where there is no physical evidence at
19  issue, just where somebody says I told a
20  person this and somebody else says I was
21  never told that. Do you consider both of
22  those pieces of evidence equally, or do you
23  give credence to one witness over another

Page 219

1  because you're being paid by the lawyer
2  representing that witness?
3    MR. JOHNSON:  Object to the
4  form, it's a lack of foundation.
5    A.  The gist of your question --
6    MR. JOHNSON:  Inappropriate
7  hypothetical.
8    MR. DEAN:  Object to the form.
9    A.  -- is nobody buys me. They only
10  reimburse me for my time and expenses. I
11  am not for sale. My credibility is on the
12  line in every case. So don't come here
13  trying to pull that one on me. The next
14  thing is if I can --
15    Q.  If I could just --
16    A.  Let me finish my answer.
17    MR. JOHNSON:  Let him finish
18  your question, Keith.
19    A.  When I have a case in which one
20  says this and the other one says that, I'll
21  look for some means to support either one
22  of them equally. And in this case, I don't
23  find anything to support Mr. Cook when he

Page 220

1  says he told them, and there's no
2  collaborating evidence nowhere.
3    When I come back to Mr. Wheeler,
4  I don't see any -- I haven't found a reason
5  to really support that, yes, he was told
6  and he ignored him. So I don't see a way
7  to discredit him either.
8    Q.  And collaborating evidence could
9  be things such as documentary evidence or
10  other witness' evidence or physical
11  evidence, correct?
12    A.  That is correct.
13    Q.  And so you're saying that in
14  this case you have no collaborating
15  evidence from any source to support Josh
16  Cook's statement that he told the BetaCom
17  crew that they were going to be working
18  overhead that morning?
19    MR. JOHNSON:  Object to the
20  form. Assumes facts that have not been
21  testified to or established in any way.
22    MR. DEAN:  Object to the form.
23    MR. GANN:  Well, I thought you

Page 221

1  said before that object to the form was the
2  objection.
3    MR. JOHNSON:  It is.
4    MR. GANN:  Okay.
5    MR. DEAN:  I just objected to
6  the form.
7    MR. JOHNSON:  But I wanted to
8  make sure you understood my objection.
9    MR. GANN:  Okay.
10    A.  That is correct.
11    Q.  Let me restate the question
12  again.
13    A.  Thank you.
14    Q.  And the reason I'm going to
15  restate it, your lawyer, the lawyer that's
16  retained you --
17    MR. JOHNSON:  I'm not his
18  lawyer.
19    Q.  (By Mr. Gann:)  -- has
20  interrupted the question.
21    MR. JOHNSON:  Keith, I'm not his
22  lawyer.
23    MR. GANN:  I said the lawyer

56 (Pages 218 to 221)

Page 222

1  that retained you.
2       MR. JOHNSON: You said your
3  lawyer.
4       MR. GANN: Your lawyer, your
5  lawyer that retained you.
6       MR. JOHNSON: Okay.
7       Q. (By Mr. Gann:) Now, let me
8  restate the question so that there will be
9  no question about what your testimony is in
10 this case. In this case, you are basically
11 disregarding the testimony of Josh Cook,
12 who states that he told the BetaCom
13 employees that he was -- he and his crew
14 were working overhead because you say you
15 see no corroborating evidence from any
16 source to support that, either other
17 witnesses' testimony, documentary evidence,
18 or physical evidence; is that true?
19       MR. DEAN: Object to the form.
20       A. That's true.
21       Q. But you are accepting the
22 testimony of Mr. Wheeler, who says that he
23 was not told that the crew was working

Page 223

1  above, above even though there is no
2  documentary evidence, corroborating
3  testimony in this record, is there?
4       MR. JOHNSON: Object to the
5  form.
6       A. Other than the lack of response
7  of being -- if he was told and put on
8  notice and he didn't react, then why
9  shouldn't Mr. Cook say, wait a minute,
10 you're not getting the message. So
11 therefore, apparently you don't understand
12 what I just told you, you're not
13 responding, so therefore I'm going to call
14 my superiors.
15       Q. Are you saying it would not be
16 reasonable for Mr. Wheeler to act in the
17 manner in which he acted if, in fact, he
18 had been told or was aware that the crew
19 was working overhead?
20       A. If he'd have acted in a
21 reasonable manner, if he, in fact, had been
22 told, he should have pulled his people off
23 of that job site or either he would have

Page 224

1  established some kind of control point of
2  communication that they were going to be
3  inside that structure and not leave without
4  an approval, so to speak, or a commitment
5  from Mr. Cook who was operating the cap
6  stand that it was safe for them to leave
7  that structure.
8       Q. To do otherwise on the part of
9  Mr. Wheeler would not be reasonable,
10 correct?
11       MR. DEAN: Object to the form.
12       MR. JOHNSON: Same.
13       A. I'll agree with that statement.
14       Q. Thank you. Now, I want to ask
15 you some questions about what has been
16 called the Handbook for Riggers.
17       A. Yes, sir.
18       Q. How would you describe that
19 publication in the way of its authoritative
20 nature, would you say it is or is not an
21 authoritative document?
22       A. I'll say it is a document that
23 has been widely accepted throughout the

Page 225

1  industry. There are people on the --
2  that's been acknowledged, the authors of
3  this, some I know personally. And I have a
4  great deal of respect for one in
5  particular, Mr. D.E. Dickey from Ontario,
6  Canada, Toronto.
7       Q. So you think it's very
8  authoritative?
9       A. Absolutely.
10      Q. All right. If you would turn
11 with me to page 66.
12      A. Yes, sir.
13      Q. What is the purpose of the
14 writing on page 66?
15      A. As it states, the rule of thumb
16 for new ropes when load tables are not
17 available and then they classify as manila
18 rope, nylon rope, polypropylene rope,
19 polyester rope.
20      Q. All right. Now, let's turn to
21 the OSHA section that you referred to
22 earlier, section 1926.251.
23      A. Correct.

Page 226

1    Q. It's entitled "Rigging equipment
2  for material handling", correct?
3    A. Correct.
4    Q. Now, you testified earlier that
5  rigging equipment or ropes should not be
6  used unless they had been properly
7  certified. Was that your term,
8  "certified"?
9    A. Certified or identified to the
10 point by the manufacturer's
11 recommendations, yes, sir.
12   Q. Okay. Well, is the word
13 certified used anywhere within that OSHA
14 section or any related OSHA sections, to
15 your knowledge?
16   A. To my knowledge, the word
17 certified is not. But how in the world
18 could you have a tag on that identifying
19 load-rated capacity that's not put on there
20 by the manufacturer --
21   Q. No, sir. I'm asking a real
22 simple question. You used the term
23 certified several times in your prior

Page 227

1  testimony when questioned by Mr. Frost. Do
2  you remember that?
3    A. Yes, sir.
4    Q. I want to ask you right now: Is
5  the term "certified" or "certification",
6  either of those terms, contained anywhere
7  within the OSHA sections that we've
8  referred to or that you think are
9  applicable?
10   A. I don't know of a case.
11   Q. Okay. So the term certified or
12 certification or similar terms is not used,
13 correct?
14   A. That is correct.
15   Q. What were you referring to when
16 you stated that OSHA required
17 certification, your term? What were you
18 actually referring to in the OSHA
19 standards, what section? Point it out to
20 me, please.
21       MR. JOHNSON: Let me object to
22 the form.
23       MR. DEAN: Object to the form.

Page 228

1    A. Let me see my OSHA book.
2    Q. Let me -- you're looking at an
3  OSHA book. Let me just ask you, were you
4  referring to section 1926.251(a)(2) where
5  it says "Rigging equipment shall not be
6  loaded in excess of its recommended safe
7  working load"?
8        MR. JOHNSON: Keith, real quick,
9  do you have two questions on the table or
10 just one right now?
11       MR. GANN: Just one.
12       MR. JOHNSON: Just the one you
13 just asked?
14       MR. GANN: Yes, that's correct.
15       MR. JOHNSON: All right.
16   Q. (By Mr. Gann:) When you
17 referred earlier to certification, sir,
18 were you referring to Section
19 1926.251(a)(2) which states "Rigging
20 equipment shall not be loaded in excess of
21 its recommended safe working load"?
22   A. That is correct.
23   Q. Okay. Now, the term

Page 229

1  "recommended safe working load", is it the
2  same as the term "minimum breaking
3  strength"?
4    A. That would only be one factor.
5    Q. That wasn't my question. Is the
6  term "recommended safe working load" the
7  same or different from the term "minimum
8  breaking strength"?
9        MR. JOHNSON: Object to the
10 form.
11   A. My answer again is that the
12 minimum breaking strength is only one
13 factor of the recommendations.
14   Q. So a recommended safe working
15 load, can you obtain that from a
16 manufacturer's certification or
17 manufacturer's tag?
18   A. Sure.
19   Q. Okay. And in the rope that you
20 brought, could you obtain that number from
21 that tag?
22   A. 244 pounds.
23   Q. Okay. So on the rope that you

Page 230

1  brought with you today the recommended safe
2  working load, as that term is used by OSHA,
3  would be 244 pounds; is that correct?
4      A.  That's correct.
5      Q.  All right.  Now, let's look back
6  at the Handbook for Riggers, page 66.  If
7  you don't have a tag on a rope -- well, let
8  me ask you this:  Do you think it's typical
9  to have tags remain on ropes that are used
10  in a work site or not?
11          MR. JOHNSON:  Object to the
12  form.
13      A.  If it is known -- what is known
14  as an approved sling most likely it's going
15  to have a tag on that rope.
16      Q.  No, I didn't ask you about
17  approved slings.  I'm asking you now about
18  ropes that are used on work sites, okay.
19  I'm asking you the simple question:  Would
20  you find typically on ropes that are used
21  at work sites some sort of tag that
22  identifies its safe working load?
23          MR. JOHNSON:  Object to the

Page 231

1  form.
2      A.  Is this rope being used for
3  lifting purposes or not?
4      Q.  I didn't ask that question.  I'm
5  asking you about ropes on work sites.
6          MR. DEAN:  Object to the form.
7          MR. JOHNSON:  Same.
8      Q.  (By Mr. Gann:)  Ropes that are
9  used on work sites, do they typically have
10  these paper tags still on them?
11          MR. JOHNSON:  Object to the
12  form.
13      A.  If it's new and on the reel?
14      Q.  If it's new or on the reel.
15      A.  New and still on the reel.  If
16  you buy the old reel rope, normally they'll
17  be a tag on it, the reel.
18      Q.  You can't use a rope that's on a
19  reel, can you?
20          MR. JOHNSON:  Object to the
21  form.
22      A.  You can take it off the reel and
23  apply it and weave it onto a block or

Page 232

1  whatever you've got to do.
2      Q.  When you find ropes used on work
3  sites, do they typically have the paper tag
4  still on them or not?
5          MR. DEAN:  Object to the form.
6          MR. JOHNSON:  Object to the
7  form.
8      A.  I have seen them on there.  But
9  I have also seen many that were not on
10  there.  And in those cases, you would keep
11  a log or a chart to be able to refer to and
12  can identify.
13      Q.  And one of the reasons for page
14  66 is the type of chart that will allow you
15  to identify load tables for particular
16  types of rope, isn't it?
17      A.  That's correct.
18      Q.  Page 66 of the Handbook for
19  Riggers is that very type of chart that
20  someone could go to and determine how much
21  you can expect a particular type of rope to
22  carry in the way of a load; is that right?
23          MR. DEAN:  Object to the form.

Page 233

1          MR. JOHNSON:  Object to the
2  form.
3          MR. GANN:  What's wrong with the
4  question?
5          MR. JOHNSON:  Well, you're
6  making an assumption that that's a
7  polypropylene rope.  I don't know what
8  actually you're assuming, but you're making
9  an assumption about that rope.
10          MR. GANN:  I didn't ask a thing
11  about this rope right here.
12          MR. JOHNSON:  Yeah, but your
13  question certainly takes that into
14  consideration.  But go ahead.  Go ahead.
15  Go ahead.
16      Q.  (By Mr. Gann:)  Now, let's look
17  at what was marked previously.  The lawyers
18  produced, lawyers for the plaintiff,
19  produced this document, Number 37, as being
20  a rope like the rope in question.  I'll
21  represent that to you.  That's from the
22  plaintiff's lawyer.
23      A.  Thank you.

