FILED

2008 May-19  PM 05:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT
# B

Page 5

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ALABAMA

 3                    EASTERN DIVISION

 4

 5     CIVIL ACTION NUMBER:

 6     CV-06-BE-1486-E

 7

 8     PATRICIA ANNE COTTON,

 9          Plaintiff(s),

10     vs.

11     ALT, INC., WESTOWER COMMUNICATIONS,

12     INC., CINGULAR WIRELESS, LLC, et al.,

13          Defendants(s).

14

15

16            DEPOSITION TESTIMONY OF:

17              GIRARD H. TURNER

18

19     AUGUST 23, 2007

20     9:13 A.M.

21

22     COURT REPORTER:

23     Timothy R. Lovelady, CSR, CLR, CMRS
```

**American Court Reporting**
**toll-free (877) 320-1050**

1    going?

2         THE WITNESS:  Let's get it over

3    with.  I've got seven hours of driving

4    ahead of me.

5         MR. JOHNSON:  Well, just so you

6    know, this is Cingular's lawyer and not

7    Cingular and BetaCom's.

8    EXAMINATION BY MR. NORRIS:

9         Q.   I was going to introduce myself.

10   Mr. Turner, I'm Patrick Norris.  I

11   introduced myself this morning.  And I do

12   represent Cingular.  And I'm going to try

13   to not ask, believe me, some of the

14   questions that have already been asked.

15   For that reason, I'm going to kind of skip

16   around.  So if you have any trouble

17   following me, let me know, okay?

18        A.   Thank you, sir.

19        Q.   All right.  Now, you told us

20   already that you weren't real familiar with

21   the tower industry.  I'm going to ask you:

22   Do you have any familiarity with the

23   wireless industry?

1        A.    No, sir.

2        Q.    Do you have any familiarity with

3    the customs and practices employed by those

4    companies that work in the wireless

5    industry?

6        A.    No, sir.

7        Q.    Do you have any experience or

8    knowledge of about how the companies that

9    work in the wireless industry typically

10   interact with one another?

11       A.    No, sir.

12       Q.    Do you have -- give me your

13   general understanding of the companies that

14   were involved on this particular site.

15   First of all, give me the names of the

16   companies that you can recall that actually

17   were involved in this site.

18       A.    Cingular was ultimately in

19   control of that job site is my

20   understanding.  WesTower also was the

21   contractor with the ALT people on that job

22   site.  ALT was actually changing out the

23   antennas, and that BetaCom was changing out

1    the electronic equipment inside the

2    building.  That there were other

3    contractors on that job site at different

4    times in order to change buildings out by

5    using a crane to offload the existing

6    building and put it on site and put it back

7    on -- put a new building back in there.

8    But they are not involved in this issue is

9    my understanding.

10        Q.    All right.  What is your

11   understanding, if any, was the

12   relationship, if any, between Cingular and

13   WesTower?

14        A.    I'm not sure that I understand

15   it.

16        Q.    How about between WesTower and

17   ALT?

18        A.    I don't remember exactly who

19   contracted who on that job site.

20        Q.    Have you ever heard of NSORO?

21        A.    Only what I saw in the -- it's

22   my understanding it's a paper entity, so to

23   speak, that they were never on that job

**American Court Reporting**
**toll-free (877) 320-1050**

Page 267

1    site.  It's only someone that's a minority

2    contractor that it goes through their hands

3    from my understanding of it.  But I've

4    never heard of them.

5         Q.    Do you have any knowledge of any

6    relationship, if any, between Cingular and

7    NSORO?

8         A.    No, sir.

9         Q.    How about between NSORO and any

10   other person you've named already?

11        A.    I don't know other than the fact

12   that it's my understanding it was a

13   minority contractor, that it was in the

14   loop in order to qualify for some kind of

15   grant or Federal monies or whatever, I

16   don't know.  It's not a safety issue with

17   me.

18        Q.    Do you have any information at

19   all as to whether or not NSORO was directly

20   involved with any of the work on this

21   particular site?

22        A.    It's my understanding they were

23   not.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 268

1          Q.     What do you base that

2     understanding on?

3          A.     Because I see no evidence of it.

4          Q.     Do you happen to know who hired

5     WesTower on this particular job?

6          A.     I don't recall the contracts on

7     that, no, I do not.

8          Q.     Do you know who hired ALT?

9          A.     I don't remember.  I'd have to

10    go back to the contracts to figure it out.

11         Q.     That information, I guess, was

