FILED

2008 Oct-07  AM 08:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN  DIVISION

| | | |
|---|---|---|
| **JENNIFER MARIE COTTON, et. al.** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **CV-06-BE-1486-E** |
| | } | |
| **BETACOM, INC., et. al.** | } | |
| | } | |
| **Defendants.** | } | |
| | } | |

## MEMORANDUM OPINION

This matter is before the court on "Motion for Summary Judgment by Westower Communications, Inc." (doc. 122). WesTower disputes its liability under the First Amended Complaint's Count Two for Negligence/Wantonness and Count Four under the doctrine of *res ipsa loquitur*.  For the reasons stated in this memorandum opinion, the court will GRANT WesTower's motion and will enter judgment in favor of WesTower, dismissing it as a Defendant in this case.

## I.  FACTS

Viewed in the light most favorable to the Plaintiff (*see Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007)), the following facts are material to the resolution of the instant motion.

This case arises out of an on-the-job accident that occurred on March 10, 2006 at a

1

cellular phone tower site in Talladega, Alabama.  Crown Castle leased the tower site to Defendant Cingular Wireless, LLC "Cingular" who in turn hired NSORO  to carry out antenna modifications on the 400-foot tower.[1]  NSORO then hired WesTower Communications, Inc. ("WesTower"), and WesTower contracted with Defendant ALT, Inc. ("ALT") as a contractor to perform the antenna modification.  Cingular had also contracted with  Beta Com, Inc. ("Beta Com")  to perform radio equipment upgrades at the site.  WesTower had no contractual relationship with Beta Com.

The day of the accident, two crews were working at the tower site: Beta Com and ALT. Beta Com's work took place primarily inside a new concrete equipment shelter on site at the base of the tower.  Beta Com's crew consisted of four employees, including the Plaintiff, Charles R. Wheeler, who was the crew leader and responsible for the safety of the Beta Com crew at the job site.  He testified that it was his duty "to make sure that there was no hazardous things that would hurt" him or his co-employees.  Wheeler and some of his crew members, including "Bubba" Cotton,  had been working at the site off and on for approximately ten days.

The three-member ALT crew had worked on site the day before the accident, but had spent time in the equipment shelter with the Beta Com employees, because the weather was not suitable for tower work.  The men from the two crews visited with each other and talked about their tower experiences.  At the end of the day on March 9, 2006, ALT left tools and supplies in the shelter.  Because these tools and supplies were "ground work" equipment, Wheeler understood that the ALT crew would not be working overhead the next day.  However, on March 10, 2006, the day of the accident, ALT performed work in the tower; they were engaged in the

---

[1] Neither Crown Castle nor NSORO are presently parties to this action.

2

removal and replacement of antennas and other equipment from the cell tower.

On the morning of March 10, 2008, Wheeler and Cotton arrived and began working inside the concrete shelter near the tower.  The Beta Com crew could not see or hear any work being performed on the tower from inside the shelter.   Wheeler and Cotton both knew that the ALT crew was also working on site that day, but Wheeler testified that he had understood that ALT would be working on the ground, not overhead in the tower.  A Cingular employee told him a few days before that the ALT crew would be working up in the tower on Monday, March 13, 2006, and based on that statement and the ground work equipment ALT had left in the shelter, he understood that ALT would not climb the tower before the next Monday.  He also testified that no one told him or told anyone else in his presence that ALT would be working in the tower that day nor did he hear any noises from the tower.

When the ALT crew arrived on site on March 10, the ALT crew leader, Josh Cook, gathered the tools from the shelter where Cotton and Wheeler were working.  ALT then spent approximately two hours setting up the ropes on the tower.  Neither Cingular nor WesTower provided ropes to ALT for use on this project; an ALT employee had purchased the ropes used in the rigging.  At 11:30 a.m., while ALT was rigging those ropes, Wheeler walked from the shelter to a truck to get a cable and then back to the shelter.  He claims that he did not notice anyone working in the tower or hear noise coming from the tower, but he also did not see the ALT crew working on the ground.  Wheeler was looking down at his wiring diagram and studying it on the way to the truck, and was unconcerned with the ALT crew at that time.  During the rigging process, two more Beta Com employees arrived and walked across the tower site to the shelter building.  Those two employees noticed the ALT crew on the tower and once they were inside

3

the building, they discussed out loud the work that ALT was doing in the tower.  They did not

know whether Wheeler heard their conversation, and Wheeler claims that he did not.