Page 234

1    Q.  And what does it say that rope
2  is made out of, what does it say right
3  here?
4    A.  A hundred percent polypropylene.
5    Q.  That's just different.  And next
6  to it, those are different languages, I
7  believe, for the same word.  I may be
8  wrong.
9    A.  I'll agree with that.
10   Q.  You'll agree one is like in
11  Spanish and one is in French or something,
12  would you agree with that?
13   A.  I guess.  I don't know what
14  language it is, but it's not English.
15   Q.  So this rope says it's a hundred
16  percent polypropylene, correct?
17   A.  According to that tag.
18   Q.  And you say you can go by the
19  manufacturer's tag, don't you?
20   A.  Sure.
21   Q.  Okay.  Now, let's look back to
22  Table 66 -- I mean page 66 of the Rigger's
23  Handbook and calculate what it says the

Page 236

1  for Riggers, if someone were to want to
2  know what a three-eighths inch
3  polypropylene rope's load would be, you
4  would go to this book, a book that you say
5  was written by people that you respect, and
6  you would calculate that that rope would
7  carry a load of three hundred and sixty
8  pounds, correct?
9    A.  According to that calculation.
10  But that calculation will not override the
11  manufacturer's recommendation.
12   Q.  Now, for the weight that the
13  rope was carrying, is there any problem
14  with this rope at two hundred and
15  forty-four pounds being used?
16   A.  Yes, sir.  When that
17  manufacturer says it is not supposed to be
18  use for lifting.
19   Q.  Okay.  The manufacturer says
20  other things like to avoid tying it in
21  knots and all sorts of things, doesn't it?
22   A.  Absolutely.
23   Q.  All right.  But here's my

Page 235

1  load on that rope would be.  In other
2  words, what the load -- the proper load
3  would be.  Can you help me calculate that?
4    A.  Sure.  However --
5    Q.  It's very easy to do, isn't it?
6    A.  That's right.
7    Q.  All you've got to do is take the
8  three-eighths inch diameter, use the three,
9  multiply three times three times forty and
10  that comes up to three hundred and sixty
11  pounds, doesn't it?
12   A.  Thereabouts.
13   Q.  Not thereabouts.  It comes right
14  up to it, doesn't it?
15   A.  I don't have my calculator.  My
16  mind is not clicking this time of day.
17   Q.  You're telling me you can't
18  calculate what three times three times
19  forty is?
20      MR. JOHNSON:  Object to the
21  form.
22   A.  Three hundred and sixty.
23   Q.  So this book called the Handbook

Page 237

1  question.  I'm talking about the -- because
2  OSHA talks about recommended safe load,
3  safe working load, doesn't it?  That's the
4  term it uses?
5    A.  That's correct.
6    Q.  Where they recommend a safe
7  working load of two hundred and forty-four
8  pounds, just considering the weight of the
9  working load would there be any problem
10  with lifting an antenna of that weight
11  using a rope, of whatever type, if it had a
12  working load of two hundred and forty-four
13  pounds?
14      MR. JOHNSON:  Object to the
15  form.
16   A.  Provided the manufacturer
17  doesn't make the statement it's not to be
18  used for lifting.
19   Q.  So from a weight ratio, a safe
20  working load to the weight of this antenna,
21  strictly talking about the weight, you have
22  no problem with using a rope with a safe
23  working load of two hundred and forty-four

Page 238

1  pounds to lift an antenna of this weight?
2       MR. JOHNSON:  Object to the
3  form.
4       A.  That is a correct statement,
5  yes, sir.
6       Q.  Okay.  Thank you.  Now, I
7  believe you've testified that sitting here
8  today, based on everything that you know
9  and all the information that's been
10 provided and everything that you've read,
11 you are not critical of anything that OSHA
12 did in this case, other than you're
13 critical of the fact that it cited BetaCom,
14 the plaintiff's employer; is that true?
15      MR. JOHNSON:  Object to the
16 form.
17      MR. GANN:  What's wrong with the
18 question?
19      MR. JOHNSON:  I don't think
20 that's what he testified to.
21      MR. GANN:  Well, okay.  If you
22 disagree with what he testified to.
23      MR. JOHNSON:  Well, I think he

Page 239

1  testified to something a little different
2  than that.
3       MR. GANN:  Well, I'll ask it
4  another way then to make sure there's no
5  question about it.
6       MR. JOHNSON:  Sure.
7       Q.  (By Mr. Gann:)  Sitting here
8  today, based on everything that you know,
9  based on all the documents you've seen, all
10 the testimony you've seen, are you critical
11 of anything that OSHA did other than that
12 it cited BetaCom, which was the plaintiff's
13 employer?
14      MR. JOHNSON:  Same objection.
15      A.  I'm not critical of what they
16 did.  I am critical of what they did not
17 do.
18      Q.  You're critical -- so you're
19 critical of what OSHA did not do?
20      A.  Yes.
21      Q.  What do you say OSHA should have
22 done?
23      A.  OSHA should have gone back and

Page 240

1  got the controlling employer, which is
2  Cingular, because they're ultimately
3  responsible for everything on that job
4  site.
5       Q.  Okay.  Is there anything else
6  that you say OSHA should have done?
7       A.  The fact of the matter of the
8  business is in this case BetaCom really --
9  not, sorry, ALT, ALT, was actually in
10 control when then sent those guys up on
11 that job tower, on that antenna.
12      Q.  Okay.
13      A.  So they could be classified as a
14 controlling employer as well.
15      Q.  All right.  Is there anything
16 else that you say OSHA should have done?
17      A.  WesTower also could have been
18 treated as a controlling employer.
19      Q.  You say WesTower could have been
20 treated as a controlling employer?
21      A.  Correct.  And been cited for the
22 same thing that the others were cited on
23 that job site.

Page 241

1       Q.  Are you critical of anything
2  else that OSHA did, or failed to do, other
3  than what you've told us?
4       A.  Not that I can think of at the
5  moment.
6       Q.  All right.  Did OSHA cite
7  Cingular?
8       A.  I have found no evidence of it.
9       Q.  Did OSHA cite ALT as a
10 controlling employer?
11      A.  OSHA did not make that
12 distinction.  They cited ALT -
13      Q.  Simple question.  Did OSHA cite
14 ALT as a controlling employer?
15      MR. JOHNSON:  Just answer his
16 question.
17      A.  You need to ask OSHA that one.
18 I don't know.
19      Q.  From what you've seen, did OSHA
20 cite ALT as a controlling employer?
21      A.  I do not know what OSHA thought.
22      Q.  I asked you from what you've
23 seen did OSHA cite ALT as a controlling

61 (Pages 238 to 241)

Page 242

1 employer?
2     A. Again, for third time, I'm going
3 to tell you I don't what OSHA thought or
4 how OSHA treated it.
5     Q. All right. Did OSHA cite
6 WesTower as a controlling employer?
7     A. I have seen no evidence where
8 they cited WesTower.
9     Q. Is the purpose of the Handbook
10 for Riggers, page 66, so that someone who
11 has a rope on a job and the rope doesn't
12 have the tag any more or any sort of
13 identifying features, that page could go to
14 page 66 and get a general idea of what that
15 rope could be used for in the weight of a
16 load carrying capability? And I'm strictly
17 talking about the load carrying capability.
18     A. A rule of thumb, yes.
19     Q. Yes, a rule of thumb.
20 Understanding that some may be a little bit
21 higher, some may be a little bit lower.
22     A. That's correct. But I will not
23 put my name on there using that

Page 243

1 calculation, I can tell you that, because I
2 could be held personally liable.
3     Q. Did you see any testimony from
4 Adam Waterman which supported Josh Cook's
5 testimony that Josh Cook told BetaCom
6 employees that they would be working
7 overhead that morning?
8     A. On page 150, he stated that he
9 heard Josh Cook tell Wheeler and Cotton we
10 were working overhead.
11     Q. Now, let me ask you this
12 question. Did you just completely
13 disregard Adam Waterman's testimony when
14 you told us earlier in your deposition that
15 there was no evidence to support Josh
16 Cook's testimony, other than Josh Cook's
17 own testimony?
18     A. Because in his deposition,
19 starting on page 148, he was wishy-washy on
20 this thing and said he knew there was a
21 conversation between Josh Cook and Mr.
22 Wheeler and Mr. Cotton on the day of the
23 mishap but he really didn't know what they

Page 244

1 were talking about, he couldn't hear it.
2     Q. Well, what exactly did Adam
3 Waterman say on page 150? Can you pull his
4 testimony?
5     MR. JOHNSON: You're just
6 looking at your index. Do you want to get
7 his depo out. What are we looking at, 148.
8     THE WITNESS: 150. 148, 150. .
9     Q. (By Mr. Gann:) Let's turn to
10 page 150 and you tell me what Mr. Adam
11 Waterman said specifically about what he
12 heard.
13     MR. JOHNSON: Let's read all of
14 this, look at all of his testimony.
15     MR. GANN: I'm asking about page
16 150.
17     MR. JOHNSON: I know you are.
18 And just for the record, this is, I
19 believe, under the examination by Mr.
20 Waterman's attorney, or under Mr. Gann's
21 questioning, one or the other.
22     Q. (By Mr. Gann:) Are you on page
23 150?

Page 245

1     A. I am.
2     MR. JOHNSON: There's Bates
3 number here.
4     A. This is a problem when I get
5 things over the e-mail, it's got three
6 pages -- two or three pages of numbers on
7 the same sheet number and it gets awfully
8 confusing. So now I'm getting back to page
9 --
10     Q. It's just a real simple
11 question.
12     MR. DEAN: We object to the
13 form.
14     MR. JOHNSON: Yeah, I'm going to
15 object to the form of that real simple
16 question. Keith, you've asked him that
17 question and about three or four pages of
18 testimony and you're trying to nail it down
19 just to one sentence.
20     A. I'm not sure I know where to
21 pick up and get started.
22     MR. JOHNSON: Let's let him ask
23 his question again. I think he's referring

Page 246

1  you to a specific page in the deposition.
2  So you can answer his specific question
3  about the specific page in the deposition
4  that he wants you to answer a question
5  about. I think that's right. If you don't
6  have a question in mind, you can ask him to
7  ask it again or we can ask the reporter
8  to...
9      Q.  (By Mr. Gann:)  What did Adam
10  Waterman say in his sworn deposition about
11  what he heard Josh Cook say to BetaCom
12  employees?
13      MR. JOHNSON:  Do you want him to
14  just read that?
15      MR. THOMASON:  I think the
16  deposition speaks for itself.
17      MR. JOHNSON:  It does.
18      A.  This is on page 148 and I'll get
19  my numbers right. "Friendly conversation"
20  -- wait, let me back up to the question.
21  "Okay. So the day of the accident there
22  were conversations between Mr. Josh Cook,
23  Mr. Wheeler and Mr. Cotton about climbing

Page 247

1  belts?"
2      The answer "Yes."
3      Question: "Tell me about those,
4  please."
5      Answer: "Friendly
6  conversations, you know, Josh told them
7  that we were going to be working up on the
8  tower today and they were like, you know,
9  we used to do that. If we were a little
10  bit younger, we'd put our belts on and we'd
11  go up and show you how it was done. You
12  know, I mean, just ex-tower hands."
13      Then they came back with another
14  question. "And you mentioned that you
15  talked with them at some length and
16  overheard conversations at other points
17  about the other type of business they had
18  moved into after they were tower climbers?"
19      Answer: "Oh, yes, it was the
20  business they were doing now."
21      "Did you have conversations and
22  overhear conversations with Mr. Wheeler and
23  Mr. Cotton about the fact that they had

Page 248

1  moved out of their jobs as tower climbers
2  and were now doing the job at BetaCom?"
3      Answer: "Yes."
4      MR. JOHNSON:  Next question.
5      A.  The question: "Tell me what you
6  recall about those conversations, please."
7      The answer: "I just remember
8  them saying, you know, that they just
9  wanted out of it, wanted to do something a
10  little different so they went to the ground
11  work and wiring up the buildings and
12  stuff."
13      Question: "Now, on the day of
14  the accident is it true that you overheard
15  additional conversation between Josh Cook,
16  Mr. Cotton and Mr. Wheeler wherein Josh
17  Cook specifically told them that your crew
18  would be working overhead on that day?"
19      MR. JOHNSON:  You want to skip
20  the objections and go on.
21      A.  Correct. So after all of the
22  objections the question was restated. "On
23  the day of the accident, did you overhear

Page 249

1  conversations between your crew leader,
2  Josh Cook, and Mr. Wheeler and Mr. Cotton
3  about the fact that your crew would be
4  working overhead on that day?"
5      And the answer: "Yes."
6      Q.  Okay. Now, let me ask you now,
7  you've read that into the record where Mr.
8  Waterman has also testified that he
9  overheard Josh Cook tell the BetaCom
10  employees, specifically Mr. Cotton and Mr.
11  Wheeler, that they would be working
12  overhead. Did you take that into account
13  when you decided to disregard the testimony
14  of Josh Cook on that issue?
15      A.  It all sounded like small talk
16  as far as the conversation I'm reading in
17  here because they were joshing when one
18  another saying, yeah, we used to do that
19  and we'll go up the tower and do it for
20  you. So it did not relay to me that it was
21  a serious, business-type conversation.
22      Q.  So is it your testimony that men
23  who have previously worked as tower

Page 250

1  climbers have to be told something over and
2  above the statement that a crew would be
3  working on the tower that morning, there's
4  something else that they need to be told?
5      MR. JOHNSON: Object to the
6  form.
7      A. I don't think that's the point I
8  was making. I think the point I'm making
9  is they began to get jovial and joking with
10 one another so who's going to take who
11 serious. So at this point we need --
12 that's the reason I say documentation, even
13 if it's on toilet tissue, of a written
14 statement or some documentation, yes, you
15 have been put on notice. Until I see that,
16 I don't think it was adequate.
17     Q. So do you think putting it on a
18 piece of toilet tissue and putting it in
19 your pocket would make the type of
20 statement that was made by Adam Waterman
21 adequate or not?
22     A. I think it sure would support
23 his position.