12    not important to you in reaching any of

13    your opinions in this case?

14         A.     That is correct.

15         Q.     What involvement, if any, is it

16    your understanding Cingular had on this

17    site?

18         A.     My understanding, they were the

19    ultimate in control of this work site, that

20    they had had representatives on that job

21    site at various times.  So they knew this

22    job was in process and they had input into

23    some schedules of work with BetaCom.  But

1   beyond that, I don't know.

2        Q.   And you say it's your

3   understanding that they were ultimately in

4   control.  What do you base that on?

5        A.   They were the ones forking out

6   the money.

7        Q.   Are you basing it on anything

8   else besides that?

9        A.   No, sir.

10        Q.   Forking out the money.  Is that

11   an OSHA term?

12        A.   Yes, sir.

13        MR. JOHNSON:  Note both the

14   lawyer and the witness were laughing.

15        MR. NORRIS:  That was certainly

16   a joke.  The court reporter can't take down

17   smiles, can he?

18        MR. JOHNSON:  That's right.

19   That's why I said it.

20        Q.   (By Mr. Norris:)  Mr. Turner,

21   let me ask you, since you testified you're

22   not familiar with the wireless industry,

23   you understand, I guess, that Cingular is a

1    wireless carrier?  You know that, don't

2    you?

3         A.    Sure.

4         Q.    Do you know whether or not it's

5    the custom and practice of a wireless

6    carrier when having an equipment upgrade

7    done, like on this site, that they retain

8    contracts to do that work and that they

9    rely on those contractors to have their own

10   safety procedures and protocols in place?

11        MR. JOHNSON:  Let me just real

12   quick state an objection on the record just

13   for this and I don't want to give you a

14   speaking objection.  But part of this has

15   to do with the fact that we still have yet

16   to see any contracts between Cingular and

17   anybody other than some kind of master

18   agreement with NSORO that's unsigned,

19   redacted, marked up.  And I think it's

20   unfair to ask this witness questions about

21   contracts that haven't even been produced

22   to us in discovery, although they've been

23   asked for.

1          MR. NORRIS:  Well, now --

2          MR. JOHNSON:  Go ahead.  For the

3     record, try to answer his question.

4          MR. NORRIS:  Well, let me

5     respond to that.  You've got the master

6     agreement between Cingular and NSORO, which

7     he says he's looked at and even cited one

8     provision earlier on in the deposition.

9          MR. JOHNSON:  That's true.

10          MR. NORRIS:  And for the record,

11    there are -- you're correct, Eddie, there

12    are -- I don't know what better words to

13    use, boxes on some of those pages that you

14    can't read behind and for the record the

15    copy you have is the only one that I have

16    and we have requested another one from

17    NSORO.  And if I'm reading my e-mails

18    correctly, I think I've gotten five or six

19    different PDFs that are all supposed to be

20    all together, a complete copy of that.  So

21    hopefully, that is one that is actually

22    without the boxes on there.  But you also

23    have a contract with WesTower, you're got

**American Court Reporting**
**toll-free (877) 320-1050**

1    both of those and you've got that one as

2    well.  That's been produced.

3         MR. JOHNSON:  I don't believe

4    we've got one that's been authenticated as

5    a signed contact.  Okay.  We've got

6    something, we just don't know what it is.

7         MR. NORRIS:  You've gotten the

8    one between Cingular and WesTower.

9         MR. JOHNSON:  If you'll

10   represent that, we'll accept that.

11        Q.   (By Mr. Norris:)  In any event,

12   in general terms, in general terms we're

13   talking about, do you know, Mr. Turner,

14   whether or not in the wireless industry, so

15   to speak, that it is industry custom and

16   practice of a wireless carrier having

17   equipment upgrades done to rely on the

18   contractors that are hired to do that work

19   to have their own safety protocols and

20   procedures in place?

21        MR. JOHNSON:  Object to the

22   form.

23        MR. DEAN:  Object to the form.

**www.AmericanCourtReporting.com**
**August 23, 2007**

1    A.    They may, in fact, rely upon it

2    and do it as you stated.  But the law and

3    OSHA rules and regulations under 29 CFR,

4    Federal Rules and Regulations, 1926.16

5    entitled Rules for Construction ", in

6    essence you can contract away for the

7    actual work to be performed but in no case

8    shall the prime contractor", that's

9    Cingular in this case, "be relieved of the

10   overall responsibility for compliance with