Shortly before the accident, the ALT employees in the tower signaled to ALT crew

leader, Josh Cook, that they were ready to lower the first antenna.  Cook  walked over to the

shelter to insure that the Beta Com crew members were inside, but he did not enter the building

and tell them what his tower crew was doing.   Cook then walked back to the spot where he

could operate a hoist to lower the antenna.

Wheeler and his crew exited the shelter to go lunch as the ALT crew was in the process

of lowering an antenna from the tower.  Wheeler left the building first and Cotton walked out

last.  The Beta Com crew had to cross the 200-foot radius drop zone to reach their vehicles.  As

they walked out of the equipment shelter, none of the Beta Com crew members – not even the

two who knew that ALT was working on the tower – looked up to see what was happening on

the tower.  As the Beta Com employees exited the shelter, a polypropylene rope used to attach

one of the antennas broke and caused the antenna to fall from a height of about 250 feet.  The

ALT crew members called out the warning "headache" to signal a falling object, and Mr.

Wheeler claims that he dove under a truck and injured his back to escape the falling antenna.

The 50-pound antenna struck and killed "Bubba" Cotton.

The Talladega site was one of many tower projects on which Wheeler and Cotton had

worked.  Both men had received formal tower training and had climbed towers to raise, lower

and install equipment.  Wheeler began working on towers in 1985 and had climbed

approximately 400 towers in the past, while Cotton had worked on towers for approximately one

year before he moved to ground-level equipment work.  Wheeler had been a crew leader off and

on for Beta Com approximately eight years at the time of the accident.   Wheeler knew that items could fall from towers and that they might fly out from the tower over significant distances.  He testified, "I have seen things ricochet as far as, you know, a hundred and fifty feet away from a two hundred foot tower."  In recognition of the fact that items can fall from towers, Betacom's safety policy provides that, "*[h]ard hats . . . be worn by the grounds personnel when there is someone on the tower.*"  (§ 5.05 Tab 2, p. 104).  Neither Wheeler nor any of his other crew members was wearing a hard hat at the time of the accident.  Each cell tower is surrounded by a drop or fall zone whose radius is half the height of the tower; the Talladega tower in question was about 400 feet high, so the radius of its drop zone was 200 feet.

WesTower had no employees on site on the date of the accident.  It did, however, have a contract in effect with ALT.   The contract in place between ALT and WesTower provides that ALT is an independent contractor.  Specifically, it provides as follows:

> Neither subcontractor [ALT] nor its lower tier subcontractors, nor the employees or agents of any of them, shall be deemed to be WesTower employees or agents, it being understood that Subcontractor and its lower tier subcontractors are independent for all purposes and at all times, and Subcontractor shall be wholly responsible for withholding and payment of all Federal, state and local income and other payroll taxes with respect to its employees, including contributions from them and as required by law.  **Subcontractor further acknowledges and agrees that it retains full right of control and supervision over the performance of the Work and the full right of control over the employment, direction, means, methods, assignment, compensation and discharge of all of its employees, agents, or subcontractors.**

(emphasis added) (Ex. C, WesTower/ALT subcontract, p. 5).

Further, the contract provides that ALT shall have the following general duties and responsibilities:

> (a)      Subcontractor, at its own cost and expense, shall provide or cause

to be provided, design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and any and all other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated into the Work.

(e)     Subcontractor shall use its best skill in the performance of the Work and shall utilize only qualified and appropriately licensed personnel, subcontractors, and other professionals, as applicable, selected and paid for by Subcontractor.

(g)     Subcontractor shall be responsible for and shall coordinate all construction means, methods, techniques, sequences and procedures, and all portions of the Work.

(j)     Subcontractor shall comply with all laws, ordinances, rules, regulations and lawful orders of public authorities, including, without limitation, the provisions of the Fair Labor Standards Act of 1938, as amended, and all other laws applicable to Subcontractor as an employer or Subcontractor of labor or otherwise.  Subcontractor shall review all laws, rules, regulations, building codes, electrical codes applicable to the design and construction of a Site, correlate such laws with the Contract Documents, and advise WesTower if any changes therein are necessary to comply with such laws.

(emphasis added) (Ex. C, WesTower/ALT subcontract, p. 1-2).