Page 251

1      Q. Well, other than his sworn
2  testimony, you think if he just wrote it
3  down on a piece of toilet issue that that
4  would support his position?
5      A. And had it signed off on
6  somebody, I think it would have all kind of
7  merit.
8      Q. But his sworn testimony doesn't
9  have any merit apparently in your mind?
10     A. Not when the action was not
11 followed through.
12     Q. Yes, sir, we've already talked
13 about that.
14     A. Thank you.
15     Q. If the evidence indicates that
16 Mr. Wheeler and his crew did know that the
17 BetaCom employees were working overhead,
18 the actions of Mr. Wheeler in not
19 protecting his crew would have not been
20 reasonable, is that what you're saying?
21     MR. DEAN: Object to the form.
22     MR. JOHNSON: Same objection.
23     A. I go back to Mr. Wheeler's

Page 252

1  testimony. He did not know until he heard
2  "headache" at noon.
3      Q. I know you want to go back to
4  that testimony. I want to ask this simple
5  question: If the evidence shows that Mr.
6  Wheeler and his crew did know that the ALT
7  personnel were working overhead, are you
8  saying that Mr. Wheeler then, in that
9  circumstance, should have taken some
10 action, and if he didn't take additional
11 action that he was not acting reasonably?
12     MR. DEAN: Object to the form.
13     MR. JOHNSON: Same.
14     A. I will agree with that statement
15 if you could show me the evidence where he
16 did, where he was, in fact, put on formal
17 notice.
18     Q. Well, let me ask you this
19 question: Are you saying that there's some
20 notice required beyond telling the crew
21 that they're going to be working overhead,
22 some additional notice that has to be
23 brought forth; is that your testimony?

Page 253

1      MR. JOHNSON: Object to the
2  form.
3      A. My testimony is Mr. Cook, if he
4  did it, put Mr. Wheeler on notice, and Mr.
5  Wheeler did not respond positively, then it
6  would have been Mr. Cook's responsibility
7  to say, hey, wait a minute, I'm not getting
8  the message across, let's talk about this
9  one more time. And if that didn't work,
10 then he gets on the phone and he calls his
11 superior. Then he has acted as a diligent,
12 prudent individual on that job site.
13     Q. Well, how could Mr. Cook know
14 whether or not Mr. Wheeler was going to
15 heed his statement that they were going to
16 be working overhead, how could he know what
17 Mr. Wheeler and his crew were doing?
18     A. By actions.
19     Q. You're talking about actions
20 that occurred at noon time?
21     A. Even before then. Especially
22 when the other Mr. Cook and Mr. Davis came
23 on that job site and they looked up and

64 (Pages 250 to 253)

Page 254

1  saw, according to Mr. Cook's deposition, he
2  saw them up there, and he threw caution to
3  the wind and walked under the load anyway.
4  He entered that hazard area and entered the
5  building.
6      Q.  But we know that the BetaCom
7  employee, Mr. Cook, he's already said, he
8  admits that he knew they were working
9  overhead, yet he continued to walk
10 underneath.  Was that reasonable and
11 prudent in your opinion?
12     A.  Not on his part, no, sir.
13     Q.  All right.
14     A.  And then on the other Mr. Cook
15 for ALT, or ALT, then therefore he should
16 have seen that they actually came on that
17 job site and they didn't heed the warning.
18 They didn't -- apparently, they either
19 didn't know, he had failed to warn them.
20 But when he saw them walk that yard and go
21 into that building he should have said,
22 hey, wait a minute, we've got to shut this
23 job down until we get some control.

Page 255

1      Q.  Let me ask you about WesTower at
2  this point in time.  Do you have any
3  specific criticisms of anything that
4  WesTower did?
5      A.  They were on that job site.
6  They knew that the work was being
7  performed.  They were a controlling
8  employer.  They had done safety site
9  visits.  They checked paperwork is my
10 understanding.  And they did not assure
11 that these two were not working at the same
12 time on the same job site.
13     Q.  So your criticism is that
14 WesTower did not assure that BetaCom and
15 ALT were not working at the site on the
16 same day?
17     A.  Correct.
18     Q.  Is that your only criticism of
19 WesTower?
20     A.  It was their duty and
21 responsibility to know and have control of
22 that job site to know what was going on.
23     Q.  Let me ask you this:  Is your

Page 256

1  criticism of WesTower that they did not
2  assure that BetaCom and ALT were not
3  working at the site at the same time?
4      A.  Especially when it was an
5  overhead hazard.  Now, if they were both on
6  the ground at the same day, I wouldn't have
7  a problem with that.
8      Q.  So is that your only criticism
9  of WesTower?
10     A.  As far as I can recall.
11     Q.  So we'll -- I want to talk to
12 you about that criticism of WesTower to
13 make sure I understand exactly what your
14 criticism of WesTower is.
15     A.  Am I mistaken here, you
16 represent WesTower?
17     Q.  Yes, sir.
18     A.  Okay.
19     Q.  Yes, sir, I do.
20     A.  And BetaCom?
21     Q.  No, sir, I don't represent --
22         MR. JOHNSON:  No, he represents
23 just WesTower.

Page 257

1      A.  Okay.  Excuse me.  Well, why
2  have you been asking me all these questions
3  about BetaCom then?
4      Q.  Well, I'm trying to find out
5  what you're going to say.  Isn't that why
6  you ask questions?
7          Now, you stated that your
8  criticism of WesTower was that they did not
9  assure that ALT and BetaCom were not
10 working at the job site at the same time if
11 ALT was going to be working on the tower.
12 That's your criticism of WesTower, correct?
13     A.  Absolutely.
14     Q.  Okay.  As I understand from your
15 prior testimony, you don't have a problem
16 with the BetaCom employees being on site
17 even if the ALT crew was working overhead
18 if the BetaCom employees were aware that
19 the overhead work was going on?
20         MR. JOHNSON:  Object to the
21 form.
22     A.  By the agreement between the two
23 that you don't enter or leave that building

65 (Pages 254 to 257)

Page 258

1  until you check with me and make sure that
2  we don't have anything in suspension or...
3      Q.  In other words, you don't have a
4  problem with the concept of BetaCom working
5  within the concrete building and ALT
6  working high on the tower as long as the
7  BetaCom employees knew that ALT was working
8  on the tower and that they had
9  communications about that?
10         MR. DEAN:  Object to the form.
11         MR. JOHNSON:  Object to the
12  form.
13      A.  And complying -- in essence,
14  responding to the hazard and not exposing
15  themselves to the hazard.
16      Q.  And who would be the one to
17  respond to the hazard, BetaCom?
18      A.  Both.
19      Q.  BetaCom and ALT?
20      A.  Yes.
21      Q.  Okay.  And do you understand
22  that WesTower was not on the job site on
23  the day of the accident?

Page 259

1      A.  That's my understanding.
2      Q.  Do you have any criticism of
3  that fact?
4      A.  No, sir, but they knew the job
5  to be performed.
6      Q.  And so I'll understand it, you
7  say that the only thing WesTower did wrong,
8  according to your testimony, is that they
9  should have assured that when BetaCom and
10  ALT were on site at the same time and ALT
11  was going to be working overhead that
12  BetaCom was notified that ALT was going to
13  be working overhead so that BetaCom and ALT
14  could take appropriate precautions?
15         MR. DEAN:  Object to the form.
16         MR. JOHNSON:  Object to the
17  form.
18      A.  That's correct.
19      Q.  That's your criticism of
20  WesTower?
21      A.  That's correct.
22      Q.  And you don't have any other
23  criticism of WesTower; is that correct?

Page 260

1      A.  Not that I can think of right
2  now.
3      Q.  All right.  Now, let me ask you,
4  you said that WesTower -- did you say that
5  they could have been treated by OSHA as a
6  controlling employer?
7      A.  Absolutely.
8      Q.  Now, if you would, could you
9  tell me what factors you would look to to
10  determine whether or not any controlling
11  employer used reasonable care?
12      A.  I don't think they did.
13      Q.  That wasn't my question.  My
14  question is:  Notwithstanding this job or
15  WesTower or Cingular or anybody else, I'm
16  asking you a general question now.  Can you
17  tell me what factors you would use in
18  determining whether or not a controlling
19  employer used reasonable care?
20         MR. JOHNSON:  I'm going to
21  object to the form.
22      A.  Number one, they should control
23  the job site and eliminate any hazards that

Page 261

1  they make.  They have site visits to that
2  job site to evaluate the circumstances, do
3  we have any violations of the industry and
4  OSHA standards, do we have exposure to
5  those standards.  And if so, then it's
6  their duty then if the subcontractors or
7  contractors are not complying with the
8  rules and regulations, therefore we're
9  going to shut this job down until you do
10  come in compliance.
11      Q.  So there's no question about it.
12  You don't say that occurred in the case,
13  you're saying that that's what a
14  controlling employer should do under
15  certain circumstances?
16      A.  If he is a diligent, prudent
17  employer, yes, absolutely.
18      Q.  All right.  And that is he
19  should, you say, evaluate the situation; is
20  that right?
21      A.  Absolutely.
22      Q.  And how does someone go about
23  evaluating the situation?

66 (Pages 258 to 261)



Page 262

1     A.  By making site visits.
2         Q.  Now, did you find anything good
3    that WesTower did?  You've told me that you
4    have one criticism of WesTower, right?  Is
5    that right, sir?
6         A.  That's correct.
7         Q.  Now, I'm going to ask you:  Did
8    you find anything that WesTower did that
9    you think was good or laudable?
10        A.  They actually made site visits.
11        Q.  And that was good?
12        A.  Sure.
13        Q.  What else was good?
14        A.  They had a checklist to follow.
15        Q.  Was that good?
16        A.  Sure.
17        Q.  All right.  What else did they
18   do?  Did they check to see, for example,
19   that ALT had experienced employees?
20        A.  As far as I can tell or
21   according to the checklist that was one of
22   the items that they checked on or were
23   checked off on their checklist, yes.

Page 263

1         Q.  And when retaining ALT to do the
2    work, is it your understanding that ALT had
3    a history of doing this type of work and
4    thus had expertise in it?
5         A.  Sure.
6         Q.  And that's something that anyone
7    would want to look to in trying to
8    determine whether or not someone that you
9    contract with has expertise in a particular
10   area, correct?
11        A.  Before I sign the contract with
12   them, yes.
13        Q.  From what you can see in this
14   case, ALT had been doing this on many jobs
15   before this job, right?
16        A.  Sure.
17        Q.  And they had expertise, didn't
18   they?
19        A.  I'll agree with that.
20            MR. GANN:  That's all.  Thank
21   you.
22            MR. NORRIS:  Mr. Turner, do you
23   need a break or are you ready to keep

Page 264

1    going?
2             THE WITNESS:  Let's get it over
3    with.  I've got seven hours of driving
4    ahead of me.
5             MR. JOHNSON:  Well, just so you
6    know, this is Cingular's lawyer and not
7    Cingular and BetaCom's.
8    EXAMINATION BY MR. NORRIS:
9         Q.  I was going to introduce myself.
10   Mr. Turner, I'm Patrick Norris.  I
11   introduced myself this morning.  And I do
12   represent Cingular.  And I'm going to try
13   to not ask, believe me, some of the
14   questions that have already been asked.
15   For that reason, I'm going to kind of skip
16   around.  So if you have any trouble
17   following me, let me know, okay?
18        A.  Thank you, sir.
19        Q.  All right.  Now, you told us
20   already that you weren't real familiar with
21   the tower industry.  I'm going to ask you:
22   Do you have any familiarity with the
23   wireless industry?