11   the requirements of this part for all work

12   to be performed under the contract.  So

13   therefore, you cannot contract away your

14   duty and responsibility."

15        That's the reason OSHA will hold

16   the prime contractor, in this case

17   Cingular, as the controlling employer and

18   therefore they could and should have issued

19   the same citations to Cingular as they did

20   to the other employers on this job site.

21   Q.    Are you talking about the multi

22   employer liability doctrine?

23   A.    Absolutely.

**American Court Reporting**
**toll-free (877) 320-1050**

1      Q.   Okay.  We'll get to that in a

2   minute.  But in terms of industry custom

3   and practice, do you know whether or not,

4   in fact, that is how it works in the

5   wireless industry, that is the custom and

6   practice?

7      A.   I don't care what the practice

8   is.  I'm saying the law is going to stand

9   on its own two feet and say you cannot

10  contract away your duties and

11  responsibilities.  You're stuck with it

12  forever.

13     Q.   All right.  And again, we'll get

14  to that, believe me.  I'm just trying to

15  get an answer to my question.  Do you know

16  if that's how it works in the industry or

17  not?

18     A.   I have no idea.

19     Q.   Okay.  If there is testimony

20  that that is, in fact, how it works, you

21  wouldn't be able to dispute it, would you?

22     A.   I wouldn't dispute it, but I

23  don't agree with it either.  The law is the

1    law and it's going to stand on its own two

2    feet.

3            MR. JOHNSON:  Just try to answer

4    his questions.  I mean you know you've got

5    to...

6        Q.    (By Mr. Norris:)  Tell me what

7    you understand.  You said that Cingular had

8    representatives on site at various times.

9    Now, what do you understand about that?

10       A.    Mr. Wheeler's deposition, I

11   remember reading something about the

12   Cingular people that don't come on that job

13   site.  He even talked about a -- what did

14   he say, a mad hat?  I've forgotten the term

15   he used.  Yelling.  Loud.

16           MR. JOHNSON:  Is that what he

17   called it, a mad hat?

18           MR. DEAN:  Mad hat.

19       Q.    (By Mr. Norris:)  Anything

20   besides what you saw in Mr. Wheeler's

21   deposition, is there any knowledge you may

22   have about Cingular having any

23   representatives out there?

1    A.    Not that I recall.

2    Q.   And you mentioned that Cingular,

3    you thought, had input on schedules of

4    BetaCom's work.  What do you base that on?

5    A.    From Mr. Wheeler's deposition.

6    He's shortening his time frame with

7    deadlines.

8    Q.    Anything you understand about

9    Cingular's involvement, if any, does that

10   come from Wheeler's deposition?

11   A.    Really, yes.

12   Q.    Do you have any information at

13   all that Cingular reserved the right of

14   control over any of the employers out there

15   in terms of how they did their job?

16   A.    I don't think they were

17   directing the work, if that's what you're

18   asking.

19   Q.    Do you have any information that

20   Cingular somehow reserved right of control

21   over the site itself, the location, or any

22   speculation or conjecture?

23   A.    I'm not sure I'm -- how about

**American Court Reporting**
**toll-free (877) 320-1050**

1    repeating that question.  I didn't -- it's

2    getting late in the day for me.

3        Q.   That's all right.  I asked you

4    if you need a break, if you do you let me

5    know, okay?

6        A.    Okay.  Thank you.

7        Q.    Do you have any information,

8    outside of any speculation, conjecture or

9    assumption, that Cingular in any manner

10   reserved a right of control over the site

11   itself?

12       A.    Other than the deposition of

13   where it had come out, and the changing

14   schedule.  So apparently they had some

15   control of that site.  To me, I mean that's

16   not really speculation.  I'm relying now on

17   the deposition of Mr. Wheeler.

18       Q.    All right.  You're talking about

19   just a change in the timetable.  He

20   testified that they were supposed to be

21   done with their work on day X and they got

22   moved up two or three days to whatever day

23   it was.  Is that what you're talking about?

**www.AmericanCourtReporting.com**
**August 23, 2007**

1        A.    That's control of that job site

2    as far as that's the way I understand it.

3        Q.    All right.  What about in terms

4    of access to the job site, coming and

5    going, in and out, do you know if they

6    observed right of control over that?

7        A.    I have no idea.

8        Q.    Do you know if the employees or

9    employers that were out there had to obtain

10   permission or authority from somebody else

11   to be on the site at any given time?