As to safety and health issues on the job site, the subcontractor, ALT,  had the following

responsibilities:

(a)     Subcontractor shall be solely responsible for conducting its operations under this Agreement to avoid risk of harm to the health and safety of persons and property and for inspecting and monitoring all of its equipment, materials and work practices to ensure compliance under this Agreement. Subcontractor shall be solely responsible for adopting or developing and implementing a safety & health plan pursuant to the terms of Exhibit A, which is incorporated herein by reference, and to further abide by all Laws, rules and regulations of any Governmental Body concerning safety and environmental protection, including, but not limited to the Occupational Safety Health Act (OSHA), all Rules and Regulations established pursuant thereto, and all Amendments and Supplements thereto, and rules and regulations promulgated by any State operated safety and health agency established thereto.  Subcontractor acknowledges that compliance with the standards set forth in Exhibit A does not

relieve Subcontractor of its obligations to identify and address hazards not
covered by its standards or the terms of Subcontractor's safety and health
program.  Any Subcontractor safe practice, which differs from the safety
requirements or standards, contained in this Agreement may only be implemented
if it meets or exceeds the requirements contained herein.  Nothing contained
herein precludes the implementation and application of safety and health
provisions, which meet, exceed or supplement the requirements herein.

(b)     Subcontractor shall assume all responsibility and liability with
respect to matters regarding the safety and health of its employees of lower tier
subcontractors and suppliers and shall ensure that all of such subcontractors or
suppliers fully comply with the safety and health provisions contained in this
Agreement.

(c)     Subcontractor's failure to correct any unsafe condition or unsafe
act by its employees, subcontractors of any tier, or suppliers may at the sole
discretion of WesTower, be grounds for an order by WesTower to stop the
affected work or operations until the unsafe act or condition is corrected to
WesTower's satisfaction at Subcontractor's sole expense.  If the unsafe act or
condition at Subcontractor's expense and backcharge Subcontractor for the costs
associated with corrected the condition and/or may immediately terminate this
Agreement.  Unless otherwise specified by WesTower, Subcontractor shall
furnish all safety equipment required for the Work, require the use of such safety
equipment, and provide safety instructions to its employees and subcontractors of
any tier.

(d)     Subcontractor represents and warrants that none of its employees,
agents, or lower tier subcontractors shall be permitted to climb a tower unless
properly certified as having been trained in accordance with this Agreement, and
as required by all applicable Laws, rules, regulations and in accordance with
WesTower's policy.

(e)     Subcontractor shall develop and apply the necessary controls to
ensure the quality of products and/or services based on existing proven working
routine and practices that best reflects WesTower's planned and systematic
approach toward achieving and maintaining the highest level of quality during all
Work.  WesTower reserves the right to issue a "stop work" order at any time
during the Work, when significant adverse quality trends and/or deviations are
identified.

(Ex. C, WesTower/ALT subcontract, p. 4).

No WesTower employee was at the site on the date of the accident, but Jeremy Porch, a

WesTower employee, visited the site ten days before the accident and inspected ALT's rigging equipment.  Another WesTower employee, Joe Williams, spoke to ALT employees over the phone in the days leading up to the accident.  At one point, Williams pulled the ALT crew off the site, because numerous crews from other companies were on the site and working outside around the tower and the site was too congested.  Subsequently, the ALT crew resumed work at the site. Cook tried to get in touch with Williams during the week of the accident because he was uncomfortable about Beta Com working under him.  Williams was on vacation, but called Cook back and suggested that the contractors work together to try to resolve the matter.  The last time that the ALT crew spoke over the phone to WesTower about the status of the work was on March 7 or March 8, a couple of days before the accident.

Plaintiffs, Jennifer Marie Cotton and Jessica Michelle Cotton are the minor dependant children of Mr. Cotton and bring this wrongful death action through their mother, Patricia Ann Cotton against WesTower and other Defendants.

## II.  STANDARD OF REVIEW

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying [the evidence that demonstrates] the absence of a genuine issue of material fact. *Id.*  at 323.  After the moving party demonstrates an absence of evidence to support the nonmoving party's case, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.  A dispute of material fact is genuine if a reasonable jury, applying the relevant law to the evidence presented, could return a verdict for the nonmoving party.  *See Barfield v. Brierton*, 883 F.2d 928, 933 (11th Cir. 1989).

When considering a motion for summary judgment, a court must view the facts "in the light most favorable to the non-moving party . . . . ." *Harris*, 127 S. Ct. at 1776.  The court does not "weigh the evidence and determine the truth of the matter" but rather, simply focuses on whether a genuine issue of material fact exists.  *Anderson,* 477 U.S. at 249.   Where a reasonable fact finder may "draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007).  "[T]he plain language of Rule 56( c) mandates the entry of summary judgment, after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

9

### III.  DISCUSSION

In their First Amended Complaint, the Cotton Plaintiffs include two counts against WesTower: Count Two for Negligence/Wantonness and Count Four for liability under the doctrine of *res ipsa loquitur*.  The court will address each theory separately.