Page 265

1         A.  No, sir.
2         Q.  Do you have any familiarity with
3    the customs and practices employed by those
4    companies that work in the wireless
5    industry?
6         A.  No, sir.
7         Q.  Do you have any experience or
8    knowledge of about how the companies that
9    work in the wireless industry typically
10   interact with one another?
11        A.  No, sir.
12        Q.  Do you have -- give me your
13   general understanding of the companies that
14   were involved on this particular site.
15   First of all, give me the names of the
16   companies that you can recall that actually
17   were involved in this site.
18        A.  Cingular was ultimately in
19   control of that job site is my
20   understanding.  WesTower also was the
21   contractor with the ALT people on that job
22   site.  ALT was actually changing out the
23   antennas, and that BetaCom was changing out

Page 266

1 the electronic equipment inside the
2 building. That there were other
3 contractors on that job site at different
4 times in order to change buildings out by
5 using a crane to offload the existing
6 building and put it on site and put it back
7 on -- put a new building back in there.
8 But they are not involved in this issue is
9 my understanding.
10 Q. All right. What is your
11 understanding, if any, was the
12 relationship, if any, between Cingular and
13 WesTower?
14 A. I'm not sure that I understand
15 it.
16 Q. How about between WesTower and
17 ALT?
18 A. I don't remember exactly who
19 contracted who on that job site.
20 Q. Have you ever heard of NSORO?
21 A. Only what I saw in the -- it's
22 my understanding it's a paper entity, so to
23 speak, that they were never on that job

Page 267

1 site. It's only someone that's a minority
2 contractor that it goes through their hands
3 from my understanding of it. But I've
4 never heard of them.
5 Q. Do you have any knowledge of any
6 relationship, if any, between Cingular and
7 NSORO?
8 A. No, sir.
9 Q. How about between NSORO and any
10 other person you've named already?
11 A. I don't know other than the fact
12 that it's my understanding it was a
13 minority contractor, that it was in the
14 loop in order to qualify for some kind of
15 grant or Federal monies or whatever, I
16 don't know. It's not a safety issue with
17 me.
18 Q. Do you have any information at
19 all as to whether or not NSORO was directly
20 involved with any of the work on this
21 particular site?
22 A. It's my understanding they were
23 not.

Page 268

1 Q. What do you base that
2 understanding on?
3 A. Because I see no evidence of it.
4 Q. Do you happen to know who hired
5 WesTower on this particular job?
6 A. I don't recall the contracts on
7 that job, no, I do not.
8 Q. Do you know who hired ALT?
9 A. I don't remember. I'd have to
10 go back to the contracts to figure it out.
11 Q. That information, I guess, was
12 not important to you in reaching any of
13 your opinions in this case?
14 A. That is correct.
15 Q. What involvement, if any, is it
16 your understanding Cingular had on this
17 site?
18 A. My understanding, they were the
19 ultimate in control of this work site, that
20 they had had representatives on that job
21 site at various times. So they knew this
22 job was in process and they had input into
23 some schedules of work with BetaCom. But

Page 269

1 beyond that, I don't know.
2 Q. And you say it's your
3 understanding that they were ultimately in
4 control. What do you base that on?
5 A. They were the ones forking out
6 the money.
7 Q. Are you basing it on anything
8 else besides that?
9 A. No, sir.
10 Q. Forking out the money. Is that
11 an OSHA term?
12 A. Yes, sir.
13 MR. JOHNSON: Note both the
14 lawyer and the witness were laughing.
15 MR. NORRIS: That was certainly
16 a joke. The court reporter can't take down
17 smiles, can he?
18 MR. JOHNSON: That's right.
19 That's why I said it.
20 Q. (By Mr. Norris:) Mr. Turner,
21 let me ask you, since you testified you're
22 not familiar with the wireless industry,
23 you understand, I guess, that Cingular is a

Page 270

1   wireless carrier? You know that, don't
2   you?
3       A.  Sure.
4       Q.  Do you know whether or not it's
5   the custom and practice of a wireless
6   carrier when having an equipment upgrade
7   done, like on this site, that they retain
8   contracts to do that work and that they
9   rely on those contractors to have their own
10  safety procedures and protocols in place?
11      MR. JOHNSON: Let me just real
12  quick state an objection on the record just
13  for this and I don't want to give you a
14  speaking objection. But part of this has
15  to do with the fact that we still have yet
16  to see any contracts between Cingular and
17  anybody other than some kind of master
18  agreement with NSORO that's unsigned,
19  redacted, marked up. And I think it's
20  unfair to ask this witness questions about
21  contracts that haven't even been produced
22  to us in discovery, although they've been
23  asked for.

Page 271

1       MR. NORRIS: Well, now --
2       MR. JOHNSON: Go ahead. For the
3   record, try to answer his question.
4       MR. NORRIS: Well, let me
5   respond to that. You've got the master
6   agreement between Cingular and NSORO, which
7   he says he's looked at and even cited one
8   provision earlier on in the deposition.
9       MR. JOHNSON: That's true.
10      MR. NORRIS: And for the record,
11  there are -- you're correct, Eddie, there
12  are -- I don't know what better words to
13  use, boxes on some of those pages that you
14  can't read behind and for the record the
15  copy you have is the only one that I have
16  and we have requested another one from
17  NSORO. And if I'm reading my e-mails
18  correctly, I think I've gotten five or six
19  different PDFs that are all supposed to be
20  all together, a complete copy of that. So
21  hopefully, that is one that is actually
22  without the boxes on there. But you also
23  have a contract with WesTower, you're got

Page 272

1   both of those and you've got that one as
2   well. That's been produced.
3       MR. JOHNSON: I don't believe
4   we've got one that's been authenticated as
5   a signed contact. Okay. We've got
6   something, we just don't know what it is.
7       MR. NORRIS: You've gotten the
8   one between Cingular and WesTower.
9       MR. JOHNSON: If you'll
10  represent that, we'll accept that.
11      Q.  (By Mr. Norris:) In any event,
12  in general terms, in general terms we're
13  talking about, do you know, Mr. Turner,
14  whether or not in the wireless industry, so
15  to speak, that it is industry custom and
16  practice of a wireless carrier having
17  equipment upgrades done to rely on the
18  contractors that are hired to do that work
19  to have their own safety protocols and
20  procedures in place?
21      MR. JOHNSON: Object to the
22  form.
23      MR. DEAN: Object to the form.

Page 273

1       A.  They may, in fact, rely upon it
2   and do it as you stated. But the law and
3   OSHA rules and regulations under 29 CFR,
4   Federal Rules and Regulations, 1926.16
5   entitled Rules for Construction ", in
6   essence you can contract away for the
7   actual work to be performed but in no case
8   shall the prime contractor", that's
9   Cingular in this case, "be relieved of the
10  overall responsibility for compliance with
11  the requirements of this part for all work
12  to be performed under the contract. So
13  therefore, you cannot contract away your
14  duty and responsibility."
15      That's the reason OSHA will hold
16  the prime contractor, in this case
17  Cingular, as the controlling employer and
18  therefore they could and should have issued
19  the same citations to Cingular as they did
20  to the other employers on this job site.
21      Q.  Are you talking about the multi
22  employer liability doctrine?
23      A.  Absolutely.

69 (Pages 270 to 273)

Page 274

1    Q.  Okay.  We'll get to that in a
2    minute.  But in terms of industry custom
3    and practice, do you know whether or not,
4    in fact, that is how it works in the
5    wireless industry, that is the custom and
6    practice?
7        A.  I don't care what the practice
8    is.  I'm saying the law is going to stand
9    on its own two feet and say you cannot
10   contract away your duties and
11   responsibilities.  You're stuck with it
12   forever.
13       Q.  All right.  And again, we'll get
14   to that, believe me.  I'm just trying to
15   get an answer to my question.  Do you know
16   if that's how it works in the industry or
17   not?
18       A.  I have no idea.
19       Q.  Okay.  If there is testimony
20   that that is, in fact, how it works, you
21   wouldn't be able to dispute it, would you?
22       A.  I wouldn't dispute it, but I
23   don't agree with it either.  The law is the

Page 276

1        A.  Not that I recall.
2        Q.  And you mentioned that Cingular,
3    you thought, had input on schedules of
4    BetaCom's work.  What do you base that on?
5        A.  From Mr. Wheeler's deposition.
6    He's shortening his time frame with
7    deadlines.
8        Q.  Anything you understand about
9    Cingular's involvement, if any, does that
10   come from Wheeler's deposition?
11       A.  Really, yes.
12       Q.  Do you have any information at
13   all that Cingular reserved the right of
14   control over any of the employers out there
15   in terms of how they did their job?
16       A.  I don't think they were
17   directing the work, if that's what you're
18   asking.
19       Q.  Do you have any information that
20   Cingular somehow reserved right of control
21   over the site itself, the location, or any
22   speculation or conjecture?
23       A.  I'm not sure I'm -- how about

Page 275

1    law and it's going to stand on its own two
2    feet.
3        MR. JOHNSON:  Just try to answer
4    his questions.  I mean you know you've got
5    to...
6        Q.  (By Mr. Norris:)  Tell me what
7    you understand.  You said that Cingular had
8    representatives on site at various times.
9    Now, what do you understand about that?
10       A.  Mr. Wheeler's deposition, I
11   remember reading something about the
12   Cingular people that don't come on that job
13   site.  He even talked about a -- what did
14   he say, a mad hat?  I've forgotten the term
15   he used.  Yelling.  Loud.
16       MR. JOHNSON:  Is that what he
17   called it, a mad hat?
18       MR. DEAN:  Mad hat.
19       Q.  (By Mr. Norris:)  Anything
20   besides what you saw in Mr. Wheeler's
21   deposition, is there any knowledge you may
22   have about Cingular having any
23   representatives out there?

Page 277

1    repeating that question.  I didn't -- it's
2    getting late in the day for me.
3        Q.  That's all right.  I asked you
4    if you need a break, if you do you let me
5    know, okay?
6        A.  Okay.  Thank you.
7        Q.  Do you have any information,
8    outside of any speculation, conjecture or
9    assumption, that Cingular in any manner
10   reserved a right of control over the site
11   itself?
12       A.  Other than the deposition of
13   where it had come out, and the changing
14   schedule.  So apparently they had some
15   control of that site.  To me, I mean that's
16   not really speculation.  I'm relying now on
17   the deposition of Mr. Wheeler.
18       Q.  All right.  You're talking about
19   just a change in the timetable.  He
20   testified that they were supposed to be
21   done with their work on day X and they got
22   moved up two or three days to whatever day
23   it was.  Is that what you're talking about?

Page 278

1  A. That's control of that job site
2  as far as that's the way I understand it.
3     Q. All right. What about in terms
4  of access to the job site, coming and
5  going, in and out, do you know if they
6  observed right of control over that?
7     A. I have no idea.
8     Q. Do you know if the employees or
9  employers that were out there had to obtain
10  permission or authority from somebody else
11  to be on the site at any given time?
12    A. I have no idea.
13    Q. You don't know if Cingular
14  controlled those things, do you?
15    A. No.
16    Q. Have you ever heard of Crown
17  Castle?
18    A. I've heard the term. They owned
19  the property, I think.
20    Q. Do you know anything more about
21  that?
22    A. No, sir.
23    Q. Let me ask you about the multi

Page 279

1  employer liability doctrine. You testified
2  that in your judgment Cingular could have
3  been determined by OSHA to be a controlling
4  employer; is that correct?
5     A. That is correct.
6     Q. And you also testified in your
7  judgment that WesTower and ALT could also
8  be found to be controlling employers; is
9  that correct?
10    A. That is correct.
11    Q. Is it your testimony you can
12  have more than one controlling employer on
13  a single site?
14    A. Absolutely. You can have more
15  than one correcting and you can have more
16  than one exposing.
17    Q. What is a controlling employer?
18       MR. JOHNSON: Object to the
19  form.
20    A. The one who is in ultimate
21  control, that would be number one, and
22  anybody who has subcontractors beneath him.
23  So if we've got three different layers, we

Page 280

1  could have multiple controlling employees
2  for that phase of that work.
3     Q. When you say ultimate control,
4  what do you mean by that?
5     A. The one who has absolute control
6  from the top to the bottom. He is the top
7  man, in essence.
8     Q. Well, what is absolute control,
9  what does that mean to OSHA?
10    A. The money starts here.
11       MR. JOHNSON: Are we back to our
12  joke?
13    Q. (By Mr. Norris:) No, I'm not
14  following you. What are the criteria that
15  you would look at? If you were the one out
16  there that was doing the review, you were
17  still working at OSHA now, what would be
18  the criteria you would look at to determine
19  whether or not someone was the controlling
20  employer?
21    A. Whose contract with who. And
22  follow the chain of money.
23    Q. Are you telling me that the

Page 281

1  criteria are as simple as company A that
2  hires company B, company A is the
3  controlling employer?
4     A. Absolutely.
5     Q. Does it have anything to do with
6  controlling the manner in which the work is
7  done?
8     A. Not necessarily, no.
9     Q. Company A that hired company B,
10  they wouldn't necessarily need supervisory
11  authority according to your testimony; is
12  that right?
13       MR. DEAN: Object to the form.
14    A. That is correct.
15    Q. They don't need any kind of
16  right of control; is that correct?
17    A. As far as I know.
18    Q. Can they be a controlling
19  employer if the contract they have does not
20  indicate such?
21       MR. DEAN: Object to the form.
22    A. Sure.
23    Q. Can they be a controlling

Page 282

1  employer if the industry custom between the
2  two companies is that the hiring company
3  does not interfere with or control the work
4  of the company they hire?
5       MR. DEAN: Object to the form.
6       MR. JOHNSON: Object to the
7  form.
8       A.  That's just playing word games.
9  They're ultimately in control and you
10 cannot contract away your duties and
11 responsibilities according to law.
12      Q.  Can you envision any scenario
13 where a company that hires another company
14 to do work would not be a controlling
15 employer?
16      A.  I can think of several
17 situations in which it would be -- I'll
18 give you a good example. Maybe it'll
19 clarify it. You're at this law firm and
20 the next law firm, these lawyers are legal
21 beavers, so to speak. If the air
22 conditioner goes out, they're going to go
23 out and get them not a druggie or drunkie

Page 283

1  off the street, they're going to a
2  legitimate resource to come in and work on
3  the heating and air conditioning system.
4  So therefore, are they in a position to
5  have any control over those people, not
6  really. That is a specialty area beyond
7  their normal scope of work, whereas
8  Cingular, in this case, would be within
9  their normal scope of work.
10      Q.  And you find support for that
11 where in the OSHA regs?
12      A.  It's just what I was taught in
13 the legal aspects of training at the OSHA
14 Institute.
15      Q.  Okay. I appreciate that. But
16 I'd love it if you could find a reference
17 to that in the OSHA regs that you've
18 printed out and have in front of you.
19      MR. JOHNSON: Object to the
20 form.
21      A.  I just explained that's what I
22 was taught at the OSHA Institute. But I
23 don't have any written documentation of

Page 284

1  that.
2       Q.  Okay. Any other scenarios you
3  can come up -- let me ask it this way then:
4  If company A hires company B, if they're
5  always situated whereas they are in a
6  similar type of work or have similar
7  interest, can you envision a scenario where
8  company A would not be a controlling
9  employer?
10      MR. JOHNSON: Object to the
11 form.
12      Q.  (By Mr. Norris:) As opposed to
13 your example of a law firm hiring somebody
14 to fix it's air conditioner?
15      A.  Not really.
16      Q.  What is the current state, if
17 you know, of OSHA's multi employer
18 liability document?
19      A.  I missed the first part of that.
20      Q.  What's the current state of
21 that, is OSHA still issuing citations based
22 on that document?
23      MR. JOHNSON: Object to the

Page 285

1  form.
2       A.  I'm not sure. I know there has
3  been a judge made a ruling here recently
4  and I'm not sure what OSHA is doing about
5  it, momentarily other than on hold, I
6  expect it will go to a review commission or
7  review panel. I think OSHA is going to
8  challenge that decision.
9       Q.  What was the decision, your
10 understanding of it?
11      A.  I'm not sure of all the details
12 of it and I am not going to make any
13 comments on it other than the fact that I
14 know it has been challenged, or one man
15 made a ruling, so to speak, about OSHA's
16 multi employer citation policy and it was
17 not favorable to OSHA. And to that extent,
18 that's all I know.
19      Q.  Do you know what part of the
20 multi employer liability doctrine was
21 addressed in that decision?
22      A.  No, sir.
23      Q.  Do you know what the issue in

72 (Pages 282 to 285)

Page 286

1  that case was?
2     A. No, sir.
3     Q. Do you know whether or not any
4  of the particular employers or people
5  involved in this case could be held liable
6  as a controlling employer in light of that
7  new decision?
8     A. Because this happened before
9  that decision, therefore I think what was
10  in precedence on the day of this mishap
11  should prevail.
12     Q. All right. Thank you for that.
13  But my question is: Do you know whether or
14  not any of the companies involved in this
15  case could be held liable as a controlling
16  employer under the multi liability doctrine
17  if it's upheld after that last decision we
18  just talked about?
19        MR. DEAN: Object to the form.
20        MR. JOHNSON: Same.
21     A. I'm not in a position to answer
22  that question. I don't know.
23        THE WITNESS: Can I say

Page 287

1  something off the record?
2        MR. JOHNSON: It's his record
3  right now. So before you can say anything,
4  let him let you say something off the
5  record.
6        MR. NORRIS: I didn't hear him.
7  Did you say --
8        MR. JOHNSON: He wanted to say
9  something off the record. I don't know
10  what it is.
11     Q. (By Mr. Norris:) Let me just
12  say -- let me ask my next question and if
13  you want to talk to your lawyer -- not your
14  lawyer, the lawyers that have hired you on
15  a break, then that's fine.
16        MR. JOHNSON: I'm not his
17  lawyer. Let's get that straight.
18        MR. NORRIS: I tried to fix
19  that.
20        MR. JOHNSON: Okay.
21        MR. NORRIS: Do you need to go
22  to the bathroom or something?
23        THE WITNESS: No.

Page 288

1        MR. NORRIS: If that's the case,
2  let us know.
3        MR. JOHNSON: I mean that's what
4  I wanted to know.
5        MR. DEAN: It's a privilege
6  motion.
7     Q. (By Mr. Norris:) What is your
8  criticism, if any, of Cingular in this
9  case?
10     A. That they were the ultimate in
11  controlling that job site and did not act
12  in a manner in which would be expected of
13  them under the OSHA multi employer work
14  site policy.
15     Q. All right. How did they not do
16  that?
17     A. By not controlling the job site
18  to keep the two subject entities here,
19  BetaCom and ALT, off of that site, working
20  aloft on the same day.
21     Q. Is that the same criticism you
22  have of WesTower?
23     A. Correct.

Page 289

1     Q. Okay. Any other criticisms
2  besides that of Cingular?
3     A. Not really.
4     Q. And tell me what you think
5  Cingular should or could have done that you
6  think would have been reasonable or
7  prudent?
8     A. To evaluate the situation and
9  know that the -- who was going to be on
10  that job site which day doing what work and
11  knowing the circumstances of removing the
12  hazards of overhead work while the BetaCom
13  people were on that job site.
14     Q. Do you have any evidence, Mr.
15  Turner, that Cingular knew that ALT and
16  BetaCom were going to be working on that
17  site at the same time and that they would
18  not communicate with one another as you've
19  described earlier when you said it was okay
20  if they worked on the same site as long as
21  they had a procedure in place. Do you have
22  any idea that Cingular knew that was going
23  to happen?

Page 290

1    MR. DEAN: Object to the form.
2        MR. JOHNSON: Object to the
3  form.
4    A.  I think they had a duty to know
5  it was going to happen.
6    Q.  How would they have fulfilled
7  that duty?
8    A.  By controlling that job site.
9    Q.  Well, how specifically would
10  they have controlled the job site on that
11  particular day?
12   A.  You know who's going to be on
13  that job site, what the nature of that work
14  is going to be and whether or not you're
15  going to allow them on that job site that
16  day while that type of work is being done.
17  Somebody has got to take control.
18   Q.  Uh-huh.  I'm struggling trying
19  to get the same thing somebody else said.
20  With that answer, I've got to ask it.  Just
21  so I'm clear, I don't want there to be a
22  misunderstanding on this.
23       If BetaCom and ALT are working

Page 291

1  out there on the site at the same time with
2  the BetaCom people in the building and the
3  ALT people outside on the tower, as long as
4  they were communicating and had a procedure
5  in place you don't have a problem with
6  that?
7        MR. DEAN: Object to the form.
8    A.  And following it?
9    Q.  Yeah, sure, and following it.
10  You don't have a problem with that; is that
11  correct?
12       MR. DEAN: Object to the form.
13   A.  That is correct.
14   Q.  Okay.  Let me ask you this while
15  I'm thinking about it.  I want you to
16  assume for me the BetaCom people knew that
17  ALT was out on the tower because they were
18  working in the building, okay, assume that
19  for me.
20   A.  Correct.
21   Q.  And assume that a procedure was
22  in place that they would communicate with
23  one another and they were following that

Page 292

1  procedure.  Whose responsibility would it
2  have been to have let the other one know
3  when the BetaCom crew decided they were
4  going to come out of the building, would it
5  have been BetaCom's crew to let ALT know
6  they were coming out?
7        MR. DEAN: Object to the form.
8        MR. JOHNSON: Same objection.
9    A.  I'll agree with that statement
10  because it's kind of like did the car stop
11  for the train or did the train stop for the
12  car.
13   Q.  Now, my question was: Do you
14  have any information that Cingular knew
15  that ALT and BetaCom would work on the same
16  site at the same time but not allegedly
17  have this plan in place and follow this
18  plan to work safely together?  Do you have
19  any information that Cingular knew that
20  would happened?
21       MR. JOHNSON: Object to the
22  form.
23   A.  No, sir.  However, I will say

Page 293

1  that they had a duty to know.
2    Q.  Let me ask you about the Alabama
3  statute you provided, 2511.  I don't recall
4  which exhibit that was.  I think it was --
5  what?
6        MR. JOHNSON: 22, Patrick, I
7  think.
8    Q.  (By Mr. Norris:) Have you got
9  that in front of you?
10   A.  Yes, sir.
11   Q.  Do you know whether or not an
12  employer can be held liable for the safety
13  of someone else's employee where that
14  employer did not reserve the right of
15  control over the workplace?
16   A.  I don't see where it says in
17  this statute that he's got to reserve a
18  right to control.  He has got the duty, and
19  he can't contract away that duty.  So
20  therefore I don't understand what you're
21  trying to get to.
22   Q.  Do you know anything about the
23  application of this statute, other than the

Page 294

1  actual statute as you read it right here in
2  front of you?
3      A. That is correct.
4      Q. Would you agree with me in this
5  particular case that Cingular did not
6  create the hazard, with the hazard being
7  working aloft, people down below?
8          MR. DEAN: Object to the form.
9      A. I'll agree with that statement.
10  I never said Cingular was the creating
11  employer.
12     Q. This is the first time I've
13  asked you about this, I'm not coming back
14  to something. And would you agree that
15  Cingular's own employees were not exposed
16  to the hazard?
17     A. If they were out there on that
18  job when they were on that tower, they were
19  exposed to it.
20     Q. Say that one more time.
21     A. If Cingular's employees were on
22  that job site while people were aloft, ALT
23  people was on that tower, they would have

Page 295

1  been exposed to it and subject to an
2  exposing employer.
3      Q. All right. Now, do you know if
4  on the day of the accident Cingular had any
5  employees out there?
6      A. I have no idea.
7      Q. If they didn't, then they would
8  not have had any of their employees exposed
9  to the hazard. That's common sense, isn't
10  it?
11     A. That wouldn't be an exposing
12  employer, but they're still the controlling
13  employer.
14     Q. Okay. I'm just talking about
15  exposing now.
16     A. Okay.
17     Q. What is, just in your own words,
18  under the OSHA multi employer liability
19  doctrine, what is the definition of a
20  controlling employer?
21     A. It goes back to the golden rule,
22  who has the gold makes the rules. So
23  therefore they're in control.

Page 296

1      Q. Is that your understanding of
2  what it says?
3      A. Yes, sir.
4      Q. I think you said this already,
5  but Cingular was not cited by OSHA for any
6  violations in this matter; is that correct?
7      A. I have not found any evidence of
8  it.
9      Q. To your knowledge, they were
10  not? To your knowledge, Cingular was not
11  cited?
12     A. That's correct, because I have
13  seen no evidence of it.
14     Q. Have you ever been asked to look
15  at a case involving a wireless industry?
16     A. No, sir.
17     Q. Getting back to your opinion
18  that Cingular is a controlling employer and
19  the duties they would have, would you agree
20  that one of the ways they could satisfy
21  their duty would be to make sure -- to make
22  it clear, as in the contract that you read
23  before, the NSORO contract, that the folks

Page 297

1  that are out there on the job are following
2  their own safety procedure protocols?
3      A. I think they had that duty.
4      Q. Sir?
5      A. I think they had that duty.
6      Q. Okay. If they did do that,
7  would that be one of the ways they could
8  satisfy their duty?
9      A. Absolutely.
10     Q. Obviously, you'd agree with me
11  that neither Cingular nor WesTower or
12  anybody involved, they can't have a person
13  there every single day, can they, on the
14  job site? That's not practical, is it?
15         MR. JOHNSON: Object to the
16  form.
17     A. I think they could. I don't
18  think it's required.
19     Q. But it's not practical, is it?
20         MR. JOHNSON: Object to the
21  form.
22     A. Depending on the circumstance.
23     Q. Well, real world, that's what

Page 298

1 we're talking about here.
2 MR. DEAN: Object to the form.
3 A. Well, we're talking about
4 people's lives, too.
5 Q. Are you familiar with -- well, I
6 can't ask you about wireless since -- are
7 you familiar with a construction -- no, I'm
8 not going to ask you that.
9 With a controlling employer,
10 their duties on the job site, are their
11 duties the same no matter whether or not
12 you're talking about its own employees
13 versus another employer's employees, or is
14 that controlling employer's duty greater
15 than or less than?
16 MR. DEAN: Object to the form.
17 MR. JOHNSON: Object to the
18 form.
19 A. I think all that responsibility
20 makes it greater.
21 Q. I think I'm going to agree with
22 this plaintiff lawyer. That was a terrible
23 question. I'm going to ask it again.

Page 299

1 When you're talking about a
2 controlling employer and what duties it has
3 on a job site, do its duties change if
4 you're looking at them as what they owe to
5 its own employees versus what they owe to
6 another contractor's employees?
7 A. They owe the same duty to
8 everyone on that job site.
9 Q. You've been today talking about
10 reasonable and prudent, and what is
11 reasonable and prudent for Randy Wheeler,
12 who was the lead person on the BetaCom
13 crew.
14 A. To assure --
15 Q. What? I didn't even ask the
16 question yet.
17 MR. JOHNSON: I objected and
18 he's just talking.
19 MR. NORRIS: I was just setting
20 up the question.
21 Q. (By Mr. Norris:) On the day of
22 this accident, that morning, he sees the
23 tower crew come inside, the equipment

Page 300

1 shelter where he's working, he sees them
2 get all their gear, he sees them go back
3 outside. He stays in the shelter, doesn't
4 see where they go. He knows it's the tower
5 crew, knows at some point the tower work is
6 going to be done. He assumes when it may
7 be done, but he's not sure. After some
8 period of time in the shelter, he then
9 comes out of the shelter, does not see the
10 tower crew anywhere on the ground.
11 Now, I'm going to ask you this:
12 Would it not be a reasonable and prudent
13 thing for him to do before exiting the
14 safety of that shelter to simply look up
15 and see if there's any tower work going on?
16 MR. JOHNSON: Object to the
17 form.
18 MR. DEAN: Object to the form.
19 A. If he could see from that
20 position.
21 Q. If he could, you'd say that
22 would be a reasonable and prudent thing for
23 him to do; is that correct?

Page 301

1 MR. JOHNSON: Object to the
2 form.
3 A. Absolutely. But with a canopy
4 over it, I'm not sure if going out there
5 looking at it, I don't see how he could see
6 that tower position from that door exit
7 under that canopy.
8 Q. Would it also be a reasonable
9 and prudent thing for him to do under the
10 circumstance to at least try to holler out
11 and ask where anybody is?
12 MR. DEAN: Object to the form.
13 MR. JOHNSON: Same objection.
14 A. I think that was doable and
15 would be reasonable.
16 Q. And if he didn't do those things
17 it would not be reasonable, would it?
18 MR. DEAN: Object to the form.
19 MR. JOHNSON: Object to the
20 form.
21 A. I agree with that statement.
22 Q. You've got a list in your
23 report, Mr. Turner, about all the materials

76 (Pages 298 to 301)

Page 302

1  you reviewed during the course of reaching
2  your opinions and after reaching your
3  opinions. And those are the first three
4  pages of your report. Do you see that?
5      A. Yes, sir.
6      Q. Look at item J for me on page 2.
7      A. Yes, sir.
8      Q. Does that indicate that some of
9  the documents you've looked at are the --
10 or were the defendants', and that's s
11 apostrophe, plural, initial disclosure?
12 Did I read that correctly?
13     A. That is correct.
14     Q. On your consulting business, as
15 I heard you say earlier, the only -- I
16 don't want to talk about your investments
17 and that kind of income, but is it true
18 that the only income that you, yourself,
19 and your bodily activities is generating
20 would be income from your consulting work;
21 is that right?
22         MR. FROST: Bodily activities?
23         MR. DEAN: He might be selling

Page 303

1  blood.
2          MR. FROST: I object to that.
3          MR. JOHNSON: To the extent that
4  it might include composting.
5          MR. NORRIS: Do you need a
6  break?
7      (Off-the-record discussion.)
8      Q. (By Mr. Norris:) Do you see
9  what I'm getting at? I don't want to find
10 out about your investments on your
11 properties or whatnot, but the only income
12 you're generating now is from your
13 consulting work; is that right?
14     A. No, sir.
15     Q. What else do you have income
16 coming in on?
17     A. Because I have investment
18 properties I do the actual work myself, I
19 get out there, I don't contract it out, I
20 do it myself. So therefore I'm fixing up
21 the rental properties for resale.
22     Q. Okay. Anything besides that?
23     A. No, sir.

Page 304

1      Q. All right. How much would you
2  say of your annual income is attributed to
3  your consulting work?
4      A. Three to five percent.
5      Q. How many cases are you carrying
6  on right now?
7      A. There's no way in the world I
8  could tell you I could answer that, I don't
9  know.
10     Q. Well, I mean where you've
11 actually been retained as an expert. I
12 mean at the current time, how many open
13 files do you have, do you think?
14     A. I don't know how to answer that
15 because some of the things that I have been
16 contracted or retained on I don't know the
17 status of the case. They probably settled
18 and got their money and run and ignored me.
19     Q. Well, let's assume all of them
20 are still active that you've been hired on.
21     A. I still don't know how to answer
22 that.
23     Q. Would it be more than 20?

Page 305

1      A. I doubt it.
2      Q. Okay. Somewhere in the range of
3  15, maybe, 15 to 20? I'm not going to hold
4  you to it. I'm just trying to get an idea.
5      A. In essence, I'm trying to get it
6  down to zero, so I don't know exactly what
7  the status is right now. I would say it
8  would be in that neighborhood, 15, 20.
9      Q. Are you trying to get out of the
10 consulting work?
11     A. I had a heart attack May it was
12 a year ago that resulted in five bypasses
13 and I'm trying to get out of everything.
14     Q. Are you not taking any new
15 assignments at this time?
16     A. That is correct.
17     Q. Have you taken a new assignment
18 since you took this case?
19     A. No, sir.
20     Q. This is the last one?
21     A. As far as I know.
22     Q. Out of the cases that you have
23 done -- how many years have you been doing

Page 306

1 consulting work?
2 A. Since 1991.
3 Q. During that period of time, in
4 the last 16 years or so, how much,
5 percentage-wise, would you say your
6 consulting work has been made up of work
7 for the plaintiffs' bar?
8 MR. JOHNSON: Object to the
9 form.
10 A. Sixty percent.
11 Q. Have you ever done any work for
12 any of the attorneys involved with the
13 plaintiffs in this case before?
14 A. No, sir.
15 Q. Do you know how they came to
16 contact you in this case?
17 A. No, sir. You'll have to ask
18 them.
19 Q. Do you advertise your consulting
20 services in any way?
21 A. Absolutely not.
22 Q. Have you ever done that?
23 A. No, sir. Now, let me clarify

Page 307

1 that. It's my understanding my name is out
2 there on some web sites somewhere with some
3 associations, such as the American Society
4 of Safety Engineers or some other
5 organization because I keep getting phone
6 calls asking me about certain things, this,
7 that and the other. But I am not paying
8 for any advertisement. I have not given
9 anybody permission to put my name out
10 there, but somehow or another it's got out
11 there. Apparently, you lawyers, when I
12 give depositions and testimony at trials,
13 somehow or another it hits the circuit
14 somewhere, and how it operates I don't
15 know.
16 Q. Do you have any brochures or
17 pamphlets or any other kind of written
18 documents advertising your services?
19 A. Advertising, absolutely not.
20 Now, I do have, because people ask me for a
21 handout occasionally about my background or
22 whatever, I do have a bi-fold that I do
23 pass out. But I do not have a business

Page 308

1 license. I do not advertise. I do not
2 seek work. I'm trying to bring it to a
3 zero.
4 Q. What's in the bi-fold that you
5 just talked about?
6 A. It is nothing more than my name,
7 address and phone number, a photo of me,
8 phone numbers, address and something about
9 my years of experience with OSHA and
10 credentials.
11 Q. Mr. Turner, give one copy to the
12 court reporter and let him mark that the
13 next exhibit.
14 (WHEREUPON, a document was
15 marked as Defendant's Exhibit Number 39 and
16 is attached to the original transcript.)
17 Q. Mr. Turner, do you ever recall
18 taking a seat on a witness stand in a
19 courtroom and not being qualified as an
20 expert?
21 A. No, sir.
22 Q. Have you ever had an occasion
23 where you weren't allowed to give an

Page 309

1 opinion because you were held out to be an
2 expert in the matter?
3 A. No, sir.
4 Q. Have any of your licenses ever
5 been suspended or revoked for any reason?
6 A. No, sir.
7 Q. Have you ever been sued
8 individually by anybody?
9 A. Yes, sir, quite a few years
10 back.
11 Q. What kind of case was that?
12 A. It was a construction contract
13 case where I was building my personal home
14 and the contractor or builder that I was
15 using he and I did not come to terms and I
16 wound up in the courtroom.
17 Q. Have you ever held any licenses
18 in any other states besides Massachusetts,
19 Georgia and, I think you said, California?
20 A. Never in California. I do hold
21 licenses in South Carolina for electrical
22 and plumbing as well as carpentry and
23 something else. Maybe sheetrock, I don't

Page 310

1 know. But Georgia for electrical and
2 plumbing. My PE license, and my engineer's
3 license has always been in Massachusetts.
4     Q. Have you ever held any other
5 licenses in any other states besides those
6 three?
7     A. No, sir.
8     Q. Do you currently or have you
9 recently taken any speaking engagements?
10     A. I can't recall the last one I
11 did.
12     Q. Well, you were asked about
13 videos earlier. Have you ever done a
14 speech or presented any kind of address to
15 any group about rigging?
16     A. Yes.
17     Q. On how many occasions have you
18 done that?
19     A. I did it when I was at OSHA. In
20 fact, if you'll go to 29 CFR
21 1926.550(g)section on "Crane suspended
22 personnel carriers", I was the author of
23 that section, which includes rigging.

Page 311

1     Q. Do you recall to whom you gave
2 the speech or the presentation?
3     A. I gave it to multiple
4 associations for open invitations
5 industry-wide, to Unions, and everything
6 else that was involved with it in
7 Jacksonville, Florida. There was some,
8 what I refer to as renowned, heavy hitters
9 of people within the industry, such as Mr.
10 Dibenedictus, who was probably as renowned
11 in this country as Mr. Dickey is in Canada
12 on cranes. And he was also involved -- he
13 was a part of the front row. And he is the
14 type of individual if you get to know this
15 gentleman, if I'd have said anything that
16 was not correct he'd have been on me with
17 both feet. So I was under the gun, so to
18 speak, and it was not an easy assignment.
19     Q. Were there any written materials
20 that you provided to any of the
21 participants?
22     A. Yes.
23     Q. Do you still have copies of

Page 312

1 those?
2     A. That would be very doubtful. If
3 I do, it would probably be protected from
4 disclosure by OSHA because it was their
5 work product, not mine.
6     Q. Did you give that speech as a
7 representative of OSHA?
8     A. Yes.
9     Q. What year did you give it?
10     A. I don't recall. It's been so
11 many years ago. It's probably been thirty
12 years ago now.
13     Q. Have you ever been retained by
14 any of the defendant companies in a case
15 that you recall?
16     A. No, sir.
17     Q. Did you know any of the lawyers
18 -- or do you know any lawyers that are in
19 the room today besides the ones that have
20 hired you in this case?
21     A. No, sir. And I never met him
22 until yesterday.
23         MR. NORRIS: All right. That's

Page 313

1 all. Thank you.
2         MR. GANN: Can I ask a few
3 follow-ups on Exhibit 5.
4 RE-EXAMINATION BY MR. GANN:
5     Q. Exhibit 5 is your case list
6 where you've testified by deposition or at
7 trial. Do you have a copy where we could
8 work together on that? If you could pull
9 that out.
10         And if you would, look at the --
11 let's just go through these page by page.
12 Look at the first page and tell me the
13 cases, if any, where you were retained by
14 the defendant. Were there any on the first
15 page?
16     A. No, sir.
17     Q. Let's go to the second page and
18 tell me on that page what, if any, of those
19 cases were you retained by the defendant?
20     A. If my memory serves me
21 correctly, none.
22     Q. All right. Let's go to third
23 page of Exhibit 5, your case list, and tell

Page 314

1   me which, if any, of those cases you were
2   retained by the defendant?
3       A.  In the 2002 section of Kurtiss
4   Nedd Brown versus Hardin Construction
5   Group, I was retained by the defendant.
6       Q.  Were you retained by Hardin
7   Construction Group?
8       A.  That is correct. Well, I was
9   retained by Dell Graham, PA, which David
10  Cornell was the attorney.
11      Q.  Uh-huh.
12      A.  And if my memory serves me
13  correctly, that's the way it was, he
14  retained me.
15      Q.  Now, in this case, was Hardin
16  Construction Group a general contractor who
17  was sued by an employee of a subcontractor?
18      A.  It's my understanding it was,
19  yes.
20      Q.  And you said in that case what,
21  that the general contractor did nothing
22  wrong?
23      A.  That is correct.

Page 315

1       Q.  And did you say that the general
2   contractor in that case was not a
3   controlling employer?
4       A.  No, sir, I did not.
5       Q.  Were they a controlling
6   employer?
7       A.  Yes.
8       Q.  Why did you say they did nothing
9   wrong?
10      A.  Because they had made a diligent
11  effort to do something and behind their
12  back they had all the paperwork necessary
13  to show that they had made that diligent
14  effort and things still occurred without
15  their knowledge.
16      Q.  So in that case, the Brown
17  versus Hardin Construction, you testified
18  on behalf of what you said was a
19  controlling employer, but because the
20  controlling employer had done a diligent
21  effort to have a safe work site, an
22  activity took place behind their back, you
23  testified under oath that Hardin

Page 316

1   Construction Company did nothing wrong; is
2   that right?
3       A.  If this is the case I'm thinking
4   about it, and I think it is, that is
5   correct.
6       Q.  All right. And that's because
7   in any job site accidents can happen, can't
8   they?
9       A.  That is correct.
10      Q.  And merely because accidents
11  happened, that doesn't mean that
12  contractors or entities on the job site are
13  somehow at fault provided that those
14  entities did the right thing?
15          MR. JOHNSON: Object to the
16  form.
17      A.  I have made many investigations
18  when I was at OSHA. To answer your
19  question, that is correct. But I found the
20  employer to be in compliance even though
21  things did, in fact, happen on that job
22  site.
23      Q.  And in those cases you would not

Page 317

1   cite that particular employer or
2   controlling employer because you found that
3   what they did was in compliance and, in
4   fact, right?
5       A.  If they did everything that I
6   would normally expect a diligent, prudent
7   employer to have done.
8       Q.  Would that include things such
9   as making sure that contractors on the work
10  site had a safety program?
11      A.  Correct.
12      Q.  Would it include things such as
13  safety audits?
14      A.  Correct.
15      Q.  Would it include things such as
16  retaining qualified personnel and personnel
17  with experience to do a particular job?
18      A.  Absolutely.
19      Q.  And in those cases, you find
20  that employers or what you say is a
21  controlling employer, they do what you
22  expect them to do and accidents still can
23  happen, can't they?

Page 318

1    A.   Absolutely.
2    Q.   That doesn't mean that it's the
3  fault of what you may think to be a
4  controlling employer?
5    A.   That is correct, provided
6  they've got the documented evidence to
7  support their position.
8    Q.   Right. Documented evidence,
9  things such as a written safety program; is
10 that right?
11   A.   Correct.
12   Q.   Things such as a written safety
13 audit?
14   A.   Correct.
15   Q.   Those are the type things that
16 you would look to to see whether or not an
17 entity did the right thing?
18   A.   Correct.
19   Q.   Let's go to the next page, which
20 will be the fourth page, and tell me which,
21 if any, of those cases --
22       MR. JOHNSON: Have you finished
23 with this page?

Page 319

1    Q.   (By Mr. Gann:) The third page
2  you told us about only one entity that you
3  said you were hired by where they were a
4  defendant, and that was the Brown versus
5  Hardin that we just talked about, right?
6       MR. JOHNSON: I just wondered if
7  he finished the page. That's what I was
8  asking him.
9    Q.   (By Mr. Gann:) Let's go to the
10 next page, the fourth page, which starts
11 off with Walker versus Cisco. Tell me --
12   A.   Excuse me. I'm trying to recall
13 the Jason McCoy. I know it was local
14 attorneys from Alabama that came over to
15 Georgia. I don't recall exactly what.
16 They say it's a cave-in, but right now I
17 cannot recall the substance of that case so
18 I can't make a decision one way or the
19 other. I'd have to question it.
20   Q.   All right. Let's go to page
21 four, starting with the Walker versus Cisco
22 case. Tell me all the way down the page
23 which, if any, of those cases you were

Page 320

1  retained by the defendant or defendant's
2  attorney.
3    A.   I don't recall any of those
4  being defendant.
5    Q.   All right. Let's go to page
6  five, which starts off with Nix versus
7  Franklin County School District.
8    A.   I was hired by the defendant
9  counsel on that one.
10   Q.   All right. In the Nix case you
11 were hired by the defendant's counsel.
12 What about any others on that page?
13   A.   The Federal court trial, the
14 Secretary of Labor versus Southern Pan
15 Services, I was hired by the defense on
16 that, which was Southern Pan.
17   Q.   Okay. That was not a personal
18 injury case, though, was it?
19   A.   No, sir.
20   Q.   Okay. Any other cases --
21   A.   It was mostly citation only.
22   Q.   Okay. Were there any other
23 cases where you were hired by the defendant

Page 321

1  on that page, page five?
2    A.   Not that I recall.
3    Q.   Let's talk about the Nix versus
4  Franklin County School District.
5    A.   I thought we just did.
6       MR. JOHNSON: Well, he wants to
7  talk about it in general.
8    Q.   (By Mr. Gann:) What were your
9  opinions in that case, why were you not
10 critical of the defendant in that case?
11 What did the defendant do right?
12       MR. JOHNSON: Object to the
13 form.
14   A.   First of all, this was not under
15 OSHA jurisdiction simply because it was a
16 school, a public school. The instructor
17 had got up teaching these guys how to read
18 a simple thing like a volt ohm meter. He
19 had a piece of conductor, a piece of Romex.
20 That is nothing more than a two-wire
21 conductor with ground with the poly jacket
22 on it that he had connected by a switch
23 where he controlled it, and a reastat that

Page 322

1  he could control the voltage going to that
2  wire or conductor from zero to so many
3  thousand volts.
4          He had all his students in
5  place, he made the announcement and told
6  all the students and the students testified
7  to the -- or gave me written statements to
8  the effect that they were told in plain
9  language, he told us and he told us and he
10  told us if you make contact with the red --
11  I mean the black and the white wire at the
12  same time from one extremity to the other,
13  he explained the hazard to them, it will
14  literally blow your heart out. And right
15  at the end of the class under a thousand
16  volts, the kid made contact with both. The
17  instructor caught him before he hit the
18  floor, but he was dead.
19          Q.  So this was a student suing a
20  school?
21          A.  Yes, sir. Student's family
22  suing the school.
23          Q.  You found in that case that the

Page 323

1  schoolteacher had properly instructed the
2  students?
3          A.  That is correct. He had
4  properly instructed, all the other students
5  in that class supported him.
6          Q.  Gotcha.
7          A.  And this guy just threw caution
8  to the wind.
9          Q.  All right. Let's go to page 6,
10  the first case listed there's is
11  Christopher Lawrence versus WCC Interest.
12  Are there any cases on page 6 where you
13  were hired by the defendant or defendant's
14  counsel?
15          A.  The Roger Akers versus Triple G
16  Construction and Mobark Industries, Inc. I
17  was retained for the defense for Mobark.
18          Q.  And what was Mobark's duties or
19  how did they play a role in that site?
20          A.  They manufactured a piece of
21  equipment that slung a ladder or a hard
22  piece of wood through the air and
23  supposedly it struck Mr. Akers.

Page 324

1          Q.  Was it a guarding case where the
2  equipment should have been guarded
3  differently, is that what was alleged?
4          A.  I don't see -- I never could
5  figure out a way to guard it. It had all
6  guards on it that were manufactured and put
7  on there. And when you throw rough wood
8  products, stumps, limbs, whatever, into a
9  grinder it's kind of like a blender that
10  you would have on the kitchen counter to
11  grind these rough pieces up and make chips
12  out of them. So I don't see how you could
13  guard it when you can't cover the hopper.
14          Q.  Are there any other cases on
15  page 6 that you were hired by the defendant
16  or defendant's attorney?
17          A.  The Robin Pertl, P-e-r-t-l,
18  versus Exit Information Guide. I was hired
19  to defend that case in Gainesville,
20  Florida.
21          Q.  Is that where an employee of a
22  subcontractor fell through a skylight?
23          A.  Yes, sir.

Page 325

1          Q.  Did he sue the general
2  contractor on the job site?
3          A.  He was the general contractor on
4  that job site.
5          Q.  Robert Pertl was?
6          A.  Yes, sir.
7          Q.  Okay. Who did he sue?
8          A.  He sued Exit Information Guide,
9  the property owner.
10          Q.  Okay. And he said the property
11  owner owed him some duty to protect him, is
12  that what he said?
13          A.  That's correct.
14          Q.  And what did you say, what was
15  your defense for the property owner?
16          A.  The property owner owned the
17  compound. It was an old Scottish lumber,
18  concrete, shingles, whatever, kind of like
19  a Home Depot. A printing company that
20  prints the magazines for the Exit
21  Information Guide that you would pick up at
22  the Welcome Station or wherever about
23  discount coupons and attractions and et

Page 326

1 cetera, so they're in the printing
2 business, advertising business.
3        And they had this shed where
4 they used to keep the shingles out in the
5 backyard. They were not using that shed
6 other than to make it available for some
7 customers to park their boats under. But
8 it had no relation to that business.
9        Someone flew over, an aerial
10 photograph, and took a picture of that site
11 and showed it to them and they recognized,
12 hey, the roof on this shed is a little
13 rusty, we need to have this thing taken
14 care of. So they went out and hired a
15 legitimate, Mr. Pertl, contractor in the
16 business of repairing roofs and painting
17 roofs, this, that and the other. They
18 didn't go out and get some druggie and some
19 drunkie off the street, which they could
20 have, but they went to a legitimate
21 contractor, explained to him what they
22 needed done. He gave them a price, he
23 brought his crew in and started spray

Page 327

1 painting.
2        And on that roof was some
3 corrugated fiberglass skylight panels and
4 he painted over them. So they had the same
5 color as everything else on that roof. And
6 doggone it, if he wasn't the one that
7 stepped in it and it killed him.
8    Q. And you're saying because the
9 landowner had done the right thing, he had
10 hired a competent company to come in, a
11 company that had been doing this before on
12 many other jobs, that he's not responsible
13 when that -- an accident grows out of the
14 activity of that competent person?
15    A. That -- to me, it was just like
16 in my home if I hired somebody to re-roof
17 my home. I'm not in the business of that
18 -- the nature of that work.
19    Q. Okay.
20    A. So therefore, don't hold me
21 responsible for his activity when I didn't
22 -- when I went to a legitimate source to
23 get that work performed. And it was not

Page 328

1 within the nature of his work, it was not
2 being used by it, it was just on the
3 property and he was being a good guy
4 loaning this space out. So therefore I
5 didn't feel like he should be held liable
6 in that case.
7    Q. Any other cases on page 6 where
8 you represented the defendant or testified
9 for the defendant?
10    A. The next case was Fox versus
11 Anheuser Busch.
12    Q. That was the next one you
13 represented?
14    A. Yes.
15    Q. Or testified for the defendant?
16    A. Yes.
17    Q. Tell me about that.
18    A. The contract carrier, a truck
19 driver, had come on site to pick up spent
20 grains, which was hot in the fact of
21 consistency of oatmeal. It was running, I
22 think, 185 degrees Fahrenheit. He
23 overloaded the truck, he goes around to the

Page 329

1 guard shack to leave the property, before
2 Anheuser would let him leave that property
3 they ran him across the scales. The fact
4 that he was overloaded, said sorry, go back
5 and offload some. And they had provisions
6 there for him to offload it.
7        When he goes back and starts
8 shoveling off from the trailer that he
9 overload into an empty trailer that
10 Anheuser had set up for him, he falls in
11 and gets scalded from the waist down in
12 this 185 degrees. In essence, it cooked
13 him. I defended Anheuser Busch in that
14 case.
15    Q. Did you find Anheuser Busch to
16 be a controlling employer?
17    A. Yes.
18    Q. But because -- why did you find
19 that they did nothing wrong?
20    A. Simply because this was a
21 relative new driver. He had been
22 instructed and trained by OJT, on-the-job
23 training, somebody else had brought him in

Page 330

1  there.  But the resources was there for him
2  to offload this trailer.  He could have
3  underloaded it just as easy as he
4  overloaded it.  If he'd have underloaded
5  it, he'd have been free to go.
6         And they hauled this grain out
7  to farmers, by the way, to feed the
8  livestock, or cattle.  But he had
9  overloaded it and I think he had to offload
10  something like a hundred pounds.  There was
11  a shovel there for him.  They had racks
12  there for him.  And he took a shortcut and
13  climbs up on the walls of that trailer,
14  dripping down with the broad shovel, or
15  seed shovel, as we would call it, and lost
16  his balance and fell in.
17       Q.  What about any other cases on
18  page 7, did you represent the defendant or
19  testify for the defendant?
20       A.  Pogue versus Oglethorpe Power
21  Corporation.  I did the work for the
22  defendant on that case.
23       Q.  Was Oglethorpe Power Corporation

Page 331

1  a landowner?
2       A.  Yes, sir.
3       Q.  Somebody that came on their
4  property got hurt?
5       A.  That's correct.
6       Q.  And you found that the landowner
7  had done -- had in place proper safety
8  procedures and all?
9       A.  In fact, the landowner in that
10  case had no one on that job site with the
11  exception of someone to verify that work
12  had been completed for them for payment
13  draws.  But they had no control of that job
14  site, they had not accepted that job site
15  or that property, it was under contract
16  with the prime contractor, or general
17  contractor, and served many subs.  But they
18  had no activity on that job site beyond the
19  payment draw.
20       Q.  All right.  Let go to page 8.
21  Tell me which cases, please, if any, you
22  testified for the defendant.
23       A.  None.

Page 332

1       Q.  Page 9, which, if any, did you
2  testify for the defendant?
3       A.  If my memory serves me
4  correctly, none.
5       Q.  Page 10, which, if any, did you
6  testify for the defendant?
7       A.  Let me state on the Atlantic
8  Steel Industries versus Harden Erectors,
9  one was a property owner, the other was a
10  contractor.  But I think they were both
11  defending themselves somehow or another in
12  this.
13       Q.  Okay.
14       A.  So I don't know how to really
15  answer that one.
16       Q.  That's not really a personal
17  injury case, is it?
18       A.  Yes, it was a personal injury
19  case.  But I think this had -- the injured
20  party was -- had been settled with and now
21  they were fighting over who was going
22  after --
23       Q.  I see.  Other than that one,

Page 333

1  where they were both defendants in the
2  personal injury case, are there any others
3  on page 10?
4       A.  Okay.  The Jesus Perez and
5  Frederic R. Harris versus ICA/Florida
6  Roads.  And this goes back to 1995.  I've
7  forgotten the exact date on that, but this
8  case wound up being -- I was on one side of
9  the table at one time and on the other side
10  of the table at another.  So I was for the
11  plaintiff, initially.
12       The plaintiff was settled with,
13  got him out of the way, and in the process
14  the agreement was that the defendants would
15  split the monies equally between -- they
16  would divide whatever Mr. Perez got and
17  each one would pay his portion equally,
18  then one of them reneged.
19       Q.  Okay.  But in the original case,
20  the original personal injury case by Jesus
21  Perez, you were for the plaintiff in that
22  case, Mr. Perez, right?
23       A.  That's correct.

Page 334

1  Q. Okay. That's really not a case
2  -- you're talking about later you got
3  involved in the indemnity issues about who
4  will pay the bills?
5  A. Well, one was suing the other.
6  I mean I was on the defense side of that as
7  it resulted.
8  Q. Page 11, any for the defendant
9  there?
10  A. If I'm not mistaken, on the
11  Martin Rodriguez versus Tucker Materials, I
12  was on the defense side of that one.
13  Q. All right. Anyone else?
14  A. And for your information, the
15  next two are really one case, even though
16  I've got them listed out there was two
17  plaintiffs, same defendant.
18  Q. Uh-huh.
19  A. But it was one case so that
20  would -- I was on the plaintiff's side of
21  that case.
22  Q. All right. Anyone else?
23  A. Not that I recall.

Page 335

1  Q. Page 13 -- excuse me, page 12.
2  Anyone on that page?
3  A. Allstate Insurance Company
4  versus Seagraves Enterprises. If I'm not
5  mistaken, I represented Seagraves
6  Enterprises. I was working on their
7  behalf.
8  Q. Okay. Anyone else?
9  A. In 1991, the Wendell Renfro
10  versus ORBA, and the Lawrence Terrell
11  versus Georgia Power. It's local
12  attorneys. I was on the defense side of
13  both of those.
14  Q. On the ORBA case and the Georgia
15  Power case?
16  A. Yes, sir.
17  Q. Was that the same accident or
18  different accidents?
19  A. Two different ones.
20  Q. All right.
21  A. Same site, same location.
22  Q. All right. Let's go to the next
23  one. The last page, April 23rd, 2007,

Page 336

1  Toledo versus Service Merchandise.
2  A. I was on the side of the
3  plaintiff.
4  Q. Okay. Next question, about hard
5  hats. You brought in some calculations
6  about a hard hat. First of all, do you
7  hold yourself out as an expert in hard
8  hats?
9  MR. JOHNSON: Object to the
10  form.
11  A. I hold myself out to be a safety
12  engineer, which hard hats are just one of
13  the many areas in which I work on.
14  Q. Is one of the functions of a
15  hard hat to defect a blow away from the
16  head and body?
17  A. That is correct.
18  Q. And the testing that you have
19  done, have given us information about, has
20  to do with direct, on top of the helmet, it
21  doesn't have anything to do with deflecting
22  issues, does it?
23  A. That is correct.

Page 337

1  Q. Okay. Are there tests that talk
2  about how much a helmet can deflect away
3  from a person's body and save his life
4  while it may cause some injury, it may
5  deflect and keep the brain from being
6  injured?
7  A. I've never seen that in writing
8  in any place or even any write-ups on it.
9  Q. It would be hard to test
10  deflection, wouldn't it, because there are
11  all sorts of angles and shapes and sizes of
12  things that could fall and be deflected
13  from a helmet; isn't that right?
14  A. In fact, ANSI has some
15  directions on penetration tests as well as
16  deflection tests and they've got the
17  criteria in the ANSI standards.
18  Q. ANSI standards. Have you done
19  any calculations in this case to see
20  whether or not a helmet, a modern hard hat
21  that is used in modern construction, could
22  have deflected this antenna in such a way
23  that it would not have killed Mr. Cotton?

Page 338

1    A.   I think that would be the most
2  asinine thing I ever heard of.
3       Q.   Why is that?
4       A.   Because of the distance, the
5  weight of that antenna fell that distance
6  and the velocity of impact, according to
7  the calculations that I have made are
8  calculations that are made according to the
9  foot pound criteria by these testing
10  authorities of ANSI.  So when you figure
11  those -- when you have those figures in
12  front of you for a helmet that was only
13  designed for forty pounds of -- forty-foot
14  pounds of impact, it doesn't even approach
15  it.
16      Q.   Well, I'm asking now about
17  deflection.
18      A.   It doesn't make any difference
19  whether it's impact or deflection.  For an
20  object that size and weight falling that
21  distance, you can forget it.  It would be
22  negligible.
23      Q.   The amount of deflection would

Page 339

1  be negligible, you say?
2       A.   Correct.
3       Q.   Have you done anything to try to
4  see whether or not deflection could play a
5  role in this case?
6       A.   Other than what I've cranked
7  those numbers through.
8            MR. GANN:  Okay.  That's all.
9  Thank you.
10           MR. FROST:  I just have to ask
11  two questions, I hope.
12  RE-EXAMINATION BY MR. FROST:
13      Q.   I had thought you had told me
14  all your opinions about ALT when I was
15  asking you.  But I heard you say, I
16  thought, when Mr. Gann was first asking you
17  questions that you were offering the
18  opinion that ALT could also be the
19  controlling employer.  Did you mean to say
20  that, or was that just a misstatement?
21      A.   They could be a controlling
22  employer because they had the control of
23  who went up on that tower when and they

Page 340

1  created that hazard.
2       Q.   All right.  Do you know of any
3  evidence, testimony or documentation that
4  would indicate that ALT or the three
5  employees it had at the site that day had
6  any supervisory capacity over anybody else
7  at the site?
8       A.   To my knowledge, they did not.
9            MR. FROST:  All right.  That's
10  all I've got.
11  RE-EXAMINATION BY MR. GANN:
12      Q.   With regard to Defendant's
13  Exhibit 28, who typed that expert witness
14  report of Girard H. Turner?
15      A.   My wife typed it up because most
16  of it is already on the computer on
17  boilerplate anyway.
18      Q.   What do you mean it's on
19  boilerplate?
20      A.   In essence, if you read this
21  report or you read one that I did five
22  years ago, it would have the exact same
23  verbiage in it in certain paragraphs.

Page 341

1       Q.   Uh-huh.  In other words, what
2  you do on the other cases where you're
3  critical of defendants, you just take your
4  other reports and use the same verbiage; is
5  that right, sir?
6            MR. JOHNSON:  Object to the
7  form.
8       Q.   (By Mr. Gann:)  In a lot of
9  examples.
10           MR. JOHNSON:  Object to the
11  form.
12      A.   Especially on my background when
13  it comes to what I have reviewed it would
14  be different.
15      Q.   Oh, I understand.
16      A.   According to my opinions, it
17  would be different.  But as far as my
18  background, basically, it's the same.
19      Q.   For example, when you use words
20  like it is my opinion that the defendants
21  were not acting in a prudent manner, would
22  those be the type of words that would be on
23  boilerplate?

Page 342

1    A.  No, sir.  In my opinion that
2  would be it and stop.
3    Q.  Okay.
4    A.  And then I would fill in the
5  blanks.
6    Q.  Fill in the banks after that.
7  What about paragraph 12, where it talks
8  about this was a multi employer environment
9  and it cites a public law and it cites
10 Alabama Industrial Relations.  Do you have
11 that on boilerplate?  I know you'll change
12 the code sections to fit the particular
13 state.
14   A.  Depending upon the situation.
15 Some have it in there, some don't.
16   Q.  You've used the same language in
17 paragraph 12 as in other cases is what
18 you're telling me?
19   A.  If it prevailed in that case.
20 But if it didn't apply in that case, then I
21 would not have put it in there.
22   Q.  Okay.  What about paragraph 11,
23 would that be the same for paragraph 11?

Page 343

1    A.  Yes, sir.
2    Q.  Okay.  And you got other cases
3  across the country where you've testified
4  for plaintiffs that are suing defendants
5  where you used the same verbiage as you
6  used in paragraph 11?
7        MR. JOHNSON:  Object to the
8  form.
9    A.  If it applied.  If it was
10 applicable if that case and it applied,
11 yes.  Of course, I may have to change the
12 state name, I may have to change some other
13 things in there, but basically the same.
14       MR. GANN:  Okay.  That's all.
15 Thank you.
16          4:46 p.m.
17
18       FURTHER THE DEPONENT SAITH NOT
19
20
21
22
23

Page 344

1            CERTIFICATE
2  STATE OF ALABAMA)
3  COUNTY OF SHELBY)
4
5        I hereby certify that the above and
6  foregoing deposition was taken down by me
7  in stenotype and the questions and answers
8  thereto were transcribed by means of
9  computer-aided transcription, and that the
10 foregoing represents a true and correct
11 transcript of the testimony given by said
12 witness upon said hearing.
13       I further certify that I am neither
14 of counsel, nor kin to the parties to the
15 action, nor am I in anyway interested in
16 the result of said cause named in said
17 caption.
18
19       _____
20            Timothy R. Lovelady
21            Certificate No:  AL-CSR-130
22 My Commission expires
23 December 8, 2009

87 (Pages 342 to 344)

The Exhibits to Mr. Turner's deposition consist of material saved on 10 CDs. Copies of these CDs have been filed with the court.