12       A.    I have no idea.

13       Q.    You don't know if Cingular

14   controlled those things, do you?

15       A.    No.

16       Q.    Have you ever heard of Crown

17   Castle?

18       A.    I've heard the term.  They owned

19   the property, I think.

20       Q.    Do you know anything more about

21   that?

22       A.    No, sir.

23       Q.    Let me ask you about the multi

Page 279

1    employer liability doctrine.  You testified

2    that in your judgment Cingular could have

3    been determined by OSHA to be a controlling

4    employer; is that correct?

5         A.    That is correct.

6         Q.    And you also testified in your

7    judgment that WesTower and ALT could also

8    be found to be controlling employers; is

9    that correct?

10        A.    That is correct.

11        Q.    Is it your testimony you can

12   have more than one controlling employer on

13   a single site?

14        A.    Absolutely.  You can have more

15   than one correcting and you can have more

16   than one exposing.

17        Q.    What is a controlling employer?

18        MR. JOHNSON:  Object to the

19   form.

20        A.    The one who is in ultimate

21   control, that would be number one, and

22   anybody who has subcontractors beneath him.

23   So if we've got three different layers, we

Page 280

1   could have multiple controlling employees

2   for that phase of that work.

3        Q.    When you say ultimate control,

4   what do you mean by that?

5        A.    The one who has absolute control

6   from the top to the bottom.  He is the top

7   man, in essence.

8        Q.    Well, what is absolute control,

9   what does that mean to OSHA?

10       A.    The money starts here.

11            MR. JOHNSON:  Are we back to our

12   joke?

13       Q.    (By Mr. Norris:)  No, I'm not

14   following you.  What are the criteria that

15   you would look at?  If you were the one out

16   there that was doing the review, you were

17   still working at OSHA now, what would be

18   the criteria you would look at to determine

19   whether or not someone was the controlling

20   employer?

21       A.    Whose contract with who.  And

22   follow the chain of money.

23       Q.    Are you telling me that the

1 criteria are as simple as company A that

2 hires company B, company A is the

3 controlling employer?

4     A.    Absolutely.

5     Q.    Does it have anything to do with

6 controlling the manner in which the work is

7 done?

8     A.    Not necessarily, no.

9     Q.    Company A that hired company B,

10 they wouldn't necessarily need supervisory

11 authority according to your testimony; is

12 that right?

13     MR. DEAN:  Object to the form.

14     A.    That is correct.

15     Q.    They don't need any kind of

16 right of control; is that correct?

17     A.    As far as I know.

18     Q.    Can they be a controlling

19 employer if the contract they have does not

20 indicate such?

21     MR. DEAN:  Object to the form.

22     A.    Sure.

23     Q.    Can they be a controlling

1    employer if the industry custom between the

2    two companies is that the hiring company

3    does not interfere with or control the work

4    of the company they hire?

5              MR. DEAN:   Object to the form.

6              MR. JOHNSON:   Object to the

7    form.

8         A.    That's just playing word games.

9    They're ultimately in control and you

10   cannot contract away your duties and

11   responsibilities according to law.

12        Q.    Can you envision any scenario

13   where a company that hires another company

14   to do work would not be a controlling

15   employer?

16        A.    I can think of several

17   situations in which it would be -- I'll

18   give you a good example.  Maybe it'll

19   clarify it.  You're at this law firm and

20   the next law firm, these lawyers are legal

21   beavers, so to speak.  If the air

22   conditioner goes out, they're going to go

23   out and get them not a druggie or drunkie

Page 283

1    off the street, they're going to a

2    legitimate resource to come in and work on

3    the heating and air conditioning system.

4    So therefore, are they in a position to

5    have any control over those people, not

6    really.  That is a specialty area beyond

7    their normal scope of work, whereas

8    Cingular, in this case, would be within

9    their normal scope of work.

10       Q.    And you find support for that

11   where in the OSHA regs?

12       A.    It's just what I was taught in

13   the legal aspects of training at the OSHA

14   Institute.

15       Q.    Okay.  I appreciate that.  But

16   I'd love it if you could find a reference

17   to that in the OSHA regs that you've

18   printed out and have in front of you.

19       MR. JOHNSON:    Object to the

20   form.

21       A.    I just explained that's what I

22   was taught at the OSHA Institute.  But I

23   don't have any written documentation of

1   that.

2        Q.    Okay.   Any other scenarios you

3   can come up -- let me ask it this way then:

4   If company A hires company B, if they're

5   always situated whereas they are in a

6   similar type of work or have similar

7   interest, can you envision a scenario where

8   company A would not be a controlling

9   employer?

10       MR. JOHNSON:   Object to the

11  form.

12       Q.    (By Mr. Norris:)   As opposed to

13  your example of a law firm hiring somebody

14  to fix it's air conditioner?

15       A.    Not really.

16       Q.    What is the current state, if

17  you know, of OSHA's multi employer

18  liability document?

19       A.    I missed the first part of that.

20       Q.    What's the current state of

21  that, is OSHA still issuing citations based

22  on that document?

23       MR. JOHNSON:   Object to the

1    form.

2         A.    I'm not sure. I know there has

3    been a judge made a ruling here recently

4    and I'm not sure what OSHA is doing about

5    it, momentarily other than on hold, I

6    expect it will go to a review commission or

7    review panel.  I think OSHA is going to

8    challenge that decision.

9         Q.    What was the decision, your

10   understanding of it?

11        A.    I'm not sure of all the details

12   of it and I am not going to make any

13   comments on it other than the fact that I

14   know it has been challenged, or one man

15   made a ruling, so to speak, about OSHA's

16   multi employer citation policy and it was

17   not favorable to OSHA.  And to that extent,

18   that's all I know.

19        Q.    Do you know what part of the

20   multi employer liability doctrine was

21   addressed in that decision?

22        A.    No, sir.

23        Q.    Do you know what the issue in

**American Court Reporting**
**toll-free (877) 320-1050**

1   that case was?

2      A.   No, sir.

3      Q.   Do you know whether or not any

4   of the particular employers or people

5   involved in this case could be held liable

6   as a controlling employer in light of that

7   new decision?

8      A.   Because this happened before

9   that decision, therefore I think what was

10   in precedence on the day of this mishap

11   should prevail.

12      Q.   All right.  Thank you for that.

13   But my question is:  Do you know whether or

14   not any of the companies involved in this

15   case could be held liable as a controlling

16   employer under the multi liability doctrine

17   if it's upheld after that last decision we

18   just talked about?

19      MR. DEAN:  Object to the form.

20      MR. JOHNSON:  Same.

21      A.   I'm not in a position to answer

22   that question.  I don't know.

23      THE WITNESS:  Can I say

**www.AmericanCourtReporting.com**
**August 23, 2007**

Page 287

1   something off the record?

2        MR. JOHNSON:  It's his record

3   right now.  So before you can say anything,

4   let him let you say something off the

5   record.

6        MR. NORRIS:  I didn't hear him.

7   Did you say --

8        MR. JOHNSON:  He wanted to say

9   something off the record.  I don't know

10  what it is.

11      Q.   (By Mr. Norris:)  Let me just

12  say -- let me ask my next question and if

13  you want to talk to your lawyer -- not your

14  lawyer, the lawyers that have hired you on

15  a break, then that's fine.

16      MR. JOHNSON:  I'm not his

17  lawyer.  Let's get that straight.

18      MR. NORRIS:  I tried to fix

19  that.

20      MR. JOHNSON:  Okay.

21      MR. NORRIS:  Do you need to go

22  to the bathroom or something?

23      THE WITNESS:  No.

1              MR. NORRIS:   If that's the case,

2     let us know.

3              MR. JOHNSON:   I mean that's what

4     I wanted to know.

5              MR. DEAN:   It's a privilege

6     motion.

7         Q.   (By Mr. Norris:)   What is your

8     criticism, if any, of Cingular in this

9     case?

10        A.    That they were the ultimate in

11    controlling that job site and did not act

12    in a manner in which would be expected of

13    them under the OSHA multi employer work

14    site policy.

15        Q.    All right.   How did they not do

16    that?

17        A.    By not controlling the job site

18    to keep the two subject entities here,

19    BetaCom and ALT, off of that site, working

20    aloft on the same day.

21        Q.    Is that the same criticism you

22    have of WesTower?

23        A.    Correct.

1      Q.    Okay.   Any other criticisms

2  besides that of Cingular?

3      A.    Not really.

4      Q.    And tell me what you think

5  Cingular should or could have done that you

6  think would have been reasonable or

7  prudent?

8      A.    To evaluate the situation and

9  know that the -- who was going to be on

10  that job site which day doing what work and

11  knowing the circumstances of removing the

12  hazards of overhead work while the BetaCom

13  people were on that job site.

14      Q.    Do you have any evidence, Mr.

15  Turner, that Cingular knew that ALT and

16  BetaCom were going to be working on that

17  site at the same time and that they would

18  not communicate with one another as you've

19  described earlier when you said it was okay

20  if they worked on the same site as long as

21  they had a procedure in place.  Do you have

22  any idea that Cingular knew that was going

23  to happen?

Page 290

1          MR. DEAN:   Object to the form.

2          MR. JOHNSON:   Object to the

3    form.

4       A.   I think they had a duty to know

5    it was going to happen.

6       Q.   How would they have fulfilled

7    that duty?

8       A.   By controlling that job site.

9       Q.   Well, how specifically would

10   they have controlled the job site on that

11   particular day?

12      A.   You know who's going to be on

13   that job site, what the nature of that work

14   is going to be and whether or not you're

15   going to allow them on that job site that

16   day while that type of work is being done.

17   Somebody has got to take control.

18      Q.   Uh-huh.   I'm struggling trying

19   to get the same thing somebody else said.

20   With that answer, I've got to ask it.   Just

21   so I'm clear, I don't want there to be a

22   misunderstanding on this.

23          If BetaCom and ALT are working

**American Court Reporting**
**toll-free (877) 320-1050**

1   out there on the site at the same time with

2   the BetaCom people in the building and the

3   ALT people outside on the tower, as long as

4   they were communicating and had a procedure

5   in place you don't have a problem with

6   that?

7          MR. DEAN:  Object to the form.

8      A.   And following it?

9      Q.   Yeah, sure, and following it.

10  You don't have a problem with that; is that

11  correct?

12         MR. DEAN:  Object to the form.

13     A.   That is correct.

14     Q.   Okay.  Let me ask you this while

15  I'm thinking about it.  I want you to

16  assume for me the BetaCom people knew that

17  ALT was out on the tower because they were

18  working in the building, okay, assume that

19  for me.

20     A.   Correct.

21     Q.   And assume that a procedure was

22  in place that they would communicate with

23  one another and they were following that

**www.AmericanCourtReporting.com**
**August 23, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

1   procedure.  Whose responsibility would it

2   have been to have let the other one know

3   when the BetaCom crew decided they were

4   going to come out of the building, would it

5   have been BetaCom's crew to let ALT know

6   they were coming out?

7          MR. DEAN:  Object to the form.

8          MR. JOHNSON:  Same objection.

9      A.    I'll agree with that statement

10  because it's kind of like did the car stop

11  for the train or did the train stop for the

12  car.

13      Q.    Now, my question was:  Do you

14  have any information that Cingular knew

15  that ALT and BetaCom would work on the same

16  site at the same time but not allegedly

17  have this plan in place and follow this

18  plan to work safely together?  Do you have

19  any information that Cingular knew that

20  would happened?

21          MR. JOHNSON:  Object to the

22  form.

23      A.    No, sir.  However, I will say

Page 293

1   that they had a duty to know.

2       Q.   Let me ask you about the Alabama

3   statute you provided, 2511.  I don't recall

4   which exhibit that was.  I think it was --

5   what?

6           MR. JOHNSON:  22, Patrick, I

7   think.

8       Q.   (By Mr. Norris:)  Have you got

9   that in front of you?

10      A.   Yes, sir.

11      Q.   Do you know whether or not an

12  employer can be held liable for the safety

13  of someone else's employee where that

14  employer did not reserve the right of

15  control over the workplace?

16      A.   I don't see where it says in

17  this statute that he's got to reserve a

18  right to control.  He has got the duty, and

19  he can't contract away that duty.  So

20  therefore I don't understand what you're

21  trying to get to.

22      Q.   Do you know anything about the

23  application of this statute, other than the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 294

1  actual statute as you read it right here in

2  front of you?

3       A.    That is correct.

4       Q.    Would you agree with me in this

5  particular case that Cingular did not

6  create the hazard, with the hazard being

7  working aloft, people down below?

8            MR. DEAN:   Object to the form.

9       A.    I'll agree with that statement.

10 I never said Cingular was the creating

11 employer.

12      Q.    This is the first time I've

13 asked you about this, I'm not coming back

14 to something.  And would you agree that

15 Cingular's own employees were not exposed

16 to the hazard?

17      A.    If they were out there on that

18 job when they were on that tower, they were

19 exposed to it.

20      Q.    Say that one more time.

21      A.    If Cingular's employees were on

22 that job site while people were aloft, ALT

23 people was on that tower, they would have

**www.AmericanCourtReporting.com**
**August 23, 2007**

Page 295

1   been exposed to it and subject to an

2   exposing employer.

3        Q.   All right.  Now, do you know if

4   on the day of the accident Cingular had any

5   employees out there?

6        A.   I have no idea.

7        Q.   If they didn't, then they would

8   not have had any of their employees exposed

9   to the hazard.  That's common sense, isn't

10   it?

11        A.   That wouldn't be an exposing

12   employer, but they're still the controlling

13   employer.

14        Q.   Okay.  I'm just talking about

15   exposing now.

16        A.   Okay.

17        Q.   What is, just in your own words,

18   under the OSHA multi employer liability

19   doctrine, what is the definition of a

20   controlling employer?

21        A.   It goes back to the golden rule,

22   who has the gold makes the rules.  So

23   therefore they're in control.

1          Q.    Is that your understanding of

2    what it says?

3          A.    Yes, sir.

4          Q.    I think you said this already,

5    but Cingular was not cited by OSHA for any

6    violations in this matter; is that correct?

7          A.    I have not found any evidence of

8    it.

9          Q.    To your knowledge, they were

10   not?  To your knowledge, Cingular was not

11   cited?

12         A.    That's correct, because I have

13   seen no evidence of it.

14         Q.    Have you ever been asked to look

15   at a case involving a wireless industry?

16         A.    No, sir.

17         Q.    Getting back to your opinion

18   that Cingular is a controlling employer and

19   the duties they would have, would you agree

20   that one of the ways they could satisfy

21   their duty would be to make sure -- to make

22   it clear, as in the contract that you read

23   before, the NSORO contract, that the folks

1   that are out there on the job are following

2   their own safety procedure protocols?

3       A.   I think they had that duty.

4       Q.   Sir?

5       A.   I think they had that duty.

6       Q.   Okay.  If they did do that,

7   would that be one of the ways they could

8   satisfy their duty?

9       A.   Absolutely.

10      Q.   Obviously, you'd agree with me

11  that neither Cingular nor WesTower or

12  anybody involved, they can't have a person

13  there every single day, can they, on the

14  job site?  That's not practical, is it?

15          MR. JOHNSON:  Object to the

16  form.

17      A.   I think they could.  I don't

18  think it's required.

19      Q.   But it's not practical, is it?

20          MR. JOHNSON:  Object to the

21  form.

22      A.   Depending on the circumstance.

23      Q.   Well, real world, that's what

1    we're talking about here.

2              MR. DEAN:   Object to the form.

3        A.    Well, we're talking about

4    people's lives, too.

5        Q.    Are you familiar with -- well, I

6    can't ask you about wireless since -- are

7    you familiar with a construction -- no, I'm

8    not going to ask you that.

9              With a controlling employer,

10   their duties on the job site, are their

11   duties the same no matter whether or not

12   you're talking about its own employees

13   versus another employer's employees, or is

14   that controlling employer's duty greater

15   than or less than?

16             MR. DEAN:   Object to the form.

17             MR. JOHNSON:   Object to the

18   form.

19       A.    I think all that responsibility

20   makes it greater.

21       Q.    I think I'm going to agree with

22   this plaintiff lawyer.   That was a terrible

23   question.   I'm going to ask it again.

Page 299

1              When you're talking about a

2    controlling employer and what duties it has

3    on a job site, do its duties change if

4    you're looking at them as what they owe to

5    its own employees versus what they owe to

6    another contractor's employees?

7         A.    They owe the same duty to

8    everyone on that job site.

9         Q.    You've been today talking about

10   reasonable and prudent, and what is

11   reasonable and prudent for Randy Wheeler,

12   who was the lead person on the BetaCom

13   crew.

14        A.    To assure --

15        Q.    What?  I didn't even ask the

16   question yet.

17             MR. JOHNSON:  I objected and

18   he's just talking.

19             MR. NORRIS:  I was just setting

20   up the question.

21        Q.    (By Mr. Norris:)  On the day of

22   this accident, that morning, he sees the

23   tower crew come inside, the equipment