### A. Count Two: Negligence/Wantonness

In Count Two of their First Amended Complaint, the Cotton Plaintiffs allege that WesTower was under a duty to exercise ordinary and reasonable care, and it negligently and/or wantonly breached that duty.  The court has carefully examined the briefs of the parties and the evidence presented on the record.  Based on that examination, the court finds that WesTower is not liable for its own, direct actions.  WesTower had no employees or agents at the tower site in the week prior to the accident, and the court finds that no evidence on the record otherwise establishes that WesTower's own actions gave rise to a duty or represented a breach of any duty.

Plaintiffs claim, however, that WesTower is vicariously liable for the actions or purported negligence and/or wantonness of its contractor, ALT.  WesTower disagrees, asserting that ALT was an independent contractor specializing in tower construction and tower maintenance, and that WesTower is not liable for the alleged negligent or wanton acts of its independent contractor.

To determine whether ALT is an independent contractor of WesTower, the court looks to the contract between the parties and to the conduct of WesTower.  Having examined the contract between the parties, the court finds that the express provisions of the contract state that ALT is an "independent" contractor and further state that  ALT – not WesTower – controls **"all construction means, methods, techniques, sequences and procedures, and all portions of the

Work."  Although the contract does provide for WesTower's retention of the right to supervise or inspect ALT's work, Alabama law provides that such retention to ensure compliance with the terms of an agreement does not convert the relationship from one of independent contractor to agent.  *Pate v. United States Steel Corp.*, 393 So. 2d 992, 995 (Ala. 1981).

The court has also examined the record regarding the conduct of WesTower to see if its actions contradict the terms of the contract.  As noted previously, the parties stipulated to the fact that WesTower had no employees or agents at the tower site in the week prior to the action and to the additional fact that WesTower had no knowledge of the manner in which ALT rigged the tower on the day of the accident.  The ALT crew leader testified that he determined the method and means by which the work was to be performed, and no evidence contradicts this testimony.  Accordingly, the evidence does not demonstrate the WesTower controlled the manner and means by which ALT performed its work.  Thus, the court finds that ALT is a true independent contractor of WesTower, and further finds that WesTower is not liable for the alleged negligence and/or wantonness of ALT.

Accordingly, the court finds that Plaintiffs fail to create a genuine issue of material fact as to WesTower's liability under Count Two of the First Amended Complaint.  Thus, the court will grant the motion and enter judgment in favor of WesTower on Count Two..

### B.  Count Four: *Res Ipsa Loquitur*

The only other count of Plaintiffs' First Amended Complaint that names WesTower is Count Four.  Count Four alleges that WesTower "had full management and control of the antenna(s) which struck Cotton causing his injury and death," that the accident would not have happened if those with control were not negligent, and that WesTower is liable under the

11

doctrine of *res ipsa loquitur*.

To establish a *prima facie* case under this doctrine, Plaintiffs must provide evidence supporting the following elements: "(1) [T]he defendant must have had full management and control of the instrumentality which caused the injury; (2) the circumstances must be such that according to common knowledge and the experience of mankind the accident could not have happened if those having control of the management had not been negligent; and (3) the plaintiff's injury must have resulted from the accident." *Ex parte Mobile Power & Light Co., Inc.*, 810 So. 2d  756, 759 (Ala. 2001) (quoting *Khirieh v. State Farm Mutual Auto Ins. Co.*, 594 So. 2d 1220, 1223 (Ala. 1992)) (citations omitted).

In the instant case, no evidence exists that WesTower had full management or control of the antenna that struck Cotton; to the contrary, the undisputed evidence demonstrates that no WesTower agents or employees were present at the tower site on March 10, 2006.  Further, this court has found that ALT is an independent contractor of WesTower, that WesTower exercised no control over the manner and means by which ALT performed its tower work,  and that WesTower is not liable for ALT's alleged negligence and/or wantonness.  Accordingly, Plaintiffs' *prima facie* case against WesTower fails as a matter of law and the court will GRANT summary judgment in favor of WesTower on Count Four of the First Amended Complaint.

Because no other claims remain against WesTower in the First Amended Complaint, the court will GRANT its motion for summary judgment as a matter of law, will ENTER judgment

in its favor, and will DISMISS WesTower as a Defendant in the instant case.

      Dated this 7th day of October, 2008.